Robert J. Feinstein, Esq. (admitted *pro hac vice*)
Bradford J. Sandler, Esq. (admitted *pro hac vice*)
Debra I. Grassgreen, Esq. (admitted *pro hac vice*)
Shirley S. Cho, Esq. (admitted *pro hac vice*)
PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 34th Floor
New York, NY 10017-2024
Telephone: (212) 561-7700
Fax:  (212) 561-7777
Email:  rfeinstein@pszjlaw.com
      bsandler@pszjlaw.com
      dgrassgreen@pszjlaw.com
      scho@pszjlaw.com

*Lead Counsel to the Official Committee of
Unsecured Creditors*

Robert S. Westermann (VSB No. 43294)
Brittany B. Falabella (VSB No. 80131)
HIRSCHLER FLEISCHER, P.C.
The Edgeworth Building
2100 East Cary Street
Richmond, Virginia 23223
P.O. Box 500
Richmond, Virginia 23218-0500
Telephone: (804) 771-9500
Facsimile: (804) 644-0957
Email:  rwestermann@hirschlerlaw.com
      bfalabella@hirschlerlaw.com

*Local Counsel to the Official Committee of
Unsecured Creditors*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

|  |  |  |
|---|---|---|
| In re: | x : | **Chapter 11** |
| **CHINOS HOLDINGS, INC., et al.,** | : : | **Case No. 20-32181 (KLP)** |
| Debtors.[1] | : : | **(Jointly Administered)** |
|  | x |  |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
TO CONFIRMATION OF DEBTORS' JOINT PLAN OF REORGANIZATION**

The Official Committee of Unsecured Creditors (the "Committee") of Chinos

Holdings, Inc., *et al.* (the "Debtors") respectfully submits this objection (the "Objection") to the

confirmation of the *Amended Joint Prearranged Chapter 11 Plan of Reorganization of Chinos

Holdings, Inc. and Its Affiliated Debtors* [Docket No. 706] (as may be further amended or

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Chinos Holdings, Inc. (3834); Chinos Intermediate Holdings A, Inc. (3301); Chinos Intermediate, Inc. (3871); Chinos Intermediate Holdings B, Inc. (3244); J. Crew Group, Inc. (4486); J. Crew Operating Corp. (0930); Grace Holmes, Inc. (1409); H.F.D. No. 55, Inc. (9438); J. Crew Inc. (6360); J. Crew International, Inc. (2712); J. Crew Virginia, Inc. (5626); Madewell Inc. (8609); J. Crew Brand Holdings, LLC (7625); J. Crew Brand Intermediate, LLC (3860); J. Crew Brand, LLC (1647); J. Crew Brand Corp. (1616); J. Crew Domestic Brand, LLC (8962); and J. Crew International Brand, LLC (7471). The Debtors' corporate headquarters and service address is 225 Liberty St., New York, NY 10281.

modified, the "Plan") filed on August 10, 2020 (only one week before the deadline to file this Objection).[2]  In support of the Objection, the Committee respectfully represents as follows:

# I.

## PRELIMINARY STATEMENT

The Plan cannot be confirmed because it is based on a flawed valuation that overpays secured creditors and underpays unsecured creditors.  Specifically, the oversecured Term Loan Lenders stand to receive new equity worth at least approximately $150 - $205 million in excess of the full amount of their claims plus the allocable portion of the New Equity Allocation on account of the proposed DIP-to-exit fee, which is estimated to be not less than $186 million - $351 million as discussed below.  The undersecured IPCo Noteholders stand to receive new equity worth well in excess of the value of the limited subset of Debtors (the IPCo Debtors) who are obligated on the IPCo Notes and who have no interest in the "crown jewel" Madewell business that is the primary driver of the value of the new equity to be issued under the Plan.[3]  The Plan significantly underpays unsecured creditors who, unlike the IPCo Noteholders, have claims against Debtors which have an interest in the Madewell business.  Importantly, the proposed equity splits under the Plan are based on a presumed enterprise value of $1.75 billion. The Debtors have since revised their presumed enterprise value to $1.84 billion.[4]  ***However, neither the value used to negotiate the Transaction Support Agreement, nor the value presented in the Disclosure Statement is anywhere close to the true value of this enterprise***.  ***At the true valuation, Class 6-A and Class 6-B unsecured creditors should be paid in full.***

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan.

[3] The IPCo Noteholders are also proposed to receive their allocable portion of the New Equity Allocation to the extent that they are also DIP Lenders.

[4] "Lazard estimates that the potential range of Enterprise Value of Reorganized Chinos Holdings is approximately $1.66 to $2.03 billion." (Disclosure Stmt. Ex. D.)  $1.84 billion is the midpoint.  It should be noted by the Court that the Transaction Support Agreement and the new equity allocation, predicated on a $1.75 billion enterprise value, for the Term Lenders and the IPCo Noteholders were negotiated by the Debtors and the applicable Settling Parties prepetition, at the nadir of the market's COVID expectations, and despite the Debtors now acknowledging that value has increased from the $1.75 billion figure, no changes were made by the parties to the new equity splits previously negotiated and used in the TSA.

The lynchpin of the Debtors' undervaluation of this enterprise is a *$1 billion* undervaluation of the Madewell business and assets -- a gross undervaluation that is based on the use of valuation metrics that are contrary to generally accepted valuation principles. This undervaluation cannot be justified by the current COVID situation—particularly in light of the dramatic rebound of the capital markets from the lows of March and April and the Debtors' positive performance to date that has far out-paced budgeted projections in every week of these cases through the week ending August 8, 2020, leaving the Debtors with significant cash liquidity ███████████████████████ as discussed in detail further below.

The Committee has engaged one of the foremost valuation experts in the country, Dr. Israel Shaked of The Michel-Shaked Group, who has identified material deficiencies and errors in the Debtors' valuation. For instance, the Debtors' valuation is based on a flawed calculation of the weighted average cost of capital (WACC), which is a critical input into a discounted cash flow (DCF) valuation methodology. Specifically, Lazard, the Debtors' enterprise valuation expert, utilized an abnormal beta distorted by the extreme market volatility due to the COVID-19 pandemic. By doing so, Lazard's valuation assumes that the impact of COVID-19 will impact J. Crew and Madewell's cash flows in perpetuity, which is contrary to accepted valuation methodology (and is, in fact, internally inconsistent with the valuation methodology taken by the Debtors' other valuation professional), which supports the use of a beta calculated during a normal period with normal market volatility to correct for the impact of such volatility over the long-term. The projected cash flows already reflect the impact of COVID-19. By using an abnormal beta, the Debtors are double counting the impact of the COVID-19 pandemic.

Had Lazard correctly used a normalized beta consistent with standard valuation methodology, its DCF calculation of total enterprise value for J. Crew and Madewell combined would have increased to a total of $2.693 billion. Correcting for this error and other errors and deficiencies in the Debtors' valuation results in J. Crew and Madewell being correctly valued at

$2.9 billion – the total enterprise value ascribed to the Debtors' businesses by the Committee – as demonstrated in the MSG Expert Report and MSG Expert Rebuttal Report.[5]

In order to place the Committee's Objection to the Plan in context, it is important to understand two salient features of the Debtors' capital structure and the Plan.  First, although the Debtors are part of a single, affiliated corporate family whose Chapter 11 cases are being jointly administered, the 2017 Transaction (as defined in the Disclosure Statement and discussed further herein) resulted in a bifurcated capital structure under which there are two separate Debtor groups, each with its own distinct set of creditors, and each having pledged different collateral in favor of its respective secured creditors[6]:

- The IPCo Noteholders' Debt/Collateral.  The IPCo Debtors are the sole obligors on the IPCo Notes and only their assets secure the IPCo Notes Claims – not any of the assets of the other Debtors (referred to as the "Loan Debtors" in the Plan; referred to herein as the "Non-IPCo Debtors"), including most notably the Madewell business and assets.  The IPCo Noteholders' collateral is basically limited to certain domestic "J. Crew" trademarks and intellectual property ("J. Crew IP").

- The Term Lender Debt/Collateral.  Substantially all of the Non-IPCo Debtors are liable on the Term Loan Claims, which are secured by liens on the vast majority of the assets of the Non-IPCo Debtors, including the assets of Madewell and the remaining assets of J. Crew (other than the J. Crew IP).

Generally speaking, the general unsecured creditors whose interests are represented by the Committee have claims against the Non-IPCo Debtors which, unlike the IPCo Debtors, have direct or indirect interests in the Madewell business.

Second, although the Debtors are composed of two separate Debtor groups with distinctly different groups of creditors, the Plan proposes to give the IPCo Noteholders and the Term Lenders new equity in the reorganized parent company of which ***both*** Debtor groups will be direct and indirect subsidiaries -- new equity whose value will be the combined value of both

---

[5] Certain of the Debtors' valuation errors are described further in Section IV.A hereof.  A copy of the Expert Rebuttal Report of The Michel-Shaked Group dated August 7, 2020, attached hereto in redacted form as **Exhibit B** (the "MSG Expert Rebuttal Report").

[6] Attached hereto as **Exhibit A** is a corporate organization chart which shows, *inter alia*, the respective Debtor obligors/guarantors with respect to the Term Loans and the IPCo Notes.

4

Debtor groups and will be driven largely by Madewell's value.  It is this construct that, if approved, would allow the Term Loan Lenders and the IPCo Noteholders to receive more than 100% of the value to which they are entitled.  In both cases, this overpayment would come at the expense of the general unsecured creditors whose claims are asserted against the Non-IPCo Debtors.

Specifically, as reflected in the MSG Expert Report[7] and Province Expert Report,[8] the Plan provides the Term Lenders with an overpayment of at least **$150 - $205 million** in new equity (depending on net debt assumptions).[9]  That excess value should be realized by general unsecured creditors, not the Term Lenders.[10]

Likewise, based on the Committee's valuations, the IPCo Noteholders will be grossly overpaid under the Plan by at least **$47 - $64 million**.  This is because the value of the new equity that they will receive under the Plan is far in excess of the value of their limited pool of collateral - the J. Crew IP.  The IPCo Noteholders' recovery as secured creditors should be limited to the value of J. Crew IP  (estimated at $180 million by the Committee's expert), and the recovery on the IPCo Noteholders' unsecured deficiency claims should be limited to the value of the remaining assets of the IPCo Debtors.  An accurate valuation would result in the IPCo Noteholders being entitled to a Plan recovery, on account of their $411.6 million in secured and

---

[7] The sealed *Expert Report of The Michel-Shaked Group* dated July 31, 2020 (the "MSG Expert Report") is attached as **Exhibit B** to the *Motion of the Official Committee of Unsecured Creditors to File Under Seal (I) Expert Report of the Michel-Shaked Group and Executive Summary Thereof; and (II) Province Expert Report* [Dkt. No. 679] (the "Seal Motion"); the redacted MSG Expert Report is attached as **Exhibit B** to the N*otice of Filing of (I) Unredacted Province Expert Group; (II) Redacted Expert Report of the Michel-Shaked Group and Executive Summary Thereof; and (III) Revised Proposed Order* [Dkt. No. 767] (the "Redaction Notice").

[8] A copy of the *Province Expert Report* dated July 31, 2020 (the "Province Expert Report") is attached as **Exhibit A** to the Redaction Notice.

[9] The Term Lenders' aggregate recovery is the product of 76.5% times [Equity Value (*i.e.*, $2.9 billion TEV minus $600 million in Net Debt) less the Backstop Fee ($40 million in new equity) and the purported Exit Fee (15% of the Equity Value)].  As discussed further herein, the Term Lenders who are also DIP Lenders stand to also recover under the Plan the purported Exit Fee, which as discussed herein is unjustified and excessive.

[10] The Committee has separately filed certain pleadings, discussed herein, further addressing a number of the Plan's critical defects.  The Committee requests the Court to take judicial notice of the record of these related pleadings and proceedings.

unsecured claims, of $345.3 million in value.[11]  Yet under the Plan, the IPCo Noteholders will

receive substantially more value than this, in the form of the remaining share of the new equity

of the Reorganized Debtors that is not allocated to the Term Lenders, the excess value of which

over the $343.5 million in value to which the IPCo Noteholders  are entitled  is no less than

approximately $47 - $64 million.[12]  That excess value belongs to the general unsecured creditors

of the Non-IPCo Debtors.[13]  Based on the Committee's evidence, it is clear that the IPCo Notes

Claims, which have recourse only to limited intellectual property assets held by a few Debtors

and an intercompany claim and have no recourse whatsoever to any of the assets or value of any

of the other Debtors, are to be provided a recovery significantly higher than the value to which

they are entitled, by receiving a disproportionately high share of the equity value attributable to

*all Debtors as a consolidated enterprise*.  The IPCo Noteholders, who bargained for claims and

liens only against the IPCo Debtors, are receiving a windfall by sharing in the value of the assets

of the Non-IPCo Debtors, including the crown jewel - the Madewell brand.  As set forth further

below, the vast majority of the IPCo Note debt and the Term Loan debt in these cases are held by

the same hedge funds, but, this Plan is not premised on substantive consolidation, and there is

simply no basis under the law or commonly accepted principles of valuation for the Term

Lenders/ IPCo Noteholders to run away with the value of these companies at the expense of

general unsecured creditors.

    In addition to the overpayment of equity, both the IPCo Noteholders and the Term

Lenders are also proposed to be paid the exorbitant DIP-to-exit fee agreed upon under the TSA

that grants 15% of the reorganized equity ("New Equity Allocation") to the Term Lenders and

---

[11] As set forth in the Province Expert Report, using the Committee's valuations in a proper waterfall analysis adhering to the priority scheme under the Bankruptcy Code, the IPCo Noteholders would recover approximately $345 million in value, which takes into account, *inter alia*, a nearly full recovery on a large intercompany claim against J. Crew Group, Inc.

[12] This estimate does not take into account the overpayment, by another $186 million in the form of the DIP Lender Securities (discussed infra) proposed to be paid as a purported DIP fee, to the IPCo Noteholders and Term Lenders who are also DIP Lenders.

[13] In stark contrast to the classification scheme applied to the Term Lenders' secured claims and deficiency claims (if any), the IPCo Notes Claims (both secured and deficiency claims) are placed into a single class (Class 5) under the Plan.

6

IPCo Noteholders who signed on to become DIP Lenders plus 15% of warrants at a strike price of $1.75 billion ("New Warrants").  The Court will recall that after objections were raised, the consideration of the DIP-to-Exit Fee was deferred to confirmation.  Under any valuation adopted by this Court, the payment of the New Equity Allocation cannot be approved.  At the Debtors' (under) valuation of the reorganized Debtors at $1.84 billion, the New Equity Allocation alone is worth *$186 million*.  This amount does not include the substantial value of the New Warrants which, even at a strike price equal to the current equity value, would have substantial value based on commonly accepted principles of valuing  their "option value."  Meanwhile, based on the Committee's valuation of the reorganized Debtors, the New Equity Allocation is a jaw-dropping *$351 million*.  The expense is excessive as compared to the amounts actually used to date under the DIP Facility or even compared to the full $400 million size of the DIP Facility projected to be available upon emergence.  Payment of the New Equity Allocation reduces, on a dollar-for-dollar basis, the value that would otherwise be received by general unsecured creditors and should be denied.

To help achieve this diversion of value from unsecured creditors, the Debtors, the Term Lenders and the IPCo Noteholders that will otherwise participate and benefit from the transactions contemplated under the TSA (collectively, the "Settling Parties") have resorted to a claim classification ruse designed to deprive unsecured creditors of the right to meaningfully vote on the Plan and to the protection against the overpayment of other creditor classes to which they are entitled under the "fair and equitable" requirement applicable to dissenting creditor classes.  In particular, the Settling Parties seek to neutralize the Plan vote of general unsecured creditors by inserting the Term Loan Deficiency Claims into Class 6-B – the class of Other General Unsecured Claims – even though the Term Loan Deficiency Claims are substantially dissimilar from the other general unsecured claims.  The only purpose for including the Term Loan Deficiency Claims in Class 6-B is to skew the vote of that class and prevent the general unsecured creditors who are not also secured creditors and who will receive a pittance under the Plan from having their votes for or against the Plan fairly considered.  Based on the inclusion of

the $625 million Term Loan Deficiency Claims in their Class, creditors in Class 6-B could rightfully conclude that their vote is meaningless and not even bother to vote.  Coupled with the "deathtrap" provision that disincentivizes Class 6B from voting against the Plan for fear of their recovery being reduced from $3 million to $1 million, the classification scheme and *in terrorem* treatment intended to suppress the vote of non-Noteholder Class 6-B creditors, is so heavily tainted by these machinations that the enter Class 6-B vote (if it votes to accept the Plan) should be disregarded.

This improper purpose is made manifest by the fact that, unlike the other Class 6-B creditors, the Term Lenders have already agreed (i) pursuant to the prepetition TSA (at section 4(a)), to vote all of their claims in favor of the Plan; and (ii) not to receive any recovery on account of the alleged Term Loan Deficiency Claims in Class 6-B.  In light of the Term Lenders' relinquishment of any economic rights or interest as Class 6-B creditors, it is evident that the Term Lenders would have no legitimate purpose in voting any claims in that class.  That the Debtors and the Term Lenders nonetheless insist on the Term Lenders being entitled to vote in Class 6-B is telling.  Rather clearly, the Debtors and other Settling Parties are trying to ensure that Class 6-B votes for the Plan – that is, ***to gerrymander an accepting impaired class*** – so that they can strip the other unsecured creditors in that class of the protection of the "fair and equitable" requirement and the concomitant prohibition against the overpayment of other creditor classes.[14]

As represented previously to the Court and Debtors (including at the Disclosure Statement hearing), the Committee – composed of trade vendors and landlords – wants to see J. Crew / Madewell reorganized and succeed as a deleveraged enterprise.  The Committee, however, also wants a fair Plan that does not overpay other creditor classes at the expense of

---

[14] The Fourth Circuit Court of Appeals has succinctly explained:  "'If the plan unfairly creates too many or too few classes, if the classifications are designed to manipulate class voting, or if the classification scheme violates basic priority rights, the plan cannot be confirmed.'"  *In re Bryson Properties XVIII*, 961 F.2d 496, 502 (4th Cir. 1992) (*quoting In re Holywell Corp.*, 913 F.2d 873, 880 (11th Cir. 1990)).

DOCS_LA:331378.12 45388/002

general unsecured creditors, and provides fair value for general unsecured creditors equal to what they are entitled to under the Bankruptcy Code.

## II.

## BACKGROUND

**A.    The TSA, Plan and Disclosure Statement.**

1.    Prepetition, on May 3, 2020, the Debtors executed the Transaction Support Agreement ("TSA") with (i) certain of the "Consenting Support Parties" (as defined in the TSA) consisting of the "Ad Hoc Group" of Term Lenders and (ii) their private equity owners, a/k/a the Sponsors.[15]  Pursuant to the TSA, the Consenting Support Parties and the Sponsors agreed to support a restructuring transaction as set forth in the proposed Plan.   As noted above, most, if not all, of the non-Debtor parties to the TSA have multiple, material interests in and positions with respect to the Debtors (Term Lender, IPCo Noteholder, DIP Lender, Sponsor, common stockholder, preferred shareholder, *etc*.), and thus stand to unduly benefit under the Plan, which implements the TSA, vis-à-vis all such multiple positions, at the expense of the general unsecured creditors.  As disclosed in the Ad Hoc Group's amended verified 2019 statement, the vast majority of the IPCo Notes are held by the Term Lenders such that the identity of the Term Lenders and IPCo Noteholders in these cases overlap to a high degree:

---

[15] The "Sponsors" are defined in the Plan as "collectively, TPG Chinos, L.P., TPG Chinos Co-Invest, L.P., Green Equity Investors V, L.P., Green Equity Investors Side V, L.P., and LGP Chino Coinvest LLC."

DOCS_LA:331378.12 45388/002

| Ad Hoc Committee Holdings (as of June 19, 2020) | | | | | | | |
|---|---|---|---|---|---|---|---|
| ($ and share count in millions) | Term Loans | IPCo Notes | Series A Preferred Stock | DIP Commitments | | Total | Common Stock |
| Anchorage Capital Group LLC | $ 814 | $ 133 | $ 58 | $ 140 | | $ 1,145 | 4.8 |
| GSO Capital Partners LP | 60 | 93 | 52 | 45 | | 250 | 4.5 |
| Davidson Kempner Capital Management LP | 79 | - | - | 71 | | 150 | - |
| Citadel Equity Fund Ltd.[1] | 70 | - | - | 22 | | 92 | - |
| FS Global Credit Opportunities Fund | 12 | 33 | 19 | 26 | | 90 | 1.1 |
| Angelo Gordon & Co. LP | - | 30 | - | 44 | | 74 | - |
| LibreMax Capital, LLC | 55 | - | - | 16 | | 70 | - |
| Antora Peak Capital Management LP | 35 | 4 | 13 | 5 | | 57 | 0.7 |
| **Total Holdings of Ad Hoc Group** | **$ 1,125** | **$ 294** | **$ 141** | **$ 370** | | **$ 1,930** | **11.1** |
| Other Holdings Outside of Ad Hoc Group | 213 | 53 | 71 | 30 | | 367 | 103.9 |
| **Total Principal Amount Outstanding[2]** | **$ 1,337** | **$ 348** | **$ 212** | **$ 400** | | **$ 2,297** | **115.0** |
| *Ad Hoc Group's % of Total Outstanding* | *84%* | *85%* | *67%* | *93%* | | *84%* | *10%* |

*Source: Court filings (Docket #533, Exhibit A)*
1. Citadel beneficially owns $70 million of term loans through a total return swap.
2. Total principal amounts were sourced from court filings and schedules provided by Debtor professionals.

2. On May 18, 2020, the Debtors filed their initial Disclosure Statement and the Plan [Docket Nos. 247 and 248, respectively].  The Disclosure Statement was a skeleton in many respects as it was missing critical information and many key documents.

3. On June 11, 2020, one week before the June 18, 2020 deadline for filing objections to the Disclosure Statement, the Debtors filed their modified Disclosure Statement, together with the Debtors' post-confirmation business projections (Exhibit B to the modified Disclosure Statement) (the "Plan Projections"), liquidation analysis (Exhibit C to the modified Disclosure Statement), and valuation of the reorganized company (Exhibit D to the modified Disclosure Statement) (collectively, the "Financial Exhibits") [Docket No. 469], along with a modified Plan [Docket No. 468] and the Debtors' motion for approval of the Disclosure Statement and certain solicitation and voting procedures (the "Solicitation Motion") [Docket No. 471].

4. After a hearing held on June 25, 2020, the Court entered an order granting the Solicitation Motion and related relief (the "Solicitation Order"), which, *inter alia*, set August

17, 2020 as the deadline to file objections to the Plan and scheduled the Confirmation Hearing

for August 25, 2020.

5.       On August 10, 2020, only one week before the deadline to file objections

to the Plan, the Debtors filed the *Amended Joint Prearranged Chapter 11 Plan of Reorganization*

*of Chinos Holdings, Inc. and Its Affiliated Debtors* [Docket No. 706] and related amended

Disclosure Statement [Docket No. 707].  The Plan, as amended on August 10, 2020, deviates

from the prior Plan in that now the Debtors propose to take numerous Restructuring Transaction

Steps including the creation of a NewCo Holdings, a limited liability company that will issue the

New Common Equity to be distributed to the Term Lenders and the IPCo Noteholders, and a

NewCo Entity Group, entities to be newly formed to implement the Restructuring Transaction

Steps.  *See, e.g.,* Amended Disclosure Statement Blackline [Exhibit B to Docket No. 708],

pp. 33-34.  Previously, the reorganized corporate parent would issue New Common Shares, and

the proposed post-confirmation corporate structure was generally the same as it was prepetition.

**B.       The DIP Facility and Debtors' Performance to Date**

6.       The Debtors obtained DIP financing in these cases from their Term

Lenders, who syndicated out the loan to other Term Lenders and IPCo Noteholders. The cross-

over of holdings between the Term Loan, IPCo Note, and DIP Loan obligations can be seen from

the Ad Hoc Group's amended verified 2019 statement shown in the chart above.

7.       Under the Final Financing Order[16], the Court approved the payment of a

Backstop Premium payable to the initial DIP Lenders in the form of 10% of the aggregate $400

million commitment amount (or $40 million) payable in new common shares of the reorganized

Debtors at an assumed enterprise value of $1.75 billion.  In addition, the DIP Lenders receive

interest of $6.9 million through the budgeted period.

---

[16] *Final Order (I) Authorizing The Debtors to Obtain Postpetition Financing, (II) Authorizing The Debtors to Use
Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting
Adequate Protection to Prepetition Secured Parties, (V) Modifying Automatic Stay, and (VII) Granting Related
Relief* [Docket No. 447] (the "Final Financing Order").

8.     In addition to the $46.9 million of fees and interests already approved, the Debtors seek approval of the New Equity Allocation and New Warrants through the Plan. The Committee previously objected at the time of the hearing on the final DIP financing motion, and the issue was reserved for plan confirmation. *See* Debtors' Omnibus Reply [Docket No. 427], at p. 6, n. 9 ("The Debtors acknowledge that the Committee has objected to the portion of fees due and payable in connection with the DIP Facility in the form of reorganized equity upon consummation of the chapter 11 plan contemplated by the TSA. As noted at their first day hearing, the Debtors respectfully submit that, while these fees are certainly appropriate, any objection with respect to such fees is properly addressed in the context of plan confirmation, and the Committee's disputes in this regard are fully reserved."). As noted, the value of the New Equity Allocation give-away is not less than $186 million based on the Debtors' presumed total enterprise value. The Committee estimates that the New Equity Allocation is not less than $351 million, but likely far higher given the value of the New Warrants.

9.     The Debtors have far exceeded their budgeted projections to date.



10.    During the second fiscal quarter of 2020, the Debtors generated approximately ███████ in Total Revenue versus projected Total Revenue of just ██████ – outperformance of ███████ (or ███ above forecast).  Moreover, as evident from the chart above, during the first 14 weeks of the case, through August 8, 2020, the Debtors have generated Total Receipts of approximately ███████ versus an original DIP Budget estimate of just ███████ – outperformance of ███████ (or ███ above forecast).  This has resulted in the Debtors generating ███████ in excess Net Cash Flow compared to the original DIP Budget and an Ending Liquidity position ███████ above forecast (with an additional ███████ in cash set aside to cover excess amounts drawn under the prepetition ABL Facility).

## C.    **Pending Matters Related to Plan Confirmation**

11.    <u>Standing Motion</u>:[17]  In connection with matters relevant to Plan confirmation, the Committee filed the Standing Motion pursuant to sections 105, 1003(c) and 1109 of the Bankruptcy Code, seeking entry of an order granting the Committee standing and authority to prosecute the avoidance action count set forth in the Perfection Complaint (as defined below), and out of an abundance of caution and to the extent deemed necessary by the Court, authorization to pursue all Challenges (as defined in the Standing Motion) against, *inter alia*, the Term Lenders and IPCo Noteholders set forth in the proposed Perfection Complaint, and concurrently filed Omnibus Term Loan Relief Motion, and IPCo Collateral Valuation Motion (each being defined and described below).

12.    <u>Perfection Complaint</u>:[18]  After review and investigation, the Committee has determined that the Prepetition ABL Collateral and the Prepetition Term Collateral securing

---

[17] *See Motion of the Official Committee of Unsecured Creditors for Entry of an Order Authorizing the Committee to Prosecute Avoidance Action and Challenges Relating to the Prepetition Secured Parties* [Dkt. No. 676] ("<u>Standing Motion</u>").

[18] *See* proposed *Complaint for (I) Declaratory Judgment and Avoidance With Respect to Certain Representations, Covenants, and Waivers in Favor of Prepetition Agents on Behalf of Prepetition ABL Secured Parties and Prepetition Term Secured Parties Pursuant to Final Financing Order; and (II) Objection to the Liens and Claims Asserted by the Prepetition Agents Against the Debtors* ("<u>Perfection Complaint</u>"), attached as Exhibit A to Standing Motion.

the Prepetition ABL Obligations and the Prepetition Term Obligations, respectively, does not

include, and/or the Prepetition Agents do not have a perfected or otherwise enforceable security

interest in, certain assets of the Debtors or the proceeds thereof ("Unencumbered Assets").

13.    Omnibus Term Loan Relief Motion:[19]  Based on the MSG Expert Report

and the Province Expert Report (the "Expert Reports"), the Committee has determined that the

Prepetition Term Lenders are **oversecured** based on the Debtors' total enterprise value of $2.94

billion and that no Term Loan Deficiency Claims exist.  Accordingly, the Omnibus Term Loan

Relief Motion seeks an order declaring the same, or valuing the Term Loan Deficiency Claims at

$0.00 for Plan purposes.  Alternatively, if the Court finds that the total enterprise value is some

other amount such that the Term Loan Deficiency Claims are higher than $0.00, the Omnibus

Term Loan Relief Motion seeks to (i) reclassify the Term Loan Deficiency Claims out of the

Class 6-B Other General Unsecured Claims for voting purposes; or (ii) designate the vote of such

Term Loan Deficiency Claims as one not having been cast or solicited in good faith under

section 1126(e) of the Bankruptcy Code, that should not be counted for purposes of determining

plan acceptance or rejection by Class 6-B under Section 1126(d) of the Bankruptcy Code.

14.    IPCo Collateral Valuation Motion:[20]  Based on the MSG Expert Report,

the Committee has determined that the value of the J. Crew intellectual property that is the

prepetition IPCo collateral securing the prepetition IPCo Notes obligations is no more than $180

million.  Accordingly, the Committee seeks an order finding that the secured portion of the IPCo

Notes Claims should be valued at no more than the IPCo Collateral Value Amount pursuant to

section 506(a)(1) of the Bankruptcy Code, and that any amount of the IPCo Notes Claims asserted in

---

[19] *See Motion of the Official Committee Unsecured Creditors for an Order: (I) Determining, Pursuant to Section 506(a)(1) of the Bankruptcy Code and Bankruptcy Rule 3012, that the Term Loan Creditors are Oversecured and There Are No Term Loan Deficiency Claims; (ii) To the Extent there are Any Such Deficiency Claims, Determining Pursuant to Bankruptcy Rule 3013, that Such Claims are Improperly Classified in 6-B Under the Debtors' Plan; and (iii) Designating, Pursuant to Section 1126(e) of the Bankruptcy Code, the Term Loan Deficiency Claim Holders' Votes as Not in Good Faith and Not Counting Any Votes of Such Claimants in Determining Acceptances by Class 6-B* [Docket No. 677] ("Omnibus Term Loan Relief Motion").*

[20] *See Motion of Official Committee of Unsecured Creditors to Determine the Secured and Undersecured Amounts of the IPCo Notes Pursuant to 11 U.S.C. § 506(a)(1) and Rule 3012 of the Federal Rules of Bankruptcy Procedure* [Docket No. 678] ("IPCo Collateral Valuation Motion").*

excess of the IPCo Collateral Value Amount is unsecured, and accordingly, should be treated as a general unsecured claim against the IPCo Debtors.

15.    As discussed herein, *the IPCo Notes have different obligors and different collateral than the Term Loan Claims.  See* **Exhibit A** attached hereto (organizational chart showing the respective Debtor obligors/guarantors with respect to the Term Loans and the IPCo Notes).  Specifically, the Term Loan Claims are purportedly secured by most of the assets of Debtors Chinos Intermediate Holdings B, Inc., J. Crew Group, Inc., J. Crew Operating Corp., Grace Holmes, Inc., H.F.D. No 55, Inc., J. Crew Inc., J. Crew International, Inc., J. Crew Virginia, Inc., and Madewell Inc. (together, the "Non-IPCo Debtors"), including:  (a) a first-priority security interest in and lien on, among other things, substantially all of the tangible and intangible assets of the J. Crew Debtors,[21] including certain capital stock directly held by any Term Lenders; and (b) a second-priority security interest in and lien on the ABL Priority Collateral.  On the other hand, the IPCo Notes are purportedly secured by most assets of Debtors J. Crew Brand Intermediate, LLC, J. Crew Brand, LLC, J. Crew Brand Corp., J. Crew International Brand, LLC, and J. Crew Domestic Brand, LLC (together, the "IPCo Debtors"). The Debtors have stipulated that all obligations under the IPCo Notes and related indentures are guaranteed on:  (a) a secured basis by substantially all of the assets of J. Crew Brand, LLC and J. Crew Brand Corp. (collectively, the "IPCo Issuers") and also J. Crew Brand Intermediate, LLC, J. Crew International Brand, LLC, and J. Crew Domestic Brand, LLC, as guarantors (each, an "IPCo Guarantor"), including the J. Crew intellectual property; and (b) an unsecured basis by Chinos Intermediate Holdings A, Inc. as supplemental guarantor.  J. Crew Domestic Brand, LLC, as an IPCo Guarantor, owns 100% of an undivided ownership interest in the domestic J. Crew brand intellectual property, which serves as the primary collateral for the IPCo Noteholders.

---

[21] Other than the accounts receivable, inventory, cash, certain deposit accounts, securities accounts, and certain proceeds thereof of the J. Crew Debtors, against which the ABL Lenders have a first priority security interest (the "ABL Priority Collateral").

## III.

## OVERVIEW OF CERTAIN KEY ELEMENTS OF THE PLAN

**A.        Specific Class Treatment Under the Plan**

16.        As previously described in the Committee's objection to the Disclosure Statement [Dkt. No. 509] and in the Omnibus Term Loan Relief Motion, the Plan separately classifies unsecured claims in a manner that is materially harmful to holders of Class 6 General Unsecured Claims.

17.        Class 4 – Term Loan Secured Claims:  The Plan provides that the Term Lenders have an allowed secured claim of $716.6 million on account of which they are to receive 76.5% of the New Common Equity on the Effective Date subject to dilution.  While the Debtors state that the estimated recovery on account of Class 4 claims is 100%, this estimate purportedly does not take into account the putative $625.4 million[22] of Term Loan Deficiency Claims separately classified in Class 6-B.

18.        Class 5 – IPCo Notes Claims:  The Plan provides that the IPCo Notes Claims, inclusive of *both secured and unsecured deficiency claims*,[23] are classified in a single class – Class 5 – and are allowed against the IPCo Debtors (the sole obligors on the IPCo Notes) in the aggregate principal amount of $347.59 million plus (i) a make-whole premium equal to $58 million, (ii) accrued and unpaid interest through the Petition Date equal to $6 million, and (iii) any other prepetition obligations payable under the IPCo Indentures and IPCo Notes."  On account of the IPCo Notes Claims, the IPCo Noteholders are to receive 23.5% of the New Common Equity on the Effective Date, subject to dilution.

19.        Class 6-A – Ongoing Trade Claims:  The Plan provides that each holder of an Allowed Ongoing Trade Claim[24] will receive, on the Effective Date, its Pro Rata share of a

---

[22] *See* p. 6 summary chart in the Disclosure Statement describing Class 6-B recoveries.

[23] The IPCo Notes Claims are defined to include "the IPCo Indentures and the IPCo Notes, *including any deficiency claims* and all accrued but unpaid interest, costs, fees, and indemnities."  *See* Plan at § 1.85 (emphasis added).

[24] Ongoing Trade Claim means "any General Unsecured Claim held by a party that, within 30 days of the Petition Date, has executed a trade agreement that expressly designates such party as a holder of an Ongoing Trade Claim and that provides for continuity of goods and services to be provided to the Reorganized Debtors for a period of at

16

$71 million cash pool.  The aggregate amount of cash distributed on account of any Allowed Ongoing Trade Claim is inexplicably capped at 50% of the Allowed amount of such Claim.

20.    <u>Class 6-B – Other General Unsecured Claims</u>:  The Plan provides that each holder of an Allowed Other General Unsecured Claim (**_excluding_** Term Loan Deficiency Claims) will receive its Pro Rata share of a cash pool of either $1 million (if Class 6-B rejects the Plan) or $3 million (if Class 6-B accepts the Plan); provided that the aggregate amount of cash distributed on account of any Allowed Other General Unsecured Claim will not exceed 50% of the Allowed amount of such Claim.  The Debtors allocate specific dollar amounts by Debtor as the cash pool available for creditors of each such Debtor.  The Debtors estimate that each sub-group of Class 6-B, broken down by Debtor entity, will receive a 1.6% recovery. "Other General Unsecured Claims" are defined to expressly include the Term Loan Deficiency Claims.  _See_ Plan at § 1.104.  But, as made clear by the treatment afforded to Class 6-B Other General Unsecured Claims: "Subject to occurrence of the Effective Date and solely for purposes of the Plan, holders of the Term Loan Deficiency Claims **agree to forgo any distribution** under the Plan on account of such Term Loan Deficiency Claims." _Id._ at § 4.7(b)  (emphasis added).

## B.    **Debtor and Third Party Releases/ Exculpation/ Injunction**

21.    The Plan contains an extremely broad release by the Debtors and an ostensibly consensual third-party release for the benefit of numerous non-Debtor parties including current and former equity holders,[25] and which also cover any potential avoidance

---

least 180 days on terms no less favorable to the Debtors than those in place for the year before the Petition Date, except as otherwise agreed by the Debtors with the consent of the Requisite Consenting Support Parties (such consent not to be unreasonably withheld." Plan at § 1.102.

[25] "<u>Released Parties</u> means each of, and solely in their capacity as such, (a) the Debtors and the Reorganized Debtors, (b) the ABL Agent and ABL Lenders, (c) the Term Agent and Term Lenders, (d) the Indenture Trustees and IPCo Noteholders, (e) the Consenting Support Parties, (f) the Sponsors [which as of the Petition Date held 76% of the common stock], (g) the DIP Agent and DIP Lenders, (h) the Exit ABL Agent and Exit ABL Lenders, (i) the New Term Agent and New Term Lenders, (j) the Backstop Parties, and (k) the Related Parties for each of the foregoing; provided that a holder of a Claim or Interest that objects to or opts-out of the releases set forth in Section 10.7(b) of the Plan shall not be a 'Released Party.'" Plan at § 1.120.  "<u>Related Parties</u> means individually or collectively, and each in their capacity as such:  with respect to a given Entity, all present <u>and former</u> officers (including chief restructuring officers), directors (including independent directors), <u>stockholders</u>, general or limited partners, managers, managing directors, managing members, members, principals, employees, attorneys, agents, trustees, financial advisors, restructuring advisors, accountants, investment bankers, consultants, managed accounts, managed funds and other representatives and agents of such Entity." Plan at § 1.119 (emphasis added).

17

actions. *See* Plan at § 10.7(a) & (b).  The Debtors have not presented any evidence about the nature of the claims that they might otherwise have if not covered by the blanket Plan releases, or the specific consideration (if any) being provided in exchange therefor by each Released Party, or any other evidence supporting the propriety of these releases.

22.     The Plan includes broad exculpation provisions against claims and causes of action relating to the bankruptcy cases covering numerous non-fiduciary parties including the Term Lenders and IPCo Noteholders.[26]  The exculpation is also not limited to the post-petition period.  Plan at § 10.8.

23.     The Plan includes a broad Plan injunction protecting numerous non-Debtor parties including all of the Released Parties.  Plan at § 10.6.

# IV.

## ARGUMENT

**A.      The Plan is Not Fair And Equitable to the Holders of Other General Unsecured Claims in Class 6-B, Because it Provides for the Distribution to the Term Lenders of Property Whose Value is Well in Excess of 100% of Their Claims; and the Term Lenders Cannot Skew the Class 6-B Vote and Neutralize the Rejection of the Plan by Class 6-B by Purporting to Vote Term Loan Deficiency Claims in Class 6-B, Because Those Deficiency Claims Are Zero.**

24.     As further explained in the Omnibus Term Loan Relief Motion, based on the Committee's Expert Reports, the Term Lenders are **oversecured** because the Debtors' total enterprise value ("TEV") is $2.941 billion.  Even excluding the IPCo Debtors' Assets on which the Term Lenders do not have liens, the value of the Non-IPCo Debtors (referred to as the "Loan Debtors" in the Plan) is still well in excess of $2 billion.  As a result, the Term Loan Claims are oversecured, and no Term Loan Deficiency Claims exist or have a value in excess of $0.00.[27]

---

[26] Under the Plan (at § 1.156), "Exculpated Parties" means, collectively and, in each case, in their capacities as such, (i) the Debtors, (ii) the Reorganized Debtors, (iii) the Creditors' Committee, (iv) the Consenting Support Parties, (v) the ABL Agent and the ABL Lenders, (vi) the Term Agent and the Term Lenders, (vi) the Indenture Trustees and the IPCo Trustee Noteholders, (vii) the Backstop Parties, (viii) the DIP Lenders, (ix) the DIP Agent, (x) the New Term Lenders, (xi) the New Term Agent, (xii) the Sponsors, and (xiii) the Related Parties for each of the foregoing.

[27] The Committee incorporates herein the Committee's arguments set forth in the Omnibus Term Loan Relief Motion.

DOCS_LA:331378.12 45388/002

Based on the Committee's valuations and analysis, the Plan overpays the Term Lenders by at least $150 - $205 million in new equity (depending on net debt assumptions) plus the value of their allocable portion of the New Equity Allocation and New Warrants at the expense of general unsecured creditors.[28]

25.    The MSG Expert Report cogently explains and supports the $2.941 billion TEV. Further, as set forth in the MSG Expert Rebuttal Report, the Debtors' TEV has numerous material deficiencies and errors, including the following:

(i)    The Debtors' valuation is based on a flawed calculation of the weighted average cost of capital (WACC), which is a critical input into a discounted cash flow (DCF) valuation methodology. Specifically, the Debtors' expert Lazard utilized an abnormal beta distorted by the extreme market volatility due to the COVID-19 pandemic. By doing so, Lazard's valuation assumes that the impact of COVID-19 will impact J. Crew and Madewell's cash flows in perpetuity, which is contrary to accepted valuation methodology which supports the use of a beta calculated during a normal period with normal market volatility to correct for the impact of such volatility over the long-term. Indeed, the Debtors' projected cash flows already reflect the impact of COVID-19 and, by using an abnormal beta, the Debtors are double counting the impact of the COVID-19 pandemic. The Debtors' approach is contrary to accepted valuation methodology and is, in fact, contrary to the approach taken by Lazard itself in its own comparable company (CompCo) valuation method of J. Crew and Madewell, as well as the approach taken by the Debtors' own experts in valuing the J. Crew trademarks, which used WACC inputs prior to COVID-19 to normalize its impact on a value determination. Had Lazard correctly used a normalized beta in its valuation, its DCF value for J. Crew and Madewell would increase to a total of $2.693 million.

---

[28] This estimate excludes the overpayment, by another $186 million in the form of the DIP Lender Securities proposed to be paid as a purported DIP fee, to the Term Lenders who are also DIP Lenders. As discussed herein, the alleged DIP fee is unjustified, and is another way to overpay the Settling Parties at the general unsecured creditors' expense.

(ii)    Lazard uses an outdated, historical long-term equity risk premium of 7.2% (using data from 1926 to the present), instead of the more current, generally accepted supply-side equity risk premium (which adjusts for price-to-earnings ratio expansion) of 6.2%. Correcting for this error increases the Debtors' value of both J. Crew and Madewell by over $250 million.

(iii)    In its DCF valuation of Madewell, Lazard failed to use the generally accepted 3-stage growth model for valuing high-growth companies to step-down the perpetual growth rate (PGR) of Madewell over a 5-year period. Instead, Lazard unreasonably adopted a "falling off the cliff" approach that would see a sudden drop in growth from 8.9% to 3.5% following 2024. This approach is inconsistent with a high-growth company such as Madewell. The 3-stage approach adopted by MSG bridges the gap between the high growth initial stage of the business, and the steady state terminal value stage, by stepping down the growth rate after 2024 until reaching the normalized PGR of 3.5%. By failing to use the 3-stage approach, Lazard materially undervalues Madewell.

(iv)    The Debtors' CompCo valuation of J. Crew is flawed as it includes companies that are not comparable to J. Crew, and unreasonably excludes companies that are comparable and have historically and consistently been included in the Debtors' peer groups for J. Crew. Had Lazard included these companies in its CompCo valuation, it would have reached a higher value conclusion for J. Crew.

(v)    The Debtors' CompCo valuation of Madewell is also intrinsically flawed. It uses valuation multiples that significantly undervalue Madewell and is based on a peer group with historical growth characteristics that are not comparable to Madewell. Had the Debtors used companies more comparable to Madewell, and used a higher valuation multiple consistent with Madewell's growth profile, the Debtors would have concluded a significantly greater enterprise value for Madewell.

Correcting for such deficiencies and errors in the Debtors' valuation results in J. Crew and Madewell being correctly valued at $2.9 billion.

26.     Based on the foregoing, and the arguments set forth in the Omnibus Term Loan Relief Motion, the Plan is not confirmable in that it impermissibly provides for more than 100% recovery for the Term Lenders in violation of the bankruptcy axiom that a creditor is not allowed to be paid more than its claim.  *See, e.g., In re Oaks Partners, Ltd.*, 135 B.R. 440, 449 (Bankr. N.D. Ga. 1991) ("First and foremost, a creditor is not entitled to be paid more than its claim, regardless of what kind or how much collateral secures the claim. If First Union's argument is that it still has a claim of $14,360,000.00 and it gets to keep the $3,155,834.00 in cash post-petition payments, then it is arguing for payment of $17,515,834.00 on its $14,360,000.00 claim. This makes no sense."); *In re MCorp Financial, Inc.*, 137 B.R. 219, 235 (Bankr. S.D. Tex. 1992) ("for a plan to be confirmed when stockholders are eliminated, creditors must not be provided for more than in full"); *In re Future Energy Corp.*, 83 B.R. 470 n. 39 (Bankr. S.D. Ohio 1988) ("Clearly, overpayment of senior creditors is violative of the fair and equitable standard. [citations omitted] The legislative history of the Code also indicates that a plan may not be crammed down over a dissenting class if a senior class receives more than 100% of its claim.").

27.     Further, notwithstanding the Debtors' classification scheme, because of the oversecured nature of the Term Loan Claims and the full payment (indeed overpayment) thereof under the Plan, the Term Lenders have no deficiency claims on account of which to cast Class 6-B (or any other unsecured creditor ) votes on the Plan.

**B.      The Plan is Not Fair and Equitable to the Holders of Other General Unsecured Claims in Class 6-B, and Effects an Impermissible Quasi-Substantive Consolidation of the IPCo Debtors and Non-IPCo Debtors, Because It Provides for the Distribution to IPCo Noteholders of Property Whose Value is Far in Excess of the <u>Value of the Assets of the IPCo Debtors Who Are the Sole Obligors on Those Notes</u>**

28.     Based on the MSG Expert Report, the value of the prepetition IPCo collateral purportedly securing the IPCo Notes is no more than $180 million (as discussed further in the IPCo Collateral Valuation Motion, the "<u>IPCo Collateral Value Amount</u>").  Thus, by the

21

IPCo Collateral Valuation Motion, the Committee is seeking an order finding that (i) the secured

portion of the IPCo Notes Claims does not exceed the IPCo Collateral Value Amount pursuant to

section 506(a)(1) of the Bankruptcy Code and Bankruptcy Rule 3012 and (ii) any claims

asserted by the IPCo Noteholders in excess of the IPCo Collateral Value Amount are general

unsecured claims against the IPCo Debtors.

29.     Notwithstanding the foregoing, the IPCo Noteholders stand to receive new

equity in the entire reorganized enterprise – even though the IPCo Noteholders indisputably have

claims only against the IPCo Debtors and liens only against the IPCo Debtors' assets (none of

which includes the Madewell business) – resulting in a recovery, on account of the IPCo

Noteholders' $411 million in claims, of $460 - $475 million (based on a $2.9 billion TEV).[29]

This amount is well in excess of the value of the assets of the IPCo Debtors that are solely liable

on the IPCo Notes.  If not for the Plan's *de facto* quasi-substantive consolidation (discussed

further below) inuring to the benefit of the IPCo Noteholders at the other general unsecured

creditors' expense, the IPCo Noteholders would receive and would be entitled to receive at most

$345 million in value.[30]  Based on the Committee's evidence, it is clear that the IPCo Notes

Claims, which have recourse only to certain intellectual property and other limited assets held by

a few Debtors as a result of the 2017 Transaction and have no recourse whatsoever to any of the

assets of any of the other Debtors, will be provided under the Plan a recovery double the value to

which they are entitled, by receiving a disproportionately high share of the value attributable to

*all Debtors as a consolidated enterprise*.

30.     The Debtors have not presented, let alone proved, their case for the

propriety of the *de facto* quasi substantive consolidation of the estates under the Plan that is

entailed in satisfying claims of the IPCo Noteholders that are claims against only the IPCo

Debtors, with equity in the Reorganized Debtors which derives its value primarily from the value

---

[29] And this amount does not include the proposed additional payments to IPCo Noteholders on account of their allocable share of the New Equity Allocation and New Warrants, which as discussed *infra*, is material.

[30] As set forth in the Province Expert Report, using the Committee's valuations in a proper waterfall analysis, the IPCo Noteholders would recover $345 million in value, which takes into account, *inter alia*, a nearly full recovery on a large intercompany claim against J. Crew Group, Inc.

of the Non-IPCo Debtors (mainly, Madewell).  Although the Term Lenders and IPCo Noteholders have different Debtor obligors and different collateral packages, the Plan essentially consolidates all of the Debtor entities' assets and allocates the value thereof to them, in the form of the New Common Equity of the reorganized ultimate parent.  In so doing, however, the Plan ignores the respective values of the different pools of assets to which the Term Lenders and IPCo Noteholders have recourse on their claims, by giving IPCo Noteholders value that is well in excess of the value of the asset pool to which they have recourse.  This overpayment of the IPCo Noteholders does not, however, come at the expense of Term Lenders, because, as discussed, the Term Lenders are being overpaid with undervalued equity.  Rather, the overpayment of the IPCo Noteholders is coming at the expense of the general unsecured creditors of the Non-IPCo Debtors, by diverting value attributable to the assets of the Non–IPCo Debtors to the IPCo Noteholders.

31.     Thus, by commingling assets and liabilities of the Debtors and distributing the new equity of the ultimate Reorganized Debtor parent company of the  Reorganized Debtors in the proportions proposed, the Plan implements a form of quasi substantive consolidation without any showing whatsoever that creditors are not harmed by such comingling (in fact, the unsecured creditors of the Non-IPCo Debtors are harmed by the results of this commingling) or that the requirements for substantive consolidation have been satisfied (they have not been).[31]  In the absence of a demonstrated basis for true substantive consolidation, among other things, the Plan violates the absolute priority rule by transferring value to structurally junior creditors (creditors of the IPCo Debtors) at the expense of unsecured creditors of the Non-IPCo Debtors.

---

[31] In the Fourth Circuit, the bankruptcy court has authority to substantively consolidate separate bankruptcy estates into a single estate pursuant to its general equitable powers under section 105.  *Munford, Inc. v. TOC Retail, Inc. (In re Munford, Inc.)*, 115 B.R. 390, 397 (Bankr. N.D. Ga. 1990).  Courts in the Fourth Circuit commonly consider "(i) whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit, . . . or (ii) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors."  *In re Eagle Creek Subdivision, LLC*, 407 B.R. 206, 208 (Bankr. E.D. N.C. 2008) (quoting *In re Convalescent Ctr., of Roanoke Rapids, Inc.*, Case No. 06-00310-8-RDD, 2006 Bankr. LEXIS 4484, at *7 (Bankr. E.D.N.C. Aug. 7, 2006)).  Further, "[s]ubstantive consolidation should be 'used sparingly' to prevent injustice." *In re Fas Mart Convenience Stores, Inc*., 320 B.R. 587, 594 (Bankr. E.D. Va. 2004) (quoting *In re Bonham*, 226 B.R. 56, 76 (Bankr. D. Alaska 1998)).

23

*See, e.g., Schroeder v. New Century Liquidating Trust (In re New Century TRS Holdings, Inc.)*, 407 B.R. 576, 591-92 (D. Del. 2009) (reversing plan confirmation order, where bankruptcy court improperly confirmed plan that included *de facto* substantive consolidation; "[T]he plan here does not call for the typical case of substantive consolidation where multiple separate entities are merged into a single entity and inter-entity liabilities are erased; instead of many-into-one, the plan calls for many-into-three, and the inter-entity liabilities are not erased.  Typical or not, however, the many-into three framework still presents the same potential inequities for creditors as would be presented in the many-into-one framework, namely that creditors face increased competition for a consolidated pool of assets and a re-valued claim that is less precise than if the creditors were dealing with debtors individually….  It is true that the aggregation in this case was not accompanied by erasure of inter-entity liabilities and was achieved by compromise settlement.  These facts, however, are not meaningful grounds for differentiating the instant case from the typical substantive consolidation scenario because they do not eliminate the aggregation's potentially deleterious effects on creditors …. Thus, these differences are not sufficient to place the aggregation in this case outside the definition of substantive consolidation.").

      32.     In short, the IPCo Noteholders, like the Term Lenders, will receive significantly more value under the Plan than that to which they are entitled under their operative contracts and documents and applicable law -- in the case of both sets of creditors, because the equity in the Reorganized Debtors they will receive under the Plan has been grossly undervalued and, in the case of the IPCo Noteholders, because the value of the limited pool of assets to which they have recourse (the assets of the IPCo Debtors) is far less than the value of the (undervalued) equity in the Reorganized Debtors they will receive.  (As discussed above, value attributable to the Non-IPCo Debtors is being siphoned off to the IPCo Noteholders in a form of *de facto* quasi substantive consolidation that has no legal basis.)  Meanwhile, to enable these two creditor groups to be overpaid, the vast majority of non-go-forward general unsecured creditors – comprised mostly of holders of lease rejection claims and smaller trade claims – will receive the

24

proverbial poke in the eye with a sharp stick (a 1.6% recovery for Class 6-B), instead of full payment out of the excess value that the Plan allocates to overpay other creditor classes.

**C.    Payment of the New Equity Allocation and New Warrants as a Fee for the New Term Loans Is Unreasonably Excessive Under Any TEV Scenario and Should be <u>Denied</u>**

33.     If the Plan is confirmed <u>and</u> the DIP Facility is converted to New Term Loans (rather than being paid off), then the Debtors are required to issue the New Equity Allocation and honor the New Warrants on account of the New Term Loans.  At the Debtors' (under) valuation of the Debtors at $1.84 billion, this would result in the payment of $186 million on account of the New Equity Allocation alone, not including the substantial and unknown value of the New Warrants-- in addition to the repayment of the New Term Loans of $400 million, which still must be repaid back to the Term Lenders at an interest rate of 11% per annum.[32]  Based on the Committee's expert opinion, the New Equity Allocation value is actually ***$351 million***, and this does not even take into account the value of the New Warrants worth millions more, again, all attributable to the DIP-to-exit fee structure.  This expense is both *exorbitant and unnecessary*.

34.     The Committee objects to New Equity Allocation and the New Warrants (collectively, the "<u>DIP Lender Securities</u>") as an unreasonable fee under section 1129(a)(4) of the Bankruptcy Code.  Section 1129(a)(4) provides in pertinent part:

> The court shall confirm a plan only if all of the following requirements are met:
>
> … (4) Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

11 U.S.C. § 1129(a)(4).

---

[32] *See* Exhibit B to *Notice of Filing of Plan Supplement* [Dkt No. 705].   This interest rate decreases to approximately 9% after one year.

35.     At the lower enterprise valuation, the DIP Lender Securities represent a financing fee equal to 43% of the maximum $400 million of exit financing, which percentage is even higher when one adds the value of the New Warrants; at the higher enterprise valuation, the fee increases to **_88%_** of the exit financing (which, again, is even higher after taking into account the value of the New Warrants).  This is grossly unreasonable.  *See, e.g.*, *Mabey v. Southwestern Elec. Power Co. (In re Cajun Elec. Power Coop.),* 150 F.3d 503, 517 (5th Cir. 1998) ("What constitutes a reasonable payment will clearly vary from case to case and, among other things, will hinge to some degree upon who makes the payments at issue, who receives those payments, and whether the payments are made from assets of the estate."); *In re Congoleum Corp.*, No. 03-51524, 2010 U.S. Dist. LEXIS 44904, at *22 (D.N.J. 2010) (Court "consider[ed] the 'totality of the circumstances' when reviewing the reasonableness of the [professionals'] payments prior to confirmation.").  Nor was the magnitude of the New Equity Allocation or the New Warrants disclosed anywhere in the Disclosure Statement that would allow to allow creditors the opportunity to factor the fee into their decision to accept or reject the plan.  7 Collier on Bankruptcy P 1129.02 (16th 2020) ("After all, if large enough to matter, it will have been disclosed; and if disclosed creditors will have had the opportunity to factor the fee into their decision to accept or reject the plan.").

36.     The TSA contemplates that the DIP Facility is to be converted to the New Term Loans, but only "in each case on terms consistent with the DIP Credit Agreement."  The DIP Credit Agreement unambiguously permits the Debtors to prepay, at any time, the outstanding obligations under the DIP Facility:

"**Prepayments**.

(a) Optional.

(i) The Borrower may, upon notice to the Administrative Agent, at any time or from time to time voluntarily prepay Loans in whole but not in part without premium or penalty; provided that such notice must be received by the Administrative Agent not later than 11:00 a.m. (New York, New York time) (A) three (3) Business Days prior to any date of prepayment of Eurodollar Rate Loans and (B) on the date of prepayment of Base Rate Loans."

37.     Section 2.12(a) of the DIP Credit Agreement further confirms that the Debtors have a choice to make here.  The Debtors may, at their "sole option and discretion" "either (i) repay the Loans hereunder in cash or (ii) convert the Loans hereunder into an exit term loan (the "Exit Conversion")."  As of the week ending August 8, 2020, the Debtors had cash on hand of ███████ (including reserve accounts).  The DIP Loan balance is ███████ for the same time period.  The Debtors have the liquidity to pay off the DIP Loans in full in cash to avoid the Exit Conversion without a prepayment premium penalty.  The Debtors will, no doubt, argue that the lack of conversion of the DIP Credit Agreement into the New Term Loans will leave the Debtors without a viable exit facility.  But neither this Court, nor the Committee, has been provided with any evidence that the Debtors have run a marketing process to locate a commercially viable alternative to handing out hundreds of millions of dollars of equity value in these cases to their Term Lenders who are already being overpaid.

38.     Any distribution of DIP Lender Securities to the DIP Lenders should be viewed by the Court for what it is in practical effect -- as payment on account of the prepetition debts of the Term Lenders and the IPCo Noteholders, made to obtain their consent to the TSA, which should decrease the new equity allocations of the Term Lenders and the IPCo Noteholders as members of Class 4 and Class 5, respectively.  Otherwise, based on the Committee's evidence, the overpayment of the Term Lenders and the IPCo Noteholders under the Plan, in violation of the absolute priority rule, would become even more egregious.  *See, e.g., In re Victory Constr. Co.*, 42 B.R. 145, 155 (Bankr. C.D. Cal. 1984) ("It is clear that the drafters intended the court to deny confirmation where the plan proposes to pay more than 100 percent to a senior class without the consent of a junior.").[33]

39.     The proposed New Equity Allocation and New Warrants result in a grossly unreasonable financing fee  under any standard and the give-away of hundreds of

---

[33] *See also In re Granite Broad. Corp.*, 369 B.R. 120, 140 (Bankr. S.D.N.Y. 2007) ("There is no dispute that a class of creditors cannot receive more than full consideration for its claim, and that excess value must be allocated to junior classes of debt or equity, as the case may be."); *In re Trans Max Techs., Inc.*, 349 B.R. 80, 89 (Bankr. D. Nev. 2006) ("One component of the fair and equitable treatment is that a plan may not pay a premium to a senior class.").

millions of dollars—without any demonstrated search for alternatives by the Debtors-- comes

directly at the expense of general unsecured creditors.  The value of the New Equity

Allocation—itself excessive—does not even take into account the additional New Warrants at a

strike price of $1.75 billion that is also being offered up to the DIP Lenders on account of the

Exit Facility, which the Committee estimates could be worth in the tens of millions if not more.

And all this for conversion of the DIP Facility into an exit facility in an amount that may not be

needed and that must be repaid in full with interest.  The give-away of hundreds of millions of

dollars of value at the expense of general unsecured creditors is disproportionate to any

demonstrated benefit being received by the estates and should be denied.

**D.     The Plan's Vote-Driven Classification Scheme, Which Seeks to Engraft Term Loan Deficiency Claims into Class 6-B, Together With the Other General Unsecured Claims with Which the Term Lenders' Interests Directly Conflict, is an Illegal Attempt to Gerrymander the Vote Through the Common Classification of Claims that Are Not Substantially Similar; and the Voting of Term Loan Deficiency Claims in Class 6-B Should Not Be Permitted**

40.     In the alternative, if the Court finds that the Debtors' TEV is some other

lower amount such that the Term Loan Deficiency Claims are higher than $0.00, the Omnibus

Term Loan Relief Motion seeks to (i) reclassify the Term Loan Deficiency Claims separately

from the Class 6-B Other General Unsecured Claims for voting purposes; or (ii) designate the

vote of such Term Loan Deficiency Claims  as one not cast in good  faith under section 1126(e)

that should not be counted for purposes of 1126(d).

41.     The vote-driven purpose of the Debtors' classification scheme is readily

apparent from the circumstances.  There is no other explanation for placing Term Loan

Deficiency Claims in the class of Other General Unsecured Claims when the Term Loan

Deficiency Claims will receive nothing under the Plan.  Nor is there any other reason to

separately classify the Term Loan Deficiency Claims from the Term Loan Secured Claims when

the Term Loan Deficiency Claims will receive nothing.  The Term Lenders are proposed to

receive the controlling equity stake in the reorganized enterprise on account of their secured

claims, and nothing on account of their deficiency claims.

28

42.     By placing the Term Loan Deficiency Claims into the same voting class with the Other General Unsecured Claims, notwithstanding the otherwise pointless nature of so doing, the Term Lenders' votes in Class 6-B will overwhelm any votes against the Plan for purposes of the "majority in amount" requirement by a ratio of 3 to 1, thereby controlling the vote of this impaired class for claims amount purposes.[34] *See generally In re Bryson Properties XVIII*, 961 F.2d 496, 502 (4th Cir. 1992) (classification structure "may only be undertaken for reasons independent of the debtor's motivation to secure the vote of an impaired, assenting class of claims" (*quoting In re Greystone III Joint Venture*, 948 F.2d 134, 139 (5th Cir. 1992)) (discussed in greater detail in the Omnibus Term Loan Relief Motion).  The Plan's contrived structure by itself is compelling evidence of the Debtors' and Term Lenders' gerrymandering goal – the Term Lenders essentially waive their Term Loan Deficiency Claims for purposes of ***distribution*** under the Plan, but not for purposes of ***voting*** on the Plan, for the sole purpose of being able to vote those deficiency claims in favor of a Plan under which they will receive nothing on account of those claims.

1.     **The Term Loan Deficiency Claims Are Not Substantially Similar to the Other General Unsecured Claims in Class 6-B**

43.     In order to confirm the Plan, the Debtors must demonstrate that the Plan complies with all applicable provisions of the Bankruptcy Code.  11 U.S.C. § 1129(a)(1).  Governing the classification of claims and interests under a Chapter 11 plan, section 1122(a) of the Bankruptcy Code provides, in relevant part, that "a plan may place a claim or an interest in a particular class *only if* such claim or interest is ***substantially similar*** to the other claims or interests of such class."  11 U.S.C. § 1122(a) (emphases added).  The Plan improperly classifies together in Class 6-B the Term Loan Deficiency Claims (estimated to be over $625 million) and

---

[34] Under the Plan, the only other impaired classes of claims entitled to vote on the Plan in relation to all of the Debtors are Class 6-A (Ongoing Trade Claims) and Class 8 (Section 510(b) Claims), which may be an empty class. Class 4 (Term Loan Secured Claims) is impaired and entitled to vote, but that class only applies to the Loan Debtors.  Class 5 (IPCo Notes Claims) is impaired and entitled to vote, but this class is applicable only as to the IPCo Debtors.  *See generally In re Woodbridge Grp. of Cos., LLC*, 592 B.R. 761, 778 (Bankr. D. Del. 2018) ("*[i]n the absence of substantive consolidation*, entity separateness is fundamental' and the requirement of § 1129(a)(10) must be satisfied by each debtor in a joint plan" (citations omitted)).

the other "Other General Unsecured Claims," although these two categories of claims are vastly

dissimilar.  To begin with, unlike the other "Other General Unsecured Claims," nothing will be

distributed on account of the Term Loan Deficiency Claims.  The holders of Term Loan

Deficiency claims, while receiving nothing on those claims, will receive the lion's share of the

equity in the Reorganized Debtors on account of their Term Loan Secured Claims.  Thus, the

Term Lenders are motivated by economic considerations that are fundamentally different from

those motivating the holders of the other "Other General Unsecured Claims."  A further

dissimilarity is that, unlike the holders of the other "Other General Unsecured Claims," the

holders of Term Loan Deficiency Claims have bound themselves under the TSA (at section 4(a))

to vote for this Plan.  Nearly all of the Term Lenders (at least 96% of them, if not all of them at

this point[35]) have agreed to their treatment under the Plan, under which the Term Lenders are

receiving the vast majority of the equity in the reorganized enterprise, but receiving nothing on

their purported Class 6-B Term Loan deficiency Claims.[36]

> **2.      The Debtors' Vote-Driven Classification Scheme Is Improper
> and Should Be Rejected**

44.      As set forth in greater detail in the Omnibus Term Loan Relief Motion,

while debtors are afforded some flexibility in classifying unsecured claims, a debtor may not

classify claims in order secure the vote of an impaired, assenting class of claims.

45.      As described in *Bryson*, there is a limit on the debtor's power to classify

claims:

> Although the proponent of a plan of reorganization has
> considerable discretion to classify claims and interests
> according to the facts and circumstances of the case, this
> discretion is not unlimited.  There must be some limit on
> the debtor's power to classify creditors. . . . The potential

---

[35] *See* Disclosure Statement Blackline [Docket No. 702], p. 1 ("As of the date hereof, Consenting Support Parties and Sponsors holding approximately 96% of the Term Loans, 100% of the IPCo Notes, 85% of Series A Preferred Stock, and 89% of the Common Stock are party to the Transaction Support Agreement.").

[36] Logically, the underlying facts and circumstances related to the claim, and not just the claim itself, are important in determining whether a claim is substantially similar to other claims in order to be placed in the same class. *See In re Loop 76, LLC*, 465 B.R. 525 (B.A.P. 9th Cir. 2012); *In re U.S. Truck Co., Inc.*, 800 F.2d 581, 587 (6th Cir. 1986) (a non-creditor interest can justify separate classification).

> for abuse would be significant otherwise. . . . If the plan
> unfairly creates too many or *too few classes*, *if the*
> *classifications are designed to manipulate class voting*, or
> *if the classification scheme violates basic priority rights*,
> the plan cannot be confirmed.

961 F.2d at 502 (quoting *In re Holywell Corp*., 913 F.2d 873, 880 (11th Cir. 1990)) (emphasis added).

46.     *Holywell*, cited by *Bryson*, recognizes that improper classification can go both ways, *i.e*., classification can be improper where <u>too many</u> classes are created, which may result in a gerrymandered consenting class where potential dissenters are removed, and alternatively, classification can be improper where <u>too few</u> classes are created, which may result in a gerrymandered consenting class where the votes of potential dissenters are swamped by the votes of consenting creditors who (i) have agreed to support the plan for reasons extraneous to the treatment of their claims in the class in which their claims have been classified for vote-driven reasons; (ii) have interests that are materially adverse to maximizing the recovery on claims in that class; and (iii) as a result, should not have been placed in that class. *See Holywell*, 913 F.2d at 880.  Although the factual context in *Bryson* involved the former type of gerrymandering, *Bryson* makes clear that gerrymandering can exist in the form of either too few or too many classes; and the relevant inquiry is whether the classification "is clearly for the purpose of manipulating voting."  *Bryson*, 961 F.2d at 502; *see also In re City Homes III LLC*, 564 B.R. 827, 870 (Bankr. D. Md. 2017) (litigation claimants who could look to sources other than the unsecured class for recovery such as insurance and who would swamp the class vote could not be classified with claimants who had to rely solely on the class distribution for recovery).

47.     The vote-driven impetus for the Debtors' classification scheme is underscored by the Term Lenders' agreement to forego any recovery on account of the Term Loan Deficiency Claims.  Having in effect waived their economic rights related to their deficiency claims, the Term Lenders have in effect waived their deficiency claims and any concomitant right to vote those claims for   the Plan.  *See, e.g., JER WHTR Servs., Inc. v. Lavin*,

31

213 B.R. 791, 793 (D. Mass. 1997) ("Because of Sullivan's waiver of his claim, he did not constitute an impaired class and was not, therefore, eligible to vote for the cram down.").  In this context, it is irrational to classify together two such conspicuously different kinds of creditors, which separate groups will receive materially different consideration under the Plan (including blanket Debtor and third party releases for the Settling Parties, but not for other holders of Class 6-B "Other General Unsecured Claims") and which different treatments will drive their voting on the Plan.

48.    The *Durrett* Court, facing similar facts, held that an unsecured mortgage deficiency claim could not be classified together with general unsecured creditors where the mortgage holder had agreed to waive any distributions on its deficiency claim.  *In re Durrett*, 139 B.R. 1, 3 (Bankr. D. N.H. 1992).  The creditor was receiving its collateral in satisfaction of its claim, and had waived distributions on its unsecured deficiency claim, but intended to vote its deficiency claim in favor of the plan.  *Id*. at 2.  General unsecured creditors objected to this classification, arguing that the debtor had classified the deficiency claim with the claims of general unsecured creditors so as to ensure an impaired accepting class.  The *Durrett* court held that this classification was not acceptable, as the deficiency creditor was "influenced by totally different considerations from those motivating the other creditors . . . even if [the creditor] possesses an unsecured claim similar to that of the members of the class, the disparate treatment [of that] claim makes it substantially dissimilar to those of other members" of that class.  *Id*. at 3.[37]

49.    Indeed, there is no good faith purpose for which the Term Lenders should even *want* to vote their purported deficiency claims.  The basic purpose of the Bankruptcy Code's voting provisions is to provide plan voting rights only to those holders of impaired claims

---

[37] *See also In re Featherworks Corp*., 25 B.R. 634 (Bankr. E.D.N.Y. 1982), *aff'd*, 36 B.R. 460 (Bankr. E.D.N.Y. 1984) ("The purpose of the vote is to secure an expression from the creditors of where they think their best interest lies.  An insider, like Hudson and Windsor, does not have the same interest as the creditors.  The creditors will benefit only to the extent of their distributive share in the $40,000 to be paid out by Featherworks; Hudson and Windsor will benefit by retaining effective ownership of a functioning company which has been freed of all outstanding debts in payment for that $40,000.  Hudson and Windsor are influenced by totally different considerations from those motivating the other creditors.").

with an actual economic interest in the treatment of those claims under the proposed plan. Thus, under section 1126(g) of the Bankruptcy Code, classes of claimants receiving nothing under a chapter 11 plan are logically deemed conclusively to have rejected the plan, without the need for a vote.[38] This is intuitive – no creditor would rationally vote a claim in favor of a plan that gives them nothing on account of the voted claim – at least not without some ulterior motive.[39]

50.    The Term Lenders' desire to vote their deficiency claims for a Plan that gives the creditor nothing on account of those claims belies any notion that the deficiency claims would be voted for any purpose other than to advance the Term Lenders' interests, not as holders of general unsecured claims (their deficiency claims), but rather as Settling Parties whose interests are clearly adverse to those of all other holders of Other General Unsecured Claims in Class 6-B -- Settling Parties, who will receive under the Plan a more than full recovery on all of their claims (in the form of new undervalued equity in the reorganized enterprise), along with blanket third party and Debtor releases, and other consideration and benefits, that holders of Other General Unsecured Claims in Class 6-B will not share.

51.    Moreover, permitting the Term Lenders to vote in Class 6-B would skew the entire settlement process in these cases. When the Term Lenders negotiated the TSA, they did so in their capacity as secured creditors, to advance those secured creditor interests, not for general unsecured creditors. General unsecured creditors were not at the table when the parties to the TSA devised their plan and strategy to dictate the general unsecured creditors' fate in these cases. By proposing to permit the Term Lenders to nominally retain their deficiency claims for

---

[38] *See* S. Rep. No. 95-989, 95th Cong., 2d Sess. 2 (1978) ("Subsection (g) [of Section 1126] provides that any class denied participation under the plan is conclusively deemed to have rejected the plan. There is obviously no need to submit a plan for a vote by a class that is to receive nothing.").

[39] If the Court were to accept the Debtors' valuations and determine that the Term Lenders have a valid unsecured deficiency claim, the Court should pose a simple request on the record that would not prejudice the Term Lenders and that would quickly assess the Term Lenders' good faith in pursuing the Plan: That the Term Lenders should waive their deficiency claim in its entirety for purposes of voting on the Plan, given they have waived any recovery on this claim under the Plan as Class 6-B creditors. If the Term Lenders refuse to do so, only one conclusion can be reasonably deduced. Namely, having given up any and all economic rights relating to the deficiency claim, the Term Lenders, as sophisticated parties, must have some reason – an illegitimate one – for wanting to preserve and exercise their votes as Class 6-B creditors on the Plan in order to dominate and swing that Class's voting to accept the Plan.

33

voting purposes only and to vote within the general unsecured class, Class 6-B, the Debtors and

Settling Parties would effectively strip Plan approval or disapproval rights away from the general

unsecured creditors, and cede these rights to the very parties that negotiated for the secured

creditors.  Having negotiated a settlement on the side of one class of creditors, these secured

creditors now seek  to use their deficiency claims —in which they have no real economic

interest— to compel "acceptance" of that same settlement by the other side.  The Court should

not approve a classification scheme that implements such a skewed construct.

52.    The Debtors' gerrymandering and use of the Term Lenders to implement

that gerrymandering is a joint attempt to improperly sidestep the cramdown requirements of

section 1129(b) -- in particular, the "fair and equitable" requirement -- as it applies to Class 6-B.

If the Other General Unsecured Claims (other than the Term Loan Deficiency Claims) were

separately classified from the Term Loan Deficiency Claims, as they should be, the Other

General Unsecured Claims class would very likely vote against the Plan (given the negligible

recovery proposed for Class 6-B creditors), and the Debtors would be required to seek

confirmation with respect to that class pursuant to section 1129(b).  Under a cramdown, as

demonstrated by the Committee's evidence, the Plan distributions to the Term Lenders in Class 4

and the IPCo Noteholders in Class 5 would violate the "fair and equitable" requirement by

overpaying claims in Classes 4 and 5 with value that should be distributed to general unsecured

creditors.

### 3.    If the Court Approves the Plan's Improper, Vote-Driven Classification Scheme, the Votes of Term Loan Deficiency Claims in Class 6-B Should Be Designated

53.    If the Court does not reject the Debtors' improper classification scheme, it

should designate the votes of holders of Term Loan Deficiency Claims that are classified in

Class 6-B.  As set forth in greater detail in the Omnibus Term Loan Relief Motion, section

1126(e) of the Bankruptcy Code provides that a court may "designate any entity whose

acceptance . . . of [a] plan was not in good faith, or was not solicited . . . in good faith."  11

U.S.C. § 1126(e).  A creditor does not act in "good faith" where it casts its vote "with a purpose

of coercing payment . . . of more than he might reasonably perceive as his fair share of the debtor's estate," or where the creditor casts his vote for an "ulterior purpose." *In re Federal Support Co.*, 859 F.2d 17, 19 (4th Cir. 1988); s*ee also Dish Network Corp. v. DBSD N. Am., Inc. (In re DBSD N. Am., Inc.)*, 634 F.3d 79, 103 (2d Cir. 2011) ("Modern cases have found 'ulterior motives' in a variety of situations."); *In re Adelphia Commc'ns Corp.*, 359 B.R. 54, 63 (Bankr. S.D.N.Y. 2006) ("the kinds of motives that have so far been held to warrant vote designation have been to assume control of the debtor" and other improper purposes).

54.    The legislative history of section 1126(e) supports the conclusion that a court should be skeptical  of permitting an undersecured creditor to vote its  unsecured deficiency claim in a general unsecured claims class for a plan that holders of other claims in the class reject, while the undersecured creditor also holds and votes a secured claim that gives the undersecured creditor an interest that conflicts directly with the interests of the holders of other claims in the general unsecured claims class.  "[T]he Code's legislative history makes clear that the Court can designate the vote of a creditor who has a conflict of interest with the class in which it votes." *Dune Deck Owners Corp.*, 175 B.R. at 845.  As explained by the *Dune Deck* court:

> The original House Bill, H.R. 8200, 95th Cong., 1st Sess. (1977), included a provision, denominated § 1126(e), that expressly authorized the Court to designate the vote of an "entity that has, with respect to such class, a conflict of interest that is of such a nature as would justify exclusion of such entity's claim or interest" from the amounts and number of claims or interests required for acceptance.  The present § 1126(e) was codified as § 1126(f).  The House drafters intended to insure that a creditor who held conflicting claims in two classes could be excluded from voting in one--though not necessarily both--of those classes. H.R. Rep. No. 595, 95th Cong., 1st Sess. 411 (1977). . . .
>
> The conflict of interest section, which was not included in the Senate bill, S.2266, 95th Cong., 2d Sess. (1978), did not make it into the Code, as enacted. Congress deemed the provision unnecessary because in its view, Section 105 "constitutes a sufficient power in the court to designate exclusion of a creditor's claim on the basis of a conflict of interest." 124 Cong. Rec. S17420 (daily ed. Oct. 6, 1978) (statement of Sen. DeConcini).

*Id.* at 845, n.13.[40]

---

[40] The related House Committee Report provides:

DOCS_LA:331378.12 45388/002

55.    It is evident from the Plan's placement of the Term Loan Deficiency Claims into Class 6-B at a stipulated amount of approximately $625 million for voting purposes, but not for distribution purposes, that the votes of the Term Lenders on account of those claims would not be cast in good faith, but rather to thwart any effort by the wholly unsecured creditors who hold claims that legitimately belong in that class to vote down the Plan and thereby require the Debtors to satisfy the cramdown requirements of 1129(b) (which, the Committee contends, they cannot do given the overpayment of the Term Lenders' secured claim in Class 4).  The Term Lenders have an inherent conflict of interest with the other creditors in Class 6-B—the Term Lenders have no interest in the economic recovery on their unsecured deficiency claims, and have every interest in being overpaid on their Term Loan Secured Claims at the expense of the general unsecured creditors.  The only logical conclusion that can be drawn from the fact that the holders of Term Loan Deficiency Claims are deemed to have waived any right to a distribution on those claims under the Plan is that when the Term Lenders vote their Term Loan Deficiency Claims in favor of the Plan, they are doing so not to advance their interests as holders of Claims in Class 6-B but rather to advance their agenda, as holders of Class 4 Term Loan Secured Claims (as well as holders of Class 5 IPCo Notes Claim to the extent the holder has both types of claims), that conflicts with the interest of Class 6-B general unsecured creditors, *i.e.*, to receive more than full payment on their claims by confirming a Plan that overpays them at the expense of legitimate holders of  Class 6-B claims.

56.    Under these circumstances, to the extent the Term Loan Deficiency Claims are not reclassified out of Class 6-B, the Court should conclude that the votes of the Term

---

Subsection (e) permits the court to designate for any class of claims or interest any person that has, with respect to that class, a conflict of interest that is of such nature as would justify exclusions of that person's claim or interest from the amounts and number specified in subsection (c) or (d).  *A person might have such a conflict, for example, where he held a claim or interest in more than one class.*  Exclusion from one class for voting purposes would not require his exclusion from the other class as well.  The result is to overrule cases such as *Aladdin Hotel Corp. v. Bloom*, 200 F.2d 627 (8th Cir. 1953) , which, though not in the bankruptcy context, would appear to count votes for a reorganization plan motivated by an attempt to squeeze out a minority of a class.  In that case, the conflict of interest of those voting for the plan was clear, but the court permitted the votes.

H.R. REP. NO. 95-595, at 411 (1977) (emphasis added).

Lenders of their putative Term Loan Deficiency Claims should be designated under section

1126(d) as not being cast or solicited in good faith.

### E.    The Plan's Treatment of Intercompany Claims and Intercompany Interests Is Impermissible

57.    The Plan provides for the reinstatement and payment of Intercompany

Claims and the preservation of the Intercompany Interests (in Classes 7 and 9, respectively) in

the Debtors' sole discretion.  These Plan provisions flout basic confirmation requirements under

the Bankruptcy Code.

58.    First, by allowing for at least some Intercompany Claims to be reinstated

and unimpaired and essentially be satisfied in full, the Plan unfairly discriminates against the

*pari passu* unsecured claims in Classes 6-A and 6-B which will only share limited pools of cash

under the Plan.[41]

59.    Second, by allowing for the potential preservation and reinstatement of

some or all Intercompany Interests, the Plan violates the absolute priority rule (in the event there

is a dissenting class of general unsecured claims) in that the senior general unsecured claims in

---

[41] In order to confirm the Plan over the rejection, or deemed rejection, of a class of creditors, the Debtors must demonstrate that the Plan "does not discriminate unfairly," as required by Bankruptcy Code § 1129(b)(1).  A plan proponent "may not segregate two similar claims or groups of claims into separate classes and provide disparate treatment for those classes."  *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986*), aff'd in part, rev'd in part on other grounds*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd, Kane v. Johns-Manville* Corp. 843 F.2d 636 (2d Cir. 1988).  As explained by one court, the facts and circumstances of the particular case should be examined to determine whether unfair discrimination exists.  *In re Idearc, Inc.*, 423 B.R. 138, 171 (Bankr. N.D. Tex. 2009) ("At a minimum, however, the unfair discrimination standard prevents creditors and equity interest holders with similar legal rights from receiving *materially different treatment* under a proposed plan without *compelling justifications* for doing so.") (emphasis added); *see also In re Cypresswood Land Partners, I*, 409 B.R. 396, 434 (Bankr. S.D. Tex. 2009) ("'[T]he concept of unfair discrimination was designed to maintain equity among creditors of equal priority.'") (quoting *In re Orawsky*, 387 B.R. 128, 141 (Bankr. E.D. Pa. 2008)).  In determining whether the proposed discrimination is fair, courts in the Fourth Circuit analyze a number of factors, including "(1) whether there is a reasonable basis for the discrimination; (2) whether the plan can be confirmed and consummated without the discrimination; (3) whether the discrimination is proposed in good faith; and (4) the treatment of the classes discriminated against."  *Ownby v. Jim Beck, Inc. (In re Jim Beck, Inc.)*, 214 B.R. 305, 307 (W.D. Va. 1997), *aff'd per curiam*, 162 F.3d 1155 (4th Cir. Aug. 24, 1998) (unpublished table decision); *In re Sutton*, No. 10-10539, 2012 Bankr. LEXIS 752, at *6-*7 (Bankr. E.D.N.C. Feb. 9, 2012); *In re Sea Trail Corp.*, No. 11-07370, 2012 Bankr. LEXIS 4985, *25 (Bankr. E.D.N.C. Oct. 23, 2012) ("Consistent with the Code's requirement for fairness, courts often conclude that a plan is unfairly discriminatory when there is a large discrepancy in the percentage recovery between similarly situated creditors.").

Classes 6-A and 6-B will receive substantially less than full payment, while the lower priority

equity interests in Class 9 will be preserved and retained.

60.     The foregoing Plan provisions are contrary to black letter law and should

be rejected by the Court.

## F.    The Plan Contains Improper Third-Party Releases

61.     The Fourth Circuit has held that nonconsensual third-party releases are

only permissible after the court's consideration of numerous relevant factors and if the court

makes a record of specific factual findings that support its conclusions.  The relevant factors

include, among others, (i) whether the nondebtor has contributed substantial assets to the

reorganization; (ii) whether the release is absolutely essential to reorganization; and (iii) whether

the plan provides a mechanism to pay for all, or substantially all, of the class or classes affected

by the release.  *See Behrmann v. Nat'l Heritage Foundation, Inc.*, 663 F.3d 704, 712-23 (4th Cir.

2011).  As discussed above, the Plan contains extremely broad third-party releases in favor of

the Released Parties, which should be rejected by the Court unless the Debtors meet their burden

of providing the requisite specific justification for the Plan releases.  The Debtors portray the

third-party releases – by unimpaired creditors and creditors who do not expressly opt-out of the

third-party release – as consensual and thus permissible.  But a failure to opt out should not be

viewed by the Court as the same as affirmative consent to the release in the instant matter.  For a

release to be consensual, the Debtors must affirmatively obtain the  release; they cannot

manufacture  a consensual release out of a creditor's inaction.

62.     The Debtors' resort to the contrived "you grant a release if you do not

object" structure reflects their acknowledgment that they could never obtain affirmative third

party releases from the general unsecured creditors in Class 6-B. Indeed, why would any holder

of an Other General Unsecured Claim in Class 6-B (when informed of all the pertinent facts)

affirmatively consent to the third party release in this case, when, as discussed herein, such

creditor will not be fully paid (yet should be, as set forth in the Province Expert Report waterfall

analysis), but will instead receive less than a 2% recovery under the Debtors' Plan—and nothing

from the parties getting the third-party release?  The Debtors have provided no evidence for the Court to find that adequate consideration (or, indeed, any consideration at all) will be given by the Released Parties to creditors who default into the third-party release by neglecting to affirmatively opt-out; conclusory assertions by the Debtors are patently insufficient.

63.    Courts in the Fourth Circuit have held that consensual third-party releases may be permissible under the Bankruptcy Code, but that the approval of third-party releases generally should be allowed "cautiously and infrequently" and only under "unusual circumstances."  *See*, *e.g.*, *In re Neogenix Oncology, Inc.*, No. 12-23557, 2015 Bankr. LEXIS 3343, at *13 (Bankr. D. Md. Sept. 30, 2015).  Under the facts and circumstances here, the third-party releases under the Plan should be denied.

## G.    The Exculpation Clause Is Impermissibly Broad By Exculpating Non-Estate Fiduciaries and Extending to Prepetition Actions

64.    The Plan exculpation provision (at § 10.8) purports to limit the liability of numerous parties that are not estate fiduciaries; however, the Debtors have presented no evidence to justify limiting the liability of any of the non-fiduciary exculpated parties.  Further, the exculpation provision impermissibly extends to prepetition actions and omissions of the Exculpated Parties, not just postpetition matters.  Consequently, the Court should disapprove the exculpation provision as being overly broad, and deny confirmation of the Plan unless the scope of that provision is narrowed appropriately.  *See*, *e.g.*, *In re Hygea Holdings Corp.*, Case No. 20-10361 (KBO) (Bankr. D. Del. 2020) (certification of counsel regarding changes made to the plan and confirmation order by the court at the confirmation hearing, including court's limiting of exculpation provision to cover only estate fiduciaries and only postpetition actions, not prepetition actions (Dkt. No. 575); confirmation order including court's changes to plan definitions of "Released Parties" and "Released Claims" (Dkt. No. 576)); *In re Washington Mutual*, 442 B.R. 314, 350-51 (Bankr. D. Del. 2011) ("The exculpation clause must be limited to the fiduciaries who have served during the chapter 11 proceeding: estate professionals, the Committees and their members, and the Debtors' directors and officers.").

H.    **The Plan Injunction Is Overly Broad**

65.    The Plan injunction is overly broad, enjoining actions not only by creditors and interest holders but also "along with their respective present or former employees, agents, officers, directors, principals, and affiliates."  Further, the Plan injunction covers the Released Parties and their property; the Plan injunction should only cover said entities if and to the extent that they are approved by the Court as Released Parties and not as against creditors who opted out of the third-party releases.

## IV.

## CONCLUSION

**WHEREFORE**, for all of the foregoing reasons, the Committee requests that the Court (i) deny confirmation of the Plan, and (ii) grant such other and further relief as is appropriate and just.

Dated:    August 17, 2020

By:    /s/  Robert S. Westermann
Counsel
Robert S. Westermann (VSB No. 43294)
Brittany B. Falabella (VSB No. 80131)
HIRSCHLER FLEISCHER, P.C.
The Edgeworth Building
2100 East Cary Street
Richmond, Virginia 23223
P.O. Box 500
Richmond, Virginia 23218-0500
Telephone: (804) 771-9500
Facsimile: (804) 644-0957
Email: rwestermann@hirschlerlaw.com
         bfalabella@hirschlerlaw.com

*Local Counsel to the Official Committee of Unsecured Creditors*

-and-

Robert J. Feinstein, Esq. (admitted *pro hac vice*)
Bradford J. Sandler, Esq. (admitted *pro hac vice*)
Debra I. Grassgreen, Esq. (admitted *pro hac vice*)

Shirley S. Cho, Esq. (admitted *pro hac vice*)
PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 34th Floor
New York, NY 10017-2024
Telephone: (212) 561-7700
Facsimile:  (212) 561-7777
Email:  rfeinstein@pszjlaw.com
        bsandler@pszjlaw.com
        dgrassgreen@pszjlaw.com
        scho@pszjlaw.com

*Lead Counsel to the Official Committee of Unsecured Creditors*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 17, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which then sent a notification of such filing to all counsel of record registered with the CM/ECF system I also certify that on August 17, 2020, a copy of the foregoing was served by email on the Service List attached hereto, to the extent an email address was provided, and to the parties where only a mailing address was provided, a copy of the foregoing was mailed by overnight mail.

<u>/s/ *Robert S. Westermann*</u>
*Counsel*

42

| Creditor | Address | Address2 | Address3 | Address4 | Address5 | Phone | FAX | Email | Attention | Description |
|---|---|---|---|---|---|---|---|---|---|---|

| Name | Attn | Address 1 | Address 2 | City/State | Phone | Fax | Email | Contact | Description |
|---|---|---|---|---|---|---|---|---|---|
| Milbank LLP | | | | | 212-530-5000 | 212-530-5219 | mbrod@milbank.com | Matt Brod | *NOA - Counsel to the Ad Hoc Committee |
| Milbank LLP | Attn: Christine E. Devine | 100 Front St | | Worcester, MA 01608 | 212-530-5000 | 212-530-5219 | ddurvie@milbank.com | Dennis F. Dunne | *NOA - Counsel to the Ad Hoc Committee |
| Mirick, O'Connell, DeMallie & Lougee, LLP | Attn: Joseph H. Baldiga | 1800 W Park Dr., Ste 400 | | Westborough, MA 01581 | 508-898-1501 | 508-898-1502 | jbaldiga@mirickoconnell.com | Joseph H. Baldiga | *NOA - Asheville Retail Associates LLC, NED Little Rock LLC, |
| Mirick, O'Connell, DeMallie & Lougee, LLP | | | | | 508-898-1501 | 508-898-1502 | cdevine@mirickoconnell.com | Christine E. Devine | *NOA - Asheville Retail Associates LLC, NED Little Rock LLC, |
| Missouri Department of Revenue | Attn: John Whiteman | Bankruptcy Unit | P.O. Box 475 | Jefferson City, MO 65105-0475 | 573-751-5531 | 573-751-7232 | edeaccf@dor.mo.gov | John Whiteman | *NOA - Counsel to Missouri Department of Revenue |
| Nold Muchinsky PLLC | Attn: Brian M. Muchinsky | | 10500 NE 8th St, Ste 930 | Bellevue, WA 98004 | 425-289-5555 | 888-371-4133 | bmuchinsky@noldmuchlaw.com | Brian M. Muchinsky | *NOA - Bellevue Square, LLC and Bellevue Square Merchants' A |
| Nold Muchinsky PLLC | | | | | 425-289-5555 | 888-371-4133 | tstone@noldmuchlaw.com | Thomas W. Stone | *NOA - Bellevue Square, LLC and Bellevue Square Merchants' A |
| Nold Muchinsky PLLC | Attn: Thomas W. Stone | 10500 NE 8th St, Ste 930 | | Bellevue, WA 98004 | | 888-371-4133 | tstone@noldmuchlaw.com | Thomas W. Stone | *NOA - Counsel to Bellevue Square, LLC and Bellevue Square M |
| Office of the Attorney General | Attn: Christopher S. Murphy, AAG | Bankruptcy & Collections Division NC 008 | | Austin, TX 78711-2548 | 512-475-4867 | 512-936-1409 | christopher.murphy@oag.texas.gov | Christopher S. Murphy, AAG | *NOA - Counsel to the State of Texas |
| Office of the Attorney General | Attn: Jason B. Binford | | Bankruptcy & Collections Division MC 008 | P.O. Box 12548 | 512-463-2173 | 512-936-1409 | jason.binford@oag.texas.gov | Jason B. Binford | *NOA - State of Texas |
| Office of the Attorney General | | | | | 512-463-2173 | 512-936-1409 | abigail.ryan@oag.texas.gov | Abigail R. Ryan | *NOA - State of Texas |
| Office of the United States Trustee | Attn: Kenneth N Whitehurst, III | 701 E Broad St, Ste 4304 | | Richmond, VA 23219 | | 804-771-2330 | ustpregion04.rh.ecf@usdoj.gov | Kenneth N Whitehurst, III | Core Parties - United States Trustee |
| OPR Kurman, P.A | Attn: Stephen A. Metz | 4800 Montgomery Ln, 9th Fl | | Bethesda, MD 20814 | 240-507-1723 | 240-507-1735 | smetz@offitkurman.com | Stephen A. Metz | *NOA - Thruway Shopping Center LLC |
| Pachulski Stang Ziehl & Jones LLP | Attn: Robert Feinstein | | | | 212-561-7700 | 212-561-7777 | rfeinstein@pszjlaw.com | Robert I. Feinstein | *NOA - Counsel to Official Committee of Unsecured Creditors |
| Pachulski Stang Ziehl & Jones LLP | Attn: Bradford Sandler | | | | 212-561-7700 | 212-561-7777 | bsandler@pszjlaw.com | Bradford J. Sandler | *NOA - Counsel to Official Committee of Unsecured Creditors |
| Pachulski Stang Ziehl & Jones LLP | | | | | 212-561-7700 | 212-561-7777 | schoi@pszjlaw.com | Shirley S. Cho | *NOA - Counsel to Official Committee of Unsecured Creditors |
| Palmer Square Management | Attn: Lori Rabon | 40 Nassau St | | Princeton, NJ 08542 | 609-613-3084 | 609-921-3797 | smoran@palmersquare.com | Sandra S. Moran, Esq. | *NOA - Counsel to PSLP LLC ("PSLP") and PSLAF Partners, LLC |
| Palmer Square Management | Attn: Lori Rabon | | | | 609-613-3084 | 609-921-3797 | lrabon@palmersquare.com | Lori Rabon | *NOA - Counsel to PSLP LLC ("PSLP") and PSLAF Partners, LLC |
| Paul, Weiss, Rifkind, Wharton & Garrison LLP | Attn: Paul Basta/Jacob Adlerstein | 1285 Avenue of the Americas | | New York, NY 10019 | 212-373-3000 | 212-757-3990 | pbasta@paulweiss.com | Paul Basta | *NOA - TPG Partners VI, L.P. (Counsel to the Sponsors) |
| Paul, Weiss, Rifkind, Wharton & Garrison LLP | | | | | | | jadlerstein@paulweiss.com | Jacob Adlerstein | *NOA - TPG Partners VI, L.P. (Counsel to the Sponsors) |
| Paul, Weiss, Rifkind, Wharton & Garrison LLP | | | | | | | eparik@paulweiss.com | Eugene Y. Park | *NOA - TPG Partners VI, L.P. (Counsel to the Sponsors) |
| Paul, Weiss, Rifkind, Wharton & Garrison LLP | | | | | | | iblumberg@paulweiss.com | Irene Blumberg | *NOA - TPG Partners VI, L.P. (Counsel to the Sponsors) |
| Perdue, Brandon, Fielder, Collins & Mott, LLP | Attn: Owen M. Sonik | 1235 N Loop W, Ste 600 | | Houston, TX 77008 | 713-862-1860 | 713-862-1429 | osonik@pbfcm.com | Owen M. Sonik | *NOA - Spring Branch ISD District and City of Houston |
| Pierce McCoy, PLLC | Attn: Jonathan A. Grasso, Esq. | 101 W. Main St, Ste 101 | | Norfolk, VA 23510 | | 757-257-0387 | jon@piercemccoy.com | Jonathan A. Grasso, Esq. | *NOA - Counsel to Bellevue Square, LLC and Bellevue Square M |
| Pryor Cashman LLP | Attn: Conrad K. Chiu | 7 Times Square | | New York, NY 10036-6569 | 212-421-4100 | 212-515-6562 | cchiu@pryorcashman.com | Conrad K. Chiu | *NOA - Counsel to Envisage Group |
| Reed Smith LLP | Attn: Justin Sizemore | Riverfront Plaza – W Tower | 901 E Byrd St, Ste 1700 | Richmond, VA 23219 | 804-344-3481 | | jsizemore@reedsmith.com | Justin Sizemore | *NOA - Counsel to Tango Analytics, LLC |
| Reed Smith LLP | Attn: Lloyd A. Lim | 811 Main St, Ste 1700 | | Houston, TX 77002-6110 | 713-469-3800 | 713-469-3899 | llim@reedsmith.com | Lloyd A. Lim | *NOA - Counsel to Tango Analytics, LLC |
| Reed Smith LLP | Attn: Rachel I. Thompson | | | | | | rthompson@reedsmith.com | Rachel I. Thompson | *NOA - Counsel to Tango Analytics, LLC |
| Robinson Bring Lenwand Greene Genovese & Gluck P.C. | Attn: Fred B. Ringel | 875 Third Ave, 9th Fl | New York, NY 10022 | | 212-603-6300 | 212-956-2164 | fbr@robinsonbrog.com | Fred B. Ringel | *NOA - Counsel for Gazebway LLC |
| Ronald Page PLC | Attn: Ronald A. Page, Jr | P.O. Box 73087 | | N. Chesterfield, VA 23235 | 804-562-8704 | 804-482-2427 | rpage@page1aw.com | Ronald A. Page, Jr | *NOA - Counsel to INT S.A. and Schulz & Lyman Turnkey Services, LLC |
| Rosenberg & Estis, P.C. | Attn: Jack Rose | 733 3rd Ave | | New York, NY 10281 | 212-867-6000 | 212-551-8484 | jrose@rosenbergestis.com | Jack Rose | *NOA - Counsel to Williamsburg Portfolio II, LLC |
| S&D Law | Attn: Steven W. Kelly, Esq. | 1290 Broadway, Ste 1650 | | Denver, CO 80203 | | | | | NOA - Counsel to CPRP VII Associates, L.P. |
| Securities and Exchange Commission | 100 F St, NE | | Washington, DC 20549 | | | | | | Government Agencies |
| Securities and Exchange Commission | Philadelphia Regional Office | Attn: Kelly L Gibson | 1 Penn Ctr | 1617 John F Kennedy Blvd, Ste 520 | Philadelphia, PA 19103 | | philadelphia@sec.gov | Kelly L Gibson | Government Agencies |
| Seward & Kissel LLP | Attn: Gregg S. Bateman | Attn: John R. Ashmead | 1 Battery Park Plz | | New York, NY 10004 | 212-574-1434 | 212-480-8421 | bateman@sewkis.com | Gregg S. Bateman | Core Parties - Counsel to DIP Agent/Prepetition Term Loan Ag |
| Seward & Kissel LLP | | | | | | 212-574-1436 | 212-480-8421 | tatemyo@sewkis.com | Catherine V. LoTempio | Core Parties - Counsel to DIP Agent/Prepetition Term Loan Ag |
| Seward & Kissel LLP | | | | | | 212-574-1436 | 212-480-8421 | ashmead@sewkis.com | John R. Ashmead | Core Parties - Counsel to DIP Agent/Prepetition Term Loan Ag |
| Simon Property Group, Inc. | Attn: Ronald M. Tucker | 225 W Washington St | | Indianapolis, IN 46204 | 317-263-2346 | 317-263-7901 | rtucker@simon.com | Ronald M. Tucker | *NOA - Simon Property Group, Inc. |
| Spector & Cox | Attn: Howard Marc Spector | 12770 Coit Rd, Ste 1100 | | Dallas, TX 75251 | 214-365-5377 | 214-237-3380 | hspector@spectorcox.com | Howard Marc Spector | *NOA - Counsel to The Shops at Summerlin North, LP |
| Spotts Fain PC | Attn: Robert H. Chappell, III | 411 E Franklin St, Ste 600 | | Richmond, VA 23219 | 804-697-2000 | 804-697-2100 | rchappell@spottsfain.com | Robert H. Chappell III | *NOA - Counsel for 91 Fifth Avenue Corp and Victory International Inc. |
| Spotts Fain PC | | | | | 804-697-2000 | 804-697-2100 | nmccullagh@spottsfain.com | Neil E. McCullagh | *NOA - Counsel for 91 Fifth Avenue Corp and Victory International Inc. |
| Spotts Fain PC | Attn: Robert H. Chapell, III | Attn: Neil E. McCullagh | Attn: Karl A. Moses, Jr | 411 E Franklin St, Ste 600 | Richmond, VA 23219 | 804-697-2000 | 804-697-2100 | kmoses@spottsfain.com | Karl A. Moses, Jr. | *NOA - Counsel for Salesforce.com, Inc. |
| Squire Patton Boggs LLP | Attn: Norman N. Kinel | 1211 Avenue of the Americas, 26th Fl | New York, NY 10036 | | 212-407-0130 | 212-872-9815 | norman.kinel@squirepb.com | Norman N. Kinel | *NOA - Counsel for China Tng Garment Mfg (Group) Limited |
| Squire Patton Boggs LLP | Attn: Jeffrey N. Rothleder | 2550 M Street, NW | | Washington, DC 20037 | 202-457-6000 | 202-457-6315 | jeffrey.rothleder@squirepb.com | Jeffrey N. Rothleder | *NOA - Counsel for China Tng Garment Mfg (Group) Limited |
| Sulmeyerkupetz | Attn: Victor A. Sahn | 333 S Grand Ave, Ste 3400 | | Los Angeles, CA 90071 | 213-626-2311 | 213-629-4520 | vsahn@sulmeyerlaw.com | Victor A. Sahn | *NOA - Counsel for Denimatrix LLC |
| Tannenbaum Helpern Syracuse & Hirschtritt LLP | Attn: Michael J. Riela | 900 Third Ave, 13th Fl | | New York, NY 10022 | 212-508-6700 | 212-371-1084 | Riela@thsh.com | Michael J. Riela | *NOA - Counsel for Victory International Inc. |
| Tavenner & Beran, PLC | Attn: Lynn Tavenner/Paula Beran | 20 N 8th St, 2nd Fl | | Richmond, VA 23219 | 804-783-8300 | 804-783-0178 | ltavenner@tb-lawfirm.com | Lynn L. Tavenner | *NOA - Counsel to the Ad Hoc Committee |
| Tavenner & Beran, PLC | | | | | 804-783-8300 | 804-783-0178 | pberan@tb-lawfirm.com | Paula S. Beran | *NOA - Counsel to the Ad Hoc Committee |
| Tavenner & Beran, PLC | | | | | 804-783-8300 | 804-783-0178 | dtabakin@tb-lawfirm.com | David N. Tabakin | *NOA - Counsel to the Ad Hoc Committee |
| The County of Loudoun, Virginia | Attn: Steven F. Jackson | Assistant County Attorney | 1 Harrison St, SE, 5th Fl | Leesburg, VA 20177-7000 | 703-777-0549 | 703-771-5025 | steve.jackson@loudoun.gov | Steven F. Jackson | *NOA - Counsel to The County of Loudoun, Virginia |
| The National Association of Attorneys General | Attn: Legal Dept | 1850 M St NW, 12th Fl | | Washington, DC 20036 | 202-326-6000 | | | | Core Party |
| The Sarachek Law Firm | Attn: Joseph E. Sarachek, Esq. | 101 Park Ave, 27th Fl | | New York, NY 10178 | | 646-861-4950 | joe@saracheklawfirm.com | Joseph E. Sarachek, Esq. | *NOA - Counsel to Ray de Apparel HK Ltd. |
| The Taubman Company | Attn: Andrew S. Conway | 200 E Long Lake Rd, Ste 300 | | Bloomfield Hills, MI 48304 | 248-258-7427 | | aconway@taubman.com | Andrew S. Conway | *NOA - Counsel for Taubman Landlords |
| Thompson Hine LLP | Attn: Irving C. Apar/Yesenia Batista | 335 Madison Ave, 12th Fl | | New York, NY 10017-4611 | | | irving.apar@thompsonhine.com | Irving C Apar | Counsel to the IPCo Notes Trustees |
| Thompson Hine LLP | | | | | | | yesenia.batista@thompsonhine.com | Yesenia Batista | Counsel to the IPCo Notes Trustees |
| Thompson Hine LLP | Attn: Louis F. Solimine, Esq. | 312 Walnut St, Ste 1400 | | Cincinnati, OH 45202-4029 | | 513-241-4771 | Louis.Solimine@ThompsonHine.com | Louis F. Solimine, Esq. | *NOA - Counsel for AM MSW LLC, Peoria New Mall LLC, OKC Outl |
| Trainor Fairbrook | Attn: Jennifer L. Pruski | PO Box 255824 | | Sacramento, CA 95865 | 916-929-7000 | 916-929-7111 | jpruski@trainorfairbrook.com | Jennifer L. Pruski | *NOA - Counsel to Folsom Central, LLC |
| United States Attorney's Office | The Eastern District of Virginia | 919 E Main St, Ste 1900 | | Richmond, VA 23219 | | | | | US Attorney's Office for the Eastern District of Virginia |
| Vandeventer Black LLP | Attn: James K. Donaldson | Riverfront Plaza – West Tower | 901 E Byrd St, Ste 1600 | Richmond, VA 23219 | 804-237-8800 | 804-237-8801 | jdonaldson@vanblacklaw.com | James K. Donaldson | *NOA - Pen Pacific Co., Ltd. |
| Vedder Price PC | Attn: Anand Ramana | 1401 I St NW, Ste 1100 | | Washington, DC 20005 | 202-312-3325 | 202-312-3322 | aramana@vedderprice.com | Anand Ramana | *NOA - Counsel to 922 North Bush, LLC |
| Victory International Inc | | | | | | | justinkern@jil1.oung.com | Justin Kent | Vendor |
| Victory International Inc | | | | | | | PeterDeWitt@USourcing.com | Peter De Witt | Vendor |
| Wayne Greenwald PC | Attn: Wayne M. Greenwald | 475 Park Ave S, 26th Fl | | New York, NY 10016 | 212-983-1922 | 877-254-1003 | | | NOA - Counsel for INT S.A. |
| Weil, Gotschal & Manges LLP | Attn: Ray C. Schrock/Ryan Preston Dahl | 767 Fifth Ave. | | New York, NY 10153 | 212-310-8000 | 212-310-8007 | ray.schrock@weil.com | Ray C. Schrock, P.C. | Core Parties - Counsel to the Debtors |
| Weil, Gotschal & Manges LLP | | | | | 212-310-8000 | 212-310-8007 | ryan.dahl@weil.com | Ryan Preston Dahl | Core Parties - Counsel to the Debtors |
| Weil, Gotschal & Manges LLP | | | | | 212-310-8000 | 212-310-8007 | candace.arthur@weil.com | Candace M. Arthur | Core Parties - Counsel to the Debtors |
| Weil, Gotschal & Manges LLP | | | | | 212-310-8000 | 212-310-8007 | daniel.gwen@weil.com | Daniel Gwen | Core Parties - Counsel to the Debtors |
| Whiteford, Taylor & Preston, LLP | | | | | 804-977-3300 | | cbockel@wtplaw.com | Corey S. Booker | *NOA - TPG Partners VI, L.P. |
| Whiteford, Taylor & Preston, LLP | | | | | 804-977-3300 | | | Vernon E. Inge, Jr. | *NOA - TPG Partners VI, L.P. |
| Whiteford, Taylor & Preston, LLP | Attn: Christopher A. Jones | Attn: Vernon E. Inge, Jr /Corey S. Booker | Two James Center | 1021 E. Cary St, Ste 1700 | Richmond, VA 23219 | 804-977-3300 | | cajones@wtplaw.com | Christopher A. Jones | *NOA - TPG Partners VI, L.P. |
| Wilk Auslander LLP | Attn: Eric J. Snyder | 1515 Broadway, 43rd Fl | | New York, NY 10036 | 212-981-2300 | | esnyder@wilkauslander.com | Eric J. Snyder | *NOA - Counsel to 30 E. 85th St., Company LLC |
| Williams Mullen | Attn: Augustus Epps Jr./Michael Mueller | 200 S 10th St, Ste 1600 | | Richmond, VA 23219-3095 | 804-420-6000 | 804-420-6507 | aepps@williamsmullen.com | Augustus Epps Jr. | *NOA - Northwood P L.L.P., Cascenway LLC, Eastview Mall, LL |
| Williams Mullen | | | | | 804-420-6000 | 804-420-6507 | mmueller@williamsmullen.com | Michael Mueller | *NOA - Northwood P L.L.P., Cascenway LLC, Eastview Mall, LL |
| Williams Mullen | | | | | 804-420-6000 | 804-420-6507 | jmclemore@williamsmullen.com | | *NOA - Northwood P L.L.P., Cascenway LLC, Eastview Mall, LL |
| Williams Mullen | | | | | 804-420-6000 | 804-420-6507 | beastham@williamsmullen.com | Bennett T. W. Eastham | *NOA - Northwood P L.L.P., Cascenway LLC, Eastview Mall, LL |
| Williams Mullen | | | | | 804-420-6000 | 804-420-6507 | mmueller@williamsmullen.com | Michael D. Mueller | *NOA - Northwood P L.L.P., Cascenway LLC, Eastview Mall, LL |
| Willkie Farr & Gallagher LLP | Attn: Jeffrey D. Pawlitz | Attn: Robert I. Engelke | 787 7th Ave | | New York, New York 10019 | | | 212-728-8111 | jpawlitz@willkie.com | Jeffrey D. Pawlitz | *NOA - Counsel to J.P. Morgan Securities, LLC |
| Willkie Farr & Gallagher LLP | Attn: Mark T. Stancil | 1875 K St, NW | | Washington DC 20006-1238 | | | 202-303-2000 | mstancil@willkie.com | Mark T. Stancil | *NOA - Counsel to J.P. Morgan Securities, LLC |
| Willkie Farr & Gallagher LLP | Attn: Michael E. Hastings | Attn: Richard C. Maxwell | 901 East Byrd St, Ste 1550 | | Richmond, VA 23219 | 804-956-2049 | 540-788-8113 | mhastings@woodsrogers.com | Michael E. Hastings | *NOA - Counsel to DIP Agent/Prepetition Term Loan Agent |
| Woods Rogers PLC | Attn: Michael E. Hastings | Attn: Richard C. Maxwell | 901 East Byrd St, Ste 1550 | | Richmond, VA 23219 | 804-956-2049 | 540-788-8113 | maxwell@woodsrogers.com | Richard C. Maxwell | *NOA - Counsel to DIP Agent/Prepetition Term Loan Agent |

# Exhibit A

# (Organizational Chart)



*Source: Court filings and Debtors' schedules*

# Exhibit B

# (MSG Expert Rebuttal Report - Redacted)

 THE MICHEL-SHAKED GROUP

---

**IN THE UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | | |
|---|---|---|
| | ) | |
| **In re** | ) | **Chapter 11** |
| | ) | |
| **CHINOS HOLDINGS, INC.,** *et al.*, | ) | **Case No. 20-32181 (KLP)** |
| | ) | |
| **Debtors.** | ) | **(Jointly Administered)** |
| | ) | |

## *Expert Rebuttal Report of The Michel-Shaked Group*

**August 7, 2020**





# Table of Contents

| Topic | Page |
|-------|------|
| **I. Scope of Engagement and Summary of Opinions** | **2** |
| **II. Rebuttal to the Lazard Report** | **6** |
|    a) Lazard's Discount Rate for J. Crew and Madewell is Flawed and Incorrect | 7 |
|    b) Lazard's DCF Valuation of Madewell is Flawed | 18 |
|    c) Lazard's CompCo Valuation of J. Crew is Flawed | 21 |
|    d) Lazard's CompCo Valuation of Madewell is Flawed | 28 |
| **III. Rebuttal to the Ocean Tomo Report** | **39** |
|    a) Ocean Tomo's Royalty Rate is Unreasonable | 42 |
|    b) Ocean Tomo's Implied Profit Split is Unreasonable | 54 |
|    c) Ocean Tomo Assumed the Same Royalty Rate in its 2016 Report | 58 |
|    d) Ocean Tomo's PGR is Unreasonable | 65 |
| **IV. Limiting Factors and Other Assumptions** | **67** |
| **V. Appendix** | **69** |
|    a) Historical Peer Groups Identified for J. Crew and Madewell | 70 |
|    b) Documents Relied Upon | 73 |



# I. Scope of Engagement and Summary of Opinions



2

# Scope of Engagement

- At the request of Pachulski Stang Ziehl & Jones LLP, counsel to the Official Committee of Unsecured Creditors of Chinos Holdings Inc. and its Affiliated Debtors, we were asked to:

  ➢ Review and provide our opinions with respect to the Expert Valuation Report of Lazard Frères & Co. LLC dated July 31, 2020 ("Lazard" or "Lazard Report").

  ➢ Review and provide our opinions with respect to the Brand Valuation Report of Ocean Tomo, LLC dated July 31, 2020 ("Ocean Tomo" or "Ocean Tomo Report").

- Abbreviations and definitions used in this Report are the same as those used in the MSG Expert Report.[1]

- As discovery is ongoing as of the date of this Report, we reserve the right to supplement and amend this Report.



3

(1)  Any defined term not explicitly defined in this Report is defined in the MSG Expert Report.

# Summary of Opinions

## Review of the Lazard Report

- Following our review and analysis, it is our opinion that the Lazard Report is flawed and reaches conclusions which are unsubstantiated and incorrect. This Report describes, in detail, the following:

  ➢ Lazard's calculated Weighted Average Cost of Capital ("WACC") for J. Crew and Madewell is flawed, incorrect and should not be relied upon. This incorrect WACC results in a significant understatement of the enterprise value of J. Crew and Madewell in the Lazard Report. Specifically, Lazard incorrectly used an abnormal beta effected by the extreme market volatility due to the COVID-19 pandemic and it used the historical long-term equity risk premium, which is outdated and inconsistent with current accepted methodologies by valuation professionals.

  ➢ In its Discounted Cash Flow ("DCF") valuation of Madewell, Lazard incorrectly did not use the 3-stage growth model but rather unreasonably assumes a sudden drop in growth from 8.9% to 3.5%.

  ➢ Lazard's Comparable Company ("CompCo") valuation for J. Crew is flawed, incorrect and unreasonable because it contains companies that are not comparable to J. Crew and excludes companies that are comparable.

  ➢ Lazard's CompCo valuation for Madewell is flawed, incorrect and unreasonable because it uses multiples that significantly undervalue the company and it contains peer companies whose historical growth characteristics are not comparable to Madewell. Had Lazard used companies more comparable to Madewell, and used a higher valuation multiple more consistent with Madewell's growth profile, it would have concluded a significantly greater enterprise value for Madewell.



4

# Summary of Opinions

## Review of the Ocean Tomo Report

- Following our review and analysis, it is our opinion that the Ocean Tomo Report is flawed and reaches conclusions which are unsubstantiated and incorrect. This Report describes, in detail, the following:

  ➢ Ocean Tomo's selected royalty rate for the J. Crew IP is flawed, unreasonable and, as a result, significantly overstates the value of the J. Crew IP.[1]

  ➢ Ocean Tomo's implied profit split for the J. Crew IP, of approximately 87.7%, is unreasonable and contradicts fundamental economic rationale.[2]

  ➢ Ocean Tomo's assumed royalty rate of 3.0% in the Ocean Tomo Report is the same royalty rate Ocean Tomo assumed four years earlier in its valuation of the J. Crew IP in 2016 ("2016 Ocean Tomo Report"). This is unreasonable because following FY2016, J. Crew's revenue and profitability declined substantially. Moreover, J. Crew's projected profitability is significantly lower as of the Ocean Tomo Report than it was as of the 2016 Ocean Tomo Report. The "J. Crew of 2020" does not resemble the "J. Crew of 2016."

  ➢ Ocean Tomo's assumed perpetuity growth rate ("PGR") of 2.0% is incorrect and is inconsistent with the Lazard Report's assumption of a 0.0% PGR.

(1) Appendix A of the MSG Expert Report summarizes the trademarks and servicemarks included in the J. Crew IP. The trademarks and servicemarks are also referred to by advisors in certain third-party valuations as the "J. Crew Trade Name."

(2) Implied profit split = royalty income / earnings before interest and taxes ("EBIT"). The profit split method ("PSM") is a standard framework used by financial professionals for determining an appropriate royalty rate for licensing agreements. The PSM assumes that the licensee of certain trademarks would split a portion of the pre-tax profits derived from such trademarks with the licensor. This method ultimately applies a percentage to the profit margins (usually EBIT) and assumes the resulting margin to be an appropriate royalty rate.

MSG

5

# II. Rebuttal to the Lazard Report



## a) Lazard's Discount Rate for J. Crew and Madewell is Flawed and Incorrect



# Lazard's Discount Rate for J. Crew and Madewell is Flawed and Incorrect

## Conclusion

- Lazard's calculated WACC for J. Crew and Madewell is flawed, incorrect and should not be relied upon.[1] This incorrect WACC results in a significant understatement of the enterprise values in the Lazard Report. Specifically:

  **Lazard's Betas are Distorted Due to COVID-19**:

  ➢ Lazard downloaded peer betas from Barra and Bloomberg as of June 30, 2020 and July 24, 2020, respectively. These betas incorporate the abnormal market volatility of the market due to the COVID-19 pandemic. Lazard's decision to use an abnormal beta to determine a WACC for J. Crew and Madewell is inconsistent with financial literature and with the Debtors' IP Valuation expert, Ocean Tomo. Specifically, Ocean Tomo explicitly stated twice in its report that it used cost of capital inputs prior to the COVID-19 pandemic.[2]

  ➢ By using a beta effected by COVID-19, Lazard is assuming that the short-term impact of COVID-19 will impact J. Crew's and Madewell's cash flows in perpetuity. However, it is well accepted in finance that the regression analysis used to determine a company's beta should be calculated during a normal period with normal market volatility.

  ➢ Moreover, Lazard's use of an abnormal beta due to the market volatility as a result to COVID-19 is inconsistent with its CompCo valuation methodology. For example, in its CompCo valuation analysis, Lazard elected to not use FY2020 multiples to value J. Crew and Madewell, presumably because of the abnormal operating results of the peer companies and the subject companies due to COVID-19.

  ➢ Had Lazard used a normalized beta, as we did in the MSG Expert Report, it would have concluded on a substantially lower unlevered beta of 0.84 for J. Crew and 1.06 for Madewell. By making this adjustment to normalize the beta, and making no other changes, Lazard's concluded DCF value for J. Crew would increase to $812 million and Madewell would increase to $1,881 million, for a total enterprise value of the J. Crew Group of $2,693 million.



(1) Lazard Report, p. 25.
(2) Ocean Tomo Report, pp. 32-33.

8

# Lazard's Discount Rate for J. Crew and Madewell is Flawed and Incorrect

## Conclusion (cont.)

**Lazard Excludes Four Companies from its Beta Calculation, Without Substantiation**:

➤ Without any substantiation or support, Lazard excluded the following companies from its beta analysis for Madewell: Aritzia, Fast Retailing, Inditex, and H&M. If Lazard had included these four companies in its beta analysis for Madewell, and making no other changes, its unlevered beta would decrease to 1.30, increasing its Madewell value from $1,211 million to $1,464 million.

**Lazard's Use of a Historical Long-Term Equity Risk Premium is Outdated**:

➤ Lazard's use of the historical long-term equity risk premium of 7.2% is outdated. In recent years, valuation professionals have correctly abandoned the use of a purely historical premium and in favor of a supply-side equity risk premium. It is more common and more correct to use the supply-side equity risk premium of 6.2%, as we did in the MSG Expert Report.

➤ Had Lazard used the supply-side equity risk premium instead of the historical long-term equity risk premium, and making no other changes, its concluded DCF value for J. Crew would increase from $504 million to $553 million and Madewell would increase from $1,211 million to $1,454 million for a total enterprise value of the J. Crew Group of $2,007 million.



9

# Lazard's Discount Rate for J. Crew and Madewell is Flawed and Incorrect

## Lazard's Use of An Abnormal Beta in WACC Calculation

- Lazard states that it used an unlevered beta of 1.80 for J. Crew and 1.51 for Madewell based on peer averages. It appears that Lazard used a 2-year weekly beta through June 30, 2020 in the case of Barra and July 24, 2020 in the case of Bloomberg.[1]

- Due to COVID-19, market volatility increased significantly.[2] As a result, the regression analysis used to calculate betas over this time period could result in a beta higher or lower than during normal market conditions. Financial literature discusses the importance of using normalized inputs, such as beta, when determining a discount rate used to value a company in perpetuity. For example, consider the following:

  ➤ "Research shows that betas are time-varying (i.e., sensitive to market changes as the economy changes; betas differ during improving economic conditions compared with periods when economic conditions are declining). **Using a historical method based on a sample period may not provide a reliable indication of expected beta when economic conditions are changing**. The current and expected future economic conditions may differ from the economic conditions during the look-back period. **Therefore, the beta estimated using the data for the look-back period may not reflect the future**."[3]

- Lazard unreasonably assumes that the economy will continue to suffer from COVID-19 type shocks and volatility from 2020 in perpetuity. This approach is contrary to accepted principles.

---

(1) Lazard Report, p. 28.
(2) The VIX, formally known as the Chicago Board Option Exchange's CBOE Volatility Index, is a measure of implied volatility on S&P 500 options and a popular measure of expected overall market volatility. Also known as the Fear Index, the VIX began to surge beginning in late February 2020 due to the increased fear and uncertainty regarding the COVID-19 pandemic, indicating that investors were expecting increased market volatility in the near future. On March 16, 2020, the VIX closed at an all-time high of 82.69, the previous peak being 80.74 on November 21, 2008. As of July 31, 2020, the VIX has not fallen below pre-COVID-19 levels. Source: FactSet.
(3) Pratt, Shannon P., Roger J. Grabowski, Cost of Capital: Applications and Examples, 5th Ed. John Wiley & Sons, Inc. 2014, p. 204. (emphasis added)



MSG

# Lazard's Discount Rate for J. Crew and Madewell is Flawed and Incorrect

## Lazard Incorrectly Used an "Abnormal" Peer Beta

- In its CompCo valuation for both J. Crew and Madewell, Lazard elected to not use FY2020 enterprise value/EBITDA[1] ("EV/EBITDA") multiples, presumably due to abnormal operating metrics for the peers and for J. Crew and Madewell. This is inconsistent with Lazard's decision to use abnormal betas in its DCF valuation of J. Crew and Madewell.

- Furthermore, Ocean Tomo, brand valuation expert for the Debtors, used inputs normalized for the impact of COVID-19 in its calculation of a discount rate. For example, Ocean Tomo states the following:

  - "To arrive at a cost of equity, we looked to the median retail apparel industry cost of equity in 2019, **prior to the onset of the COVID-19 pandemic**."[2]

  - "The capital structure of the GPCs [Guideline Public Companies] reflect their most recent reporting **prior to the COVID-19 in order to approximate for a normalized capital structure for the industry**."[3]

> **Lazard's use of an abnormal beta, in addition to being flawed, is inconsistent with its own CompCo analysis and Ocean Tomo's valuation of the J. Crew IP.**

MSG

(1) EBITDA = Earnings before interest, taxes, depreciation and amortization.
(2) Ocean Tomo Report, p. 32. (emphasis added)
(3) Ocean Tomo Report, p. 33. (emphasis added)

# Lazard's Discount Rate for J. Crew and Madewell is Flawed and Incorrect

## Impact on Lazard's Valuation of J. Crew and Madewell: Normalized Beta

- As described in the MSG Expert Report, we selected a beta for the period ending December 31, 2019, pre-COVID-19. The table below compares Lazard's abnormal beta as of July 24, 2020 to a normalized beta (pre-COVID-19) as of December 31, 2019 for both J. Crew and Madewell. As illustrated below, the beta for a normalized period is significantly lower than the beta used by Lazard. Therefore, Lazard's use of an abnormal beta increases its WACC, resulting in a substantially lower enterprise value for J. Crew and Madewell.

| ($ millions) | J. Crew | | Madewell | |
| --- | --- | --- | --- | --- |
| | Lazard Abnormal Beta (1) | Corrected Normalized Beta (2) | Lazard Abnormal Beta (1) | Corrected Normalized Beta (2) |
| Peer Levered Beta | 1.71 - 1.99 | 0.84 | 1.28 - 1.73 | 1.09 |
| Peer Unlevered Beta | 1.80 | 0.84 | 1.51 | 1.06 |
| WACC | 14.2% | 7.6% | 12.2% | 9.2% |
| | | | | |
| DCF Valuation (adjusting for normalized beta only) | $504 | $812 | $1,211 | $1,881 |

**By only adjusting Lazard's abnormal beta to a normalized beta, Lazard's DCF value for J. Crew increases by $308 million and its DCF value for Madewell increases by $670 million for a total enterprise value of the J. Crew Group of $2,693 million.**

**MSG**

(1)  Lazard Report, p. 28.
(2)  FactSet.

# Lazard's Discount Rate for Madewell is Flawed and Incorrect

## Lazard Unreasonably Excludes Certain Peer Companies from its Beta Calculation

- Lazard states that it used an unlevered beta of 1.51 for Madewell based on peer averages. Without support or substantiation, Lazard excluded Aritzia, Inditex, Fast Retailing and H&M[1] from its calculation of beta. While these companies are foreign, they were included in Lazard's CompCo valuation. If these four companies are appropriate to include in the multiple calculation, they should also be appropriate for the beta calculation. The table below summarizes the impact of only including these four companies in its beta calculation. As illustrated below, the exclusion of these four companies results in an inflated beta for Madewell, resulting in a higher WACC and consequently, a lower enterprise value.

| ($ millions) | Madewell | |
| --- | --- | --- |
| | Lazard Excluding Peers | Corrected Including Peers |
| Peer Levered Beta | 1.28 - 1.73 | 1.35 |
| Peer Unlevered Beta | 1.51 | 1.30 |
| WACC | 12.2% | 10.8% |
| **DCF Valuation (adjusting only for the exclusion of four companies)** | **$1,211** | **$1,464** |

- The table below summarizes the impact of correcting for both the abnormal beta used by Lazard and the exclusion of the four companies listed above.

| ($ millions) | Madewell | |
| --- | --- | --- |
| | Lazard Excluding Peers & Abnormal Beta | Corrected Including Peers & Normalized Beta |
| Peer Levered Beta | 1.28 - 1.73 | 0.98 |
| Peer Unlevered Beta | 1.51 | 0.95 |
| WACC | 12.2% | 8.4% |
| **DCF Valuation (adjusting for normalized beta and the exclusion of four companies)** | **$1,211** | **$2,177** |

(1) Aritzia is presented in the table but is excluded from the local beta average and median calculations. While we do not necessarily agree with these companies as peer group companies, by excluding these companies from its beta calculation, Lazard is inconsistent with its CompCo valuation.

# Lazard's Discount Rate for J. Crew and Madewell is Flawed and Incorrect

## Lazard's Use of a Historical Equity Risk Premium is Incorrect

- In its WACC calculation for J. Crew and Madewell, Lazard used the historical long-term (1926 – Present) equity risk premium of 7.2%, sourced from Duff & Phelps ("D&P") as of July 29, 2020. In recent years, however, valuation analysts have abandoned the use of a purely historical risk premium and have correctly been using the supply-side equity risk premium. The supply-side equity risk premium adjusts for price-to-earning ratio expansion. For example, consider the following:

  ➢ In a study on equity risk premiums, Roger Ibbotson and Peng Chen noted the following on supply side equity risk premiums, "These forecasts [supply-side] tend to give somewhat lower forecasts than historical risk premiums, primarily because part of the total returns of the stock market have come from price-earnings ratio expansion. **This expansion is not predicted to continue indefinitely, and should logically be removed from the expected risk premium**."[1]

  ➢ "Assuming that the risk premium has declined over the last ninety years, **an historical average will be an upward biased average of the current risk premium**. **That bias can be reduced somewhat by using the so called supply side risk premium**...which deducts from the historical average the portion of the return attributable to expansion of price-earnings ratios on the grounds that such expansion will not be repeated."[2]



(1)  Pratt, P. Shannon and Robert J. Grabowski, "Developing The Cost of Equity Capital: Risk-Free Rate and ERP During Periods of 'Flight to Quality,'" excerpt from Cost of Capital: Applications and Examples, 4th ed. John Wiley & Sons, 2010, p. 15. (emphasis added)
(2)  ValueWalk, "Equity Risk Premium – The Most Important Number in Finance," May 1, 2016. (emphasis added)

14

# Lazard's Discount Rate for J. Crew and Madewell is Flawed and Incorrect

## Lazard's Use of a Historical Equity Risk Premium is Incorrect (cont.)

- The financial literature and valuation analysts have also stated:

  - "**The future-equals-past approach [purely historical long-term ERP] suffers from the following flaw: The higher the market rises, the higher the estimate of future returns given by the method. This outcome is contrary to intuition**, which would lead one to expect a low return (on any asset) if one pays a high going-in price for the asset."[1]

- Furthermore, the Delaware Chancery Court has accepted the use of the supply-side equity risk premium.

  - "Accordingly, the petitioners' expert chose the supply-side ERP of 6% reported in Ibbotson's 2007 Yearbook, which says '**the historic approach wrongly assumes that the relationship between stocks and bonds observed in the past would remain stable into the future**,' and over the long run, '**the equity return should be close to the long-run supply estimate**.' This selection had '**substantial support in the professional and academic valuation literature,' the court held**, in adopting the 6% ERP."[2]

**MSG**

(1)  Laurence B. Siegel, "The Equity Risk Premium: A Contextual Literature Review," CFA Institute Research Foundation, 2017, p. 3. (emphasis added)
(2)  Business Valuation Resource, "Supply-side ERP more reliable, says Delaware Chancery," June 15, 2010. (emphasis added)

# Lazard's Discount Rate for J. Crew and Madewell is Flawed and Incorrect

## Lazard's Use of a Historical Equity Risk Premium is Incorrect

- As described on the preceding pages, the historical long-term equity risk premium used by Lazard in its WACC calculation is incorrect. Instead, the supply-side equity risk premium is more widely accepted and should have been used. By using the historical long-term equity risk premium, Lazard's WACC is overstated, resulting in a lower enterprise value. The table below summarizes the impact of correcting Lazard's use of the historical long-term equity risk premium, with no other correction, on its J. Crew and Madewell valuations.

| | J. Crew | | Madewell | |
|---|---|---|---|---|
| | Lazard Historical Long-Term ERP | Corrected Supply-Side ERP | Lazard Historical Long-Term ERP | Corrected Supply-Side ERP |
| Equity Risk Premium | 7.2% | 6.2% | 7.2% | 6.2% |
| WACC | 14.2% | 12.5% | 12.2% | 10.8% |
| | | | | |
| **DCF Valuation (adjusting for equity risk premium only)** | **$504** | **$553** | **$1,211** | **$1,454** |

**By only adjusting Lazard's equity risk premium, Lazard's enterprise value for J. Crew increases by $49 million and its enterprise value for Madewell increases by $243 million, for a total enterprise value of the J. Crew Group of $2,007 million.**



16

# Lazard's Discount Rate for Madewell is Flawed and Incorrect

## Impact of Correcting Lazard's Beta and ERP on Madewell's DCF Valuation

- Each of the errors made by Lazard results in a higher WACC, and therefore a lower enterprise value. Correcting for the errors in Lazard's beta analysis and incorrect use of a historical long-term equity risk premium, Lazard's concluded DCF value for Madewell increases from $1,211 million to $2,667 million.



**By adjusting equity risk premium and its beta, Lazard's DCF value for Madewell increases by $1.5 billion, for a total enterprise value of $2,667 million.**



17

## b) Lazard's DCF Valuation of Madewell is Flawed



# Lazard's DCF Valuation of Madewell is Flawed

## Lazard Incorrectly Did Not Use a 3-Stage Growth Model to Value Madewell

- As discussed in the MSG Expert Report, a 3-stage growth model is appropriate to use to value Madewell because of its projected high growth from FY2022 to FY2024.[1] For example, consider the following from financial literature:

  ➢ "Since the [Three Stage FCFE] model allows for three stages of growth, and for a gradual decline from high to stable growth, it is the **appropriate model to use to value firms with very high growth rates currently**."[2]

- The 3-stage model bridges the gap between the high growth initial stage of the business, and the steady state terminal value stage.

(1)  MSG Expert Report, p. 50.
(2)  Damodaran, Aswath, "Investment Valuation: Second Edition," Chapter 14: "Free Cash Flow to Equity Discount Models," p. 50. (emphasis added)

# Lazard's DCF Valuation of Madewell is Flawed

## Lazard Incorrectly Did Not Use a 3-Stage Growth Model to Value Madewell (cont.)

- Madewell's unlevered free cash flow ("UFCF") is projected by the Debtors to grow at growth rates significantly above the terminal growth rate assumed by Lazard. In FY2023 and FY2024, Madewell's UFCF is projected to grow at 10.0% and 17.2%, respectively.[1] This growth in UFCF from FY2023 to FY2024 is significantly higher than Lazard's PGR of 3.5%.  Furthermore, as shown in the chart below, Madewell's revenue is projected to grow at 8.9% in FY2024.[2] Lazard, however, projects that immediately following FY2024, Madewell will "fall off the cliff" and its PGR will drop in one year from 8.9% to 3.5%. Due to Madewell's high growth during the projection period, Lazard should have used a 3-stage growth model to steadily decrease Madewell's UFCF growth to reach a normalized PGR.



**Madewell's Revenue Growth per Lazard Report**

(1) Lazard Report, p. 24.
(2) Lazard Report, p. 24.

## c) Lazard's CompCo Valuation of J. Crew is Flawed



# Lazard's CompCo Valuation of J. Crew is Flawed

## Conclusion

- Lazard's CompCo valuation for J. Crew is flawed, incorrect and unreasonable for the following reasons:

  ➢ Lazard's use of a FY2019 EV/EBITDA multiple to value J. Crew is incorrect as the peer company's FY2019 results have no relevance to market prices today. Today's valuation metrics for the peer companies are based on forward expectations and how the company will perform going forward, reflecting its recovery from COVID-19.

  ➢ Certain of the peer companies selected by Lazard are not comparable to J. Crew. Furthermore, Lazard omitted companies from its peer group that are frequently used by professionals who recently valued J. Crew. Had Lazard included these companies in its CompCo, it would have concluded a greater value for J. Crew.

  ➢ In its calculation of enterprise value for the peer companies (i.e., market capitalization + net debt), Lazard incorrectly did not limit certain companies' net debt at zero. For example, if a peer company had cash greater than debt, Lazard concluded that the company's enterprise value was less than its equity value, which is clearly irrational. This has the impact of lowering Lazard's multiple and thus lowering its concluded valuation of J. Crew.

- Therefore, it is our opinion that Lazard's CompCo valuation of J. Crew is flawed, incorrect and should not be relied upon.



22

# Lazard's CompCo Valuation of J. Crew is Flawed

## Summary of Lazard's J. Crew CompCo

- To value J. Crew utilizing a CompCo, Lazard calculated EV/EBITDA multiples for FY2019 and FY2021. Without any substantiation, Lazard selected a multiple range of 2.75x to 3.75x for FY2019 and 3.50x to 4.50x for FY2021. Lazard's use of a FY2019 multiple is unreasonable and should not be relied upon, as current stock market prices and valuation metrics for the peer companies are based on expectations of the future (e.g., recovery from COVID-19). The table below summarizes Lazard's FY2021 EV/EBITDA multiples for its selected J. Crew peer group.[1]

| ($ billions) Company Name | Market Value | Net Debt | Enterprise Value | EV/EBITDA FY2021 |
|---|---|---|---|---|
| Gap, Inc. | $ 5.4 | $ 0.7 | $ 6.1 | 5.3x |
| American Eagle Outfitters, Inc. | 1.8 | (0.3) | 1.6 | 3.7x |
| Urban Outfitters, Inc. | 1.7 | (0.5) | 1.3 | 4.1x |
| Oxford | 0.8 | - | 0.8 | 7.1x |
| Children's Place | 0.4 | 0.1 | 0.6 | 3.6x |
| Abercrombie & Fitch Co. | 0.7 | (0.2) | 0.4 | 1.7x |
| Chico's | 0.2 | - | 0.2 | 2.9x |

| | |
|---|---|
| Upper Quartile | 4.7x |
| Average | 4.1x |
| Median | 3.7x |

| | |
|---|---|
| Lazard Selected Range | 3.50x to 4.50x |

- Lazard's selected multiple range of 3.50x to 4.50x results in a valuation range of $339 million to $435 million, with a midpoint of $388 million for J. Crew.



(1)   Lazard Report, p. 32. Note: minor differences due to rounding.

# Lazard's CompCo Valuation of J. Crew is Flawed

## Lazard's Selected Peer Group is Unreasonable

- In order to assess the reasonableness of the peer group used by Lazard, we compared the comparable companies selected by various financial professionals obtained through discovery. These financial professionals include Duff & Phelps, Goldman Sachs, Alvarez and Marsal, Bank of America Merrill Lynch, Lazard itself and the Debtors.[1] We performed a count of every company referred to in 7 different sources, and the results are shown in the table to the right.[1]

- Notably, Children's Place, selected by Lazard as a peer company to J. Crew, was not mentioned even once in any of the 7 sources.

- Furthermore, Guess?, L Brands and Ralph Lauren were referred to at least 4 times in these documents, yet were not included by Lazard in J. Crew's peer group.

| Company Name | Lazard Report Peer Company | # of Times Identified in Other Reports |
|---|---|---|
| Abercrombie & Fitch Co. | X | 7 |
| American Eagle Outfitters, Inc. | X | 6 |
| Ascena Retail Group, Inc. | | 5 |
| Burlington Stores, Inc. | | 1 |
| Chico's FAS, Inc. | X | 6 |
| Children's Place, Inc. | X | - |
| Express, Inc. | | 4 |
| Gap, Inc. | X | 7 |
| Guess?, Inc. | | 6 |
| H&M | | 2 |
| Inditex | | 1 |
| L Brands, Inc. | | 4 |
| Michael Kors Ltd. / Capri | | 1 |
| Nordstrom, Inc. | | 2 |
| Oxford Industries, Inc. | X | 1 |
| PVH Co. | | 1 |
| Ralph Lauren Co. | | 5 |
| Ross Stores, Inc. | | 1 |
| Stein Mart, Inc. | | 1 |
| Tapestry / Kate Spade / Coach Stores | | 2 |
| TJX Companies Inc. | | 1 |
| Under Armour, Inc. | | 1 |
| Urban Outfitters, Inc. | X | 7 |

(1) See Appendix A for a summary of the peer companies listed in each document.
(2) Note: D&P issued 9 valuation reports from 2016 to 2020 and had the same peer group for J. Crew in every report. In this analysis we have considered all of the D&P reports as one peer group source. Moreover, one of the 7 sources is a March 2020 draft of J. Crew's FY2019 10-K. This document included the following companies: Abercrombie & Fitch Co., American Eagle Outfitters, Inc., Ascena Retail Group, Inc., Chico's FAS, Inc., Gap, Inc., Guess?, Inc., L Brands, Inc., Michael Kors Ltd., Nordstrom, Inc., Ralph Lauren Co., Tapestry Inc., Under Armor, Inc., and Urban Outfitters, Inc.



24

# Lazard's CompCo Valuation of J. Crew is Flawed

## Lazard's Selected Peer Group is Unreasonable

- A key flaw in Lazard's CompCo valuation of J. Crew is that it included Children's Place and it excluded Guess.?, L Brands, and Ralph Lauren. Children's Place should have been excluded because it was not selected as a peer company by any other financial advisor to the Debtors and is specialty retailer for children's clothing and accessories. Guess?, L Brands, and Ralph Lauren should have been included due to comparable financial performance and operating model to J. Crew.[1]

- By excluding Children's Place, and including Guess?, L Brands and Ralph Lauren as companies comparable to J. Crew, the median multiple of the comparable companies increases from 3.7x to 4.4x, resulting in an increase in J. Crew's enterprise value from $359 million to $427 million.[2]

| ($ billions) Company Name | Market Value | Enterprise Value | EV/EBITDA FY2021 |
|---|---|---|---|
| L Brands, Inc. | $  7.2 | $  11.7 | 7.1x |
| Gap, Inc. | 5.4 | 6.1 | 5.3x |
| Ralph Lauren Co. | 5.6 | 5.6 | 6.5x |
| American Eagle Outfitters, Inc. | 1.8 | 1.6 | 3.7x |
| Urban Outfitters, Inc. | 1.7 | 1.3 | 4.1x |
| Guess?, Inc. | 0.7 | 0.8 | 4.4x |
| Oxford | 0.8 | 0.8 | 7.1x |
| Abercrombie & Fitch Co. | 0.7 | 0.4 | 1.7x |
| Chico's | 0.2 | 0.2 | 2.9x |

| | |
|---|---|
| Maximum | 7.1x |
| Upper Quartile | 6.5x |
| Average | 4.8x |
| **Median** | **4.4x** |
| Lower Quartile | 3.7x |
| Minimum | 1.7x |

| Concluded Enterprise Value for J. Crew EV/EBITDA FY2021 | |
|---|---|
| Operating Figure | $  97 |
| Trading Multiple - Median | 4.4x |
| **Enterprise Value** | **$  427** |

(1) Note: In addition to the adjustments described in this paragraph, three additional differences remain between the peer group for J. Crew in the MSG Expert Report and Lazard Report. Lazard includes Chico's FAS, Inc. in its peer group while we include Nordstrom and PVH in our peer group. We chose not to include Chico's in our analysis as the company has displayed signs of financial distress as its stock price was $1.43 per share on July 27, 2020, representing 27% of its 52 week high. Lazard should have included Nordstrom in its peer group as management identified it as a peer company in a March 2020 draft of its FY2019 10-K. Additionally, Lazard should have included PVH in its peer group as it displayed similar financial performance to J. Crew from FY2017 to FY2019 and was selected as a peer by Bank of America Merrill Lynch (investment banker for the Debtors).

(2) Sources: Lazard Report, p. 32 and FactSet.



25

# Lazard's CompCo Valuation of J. Crew is Flawed

## Lazard's Calculation of its Peer Companies' Enterprise Value is Incorrect

- Lazard makes an error in its calculation of its peer companies' enterprise values. Enterprise value is commonly calculated by adding net debt to a company's market value of equity. Net debt is calculated by subtracting cash from debt, under the assumption that cash on hand could be used to repay debt.

    Market value of equity + (debt – cash) = Enterprise value

- However, there are several peer group companies (identified by Lazard and us) where cash on hand is greater than debt. In these cases, Lazard has followed this formula but did not apply the appropriate constraints, which results in a negative number being added to market value of equity. For example, in the case of Urban Outfitters, Lazard calculated its enterprise value as follows ($ amounts in billions):[1]

    $1.7 + ($0.1 – $0.6) = $1.3 (minor rounding difference)

- This calculation results in an enterprise value ($1.3 billion) that is lower than the company's equity value ($1.7 billion), and consequently results in a lower multiple. While this may make sense in an M&A scenario (e.g., if you acquire the company for $1.7 billion, you will take control of $0.6 billion in cash, so your effective cost is lower), it does not make sense that, in a valuation context, a company such as Urban Outfitters in this example, is less valuable because it has cash on its balance sheet. Yet it will appear less valuable as the multiple is skewed downwards. As a result of this downward bias, the multiple used by Lazard to value J. Crew is lower. Under this approach, J. Crew would be considered less valuable because one of its competitors has cash on its balance sheet.

- In the MSG Expert Report, we correctly limited net debt to zero, so that enterprise value used to calculate the multiple is not lower than the company's equity value.



(1)   Sources: Lazard Report, p. 32.

26

# Lazard's CompCo Valuation of J. Crew is Flawed

## Lazard's Calculation of its Peer Companies' Enterprise Value is Incorrect (cont.)

- By correcting this error and ensuring that enterprise value cannot be lower than equity value, Lazard's multiple (after excluding Children's Place and including Ralph Lauren, Guess?, Inc. and L Brands) would increase from 4.4x to 5.3x, resulting in an increase in J. Crew's enterprise value from $427 million to $514 million.[1]

| ($ billions) Company Name | Market Value | Enterprise Value | EV/EBITDA FY2021 |
|---|---|---|---|
| L Brands, Inc. | $  7.2 | $  11.7 | 7.1x |
| Gap, Inc. | 5.4 | 6.1 | 5.3x |
| Ralph Lauren Co. | 5.6 | 5.6 | 6.5x |
| American Eagle Outfitters, Inc. | 1.8 | 1.8 | 4.2x |
| Urban Outfitters, Inc. | 1.7 | 1.7 | 5.4x |
| Guess?, Inc. | 0.7 | 0.8 | 4.4x |
| Oxford | 0.8 | 0.8 | 7.1x |
| Abercrombie & Fitch Co. | 0.7 | 0.7 | 3.0x |
| Chico's | 0.2 | 0.2 | 2.9x |

| | |
|---|---|
| Maximum | 7.1x |
| Upper Quartile | 6.5x |
| Average | 5.1x |
| **Median** | **5.3x** |
| Lower Quartile | 4.2x |
| Minimum | 2.9x |

| Concluded Enterprise Value for J. Crew EV/EBITDA FY2021 | | |
|---|---|---|
| Operating Figure | $ | 97 |
| Trading Multiple - Median | | 5.3x |
| **Enterprise Value** | **$** | **514** |

**MSG**

(1)  Sources: Lazard Report, p. 32 and FactSet.

## d) Lazard's CompCo Valuation of Madewell is Flawed



# Lazard's CompCo Valuation of Madewell is Flawed

## Conclusion

- Lazard's CompCo valuation for Madewell is flawed, incorrect and unreasonable for the following reasons:

  ➢ Similar to its J. Crew CompCo valuation, Lazard's use of a FY2019 EV/EBITDA multiple to value Madewell is incorrect as the peer company's FY2019 results have no relevance to market prices today. Today's valuation metrics for the peer companies are based on forward expectations of how the company will perform going forward, reflecting its recovery from COVID-19.

  ➢ In its Madewell CompCo, Lazard provides no support or substantiation for its FY2021 EV/EBITDA multiple range of 11.75x to 13.75x. Lazard's multiple range is unreasonably low as Madewell's growth characteristics warrant a significantly higher valuation multiple. Moreover, without any support or explanation, Lazard excluded Lululemon from its median multiple calculation.[1]

  ➢ Certain of the peer companies selected by Lazard are not comparable to Madewell because of their vastly different historical growth characteristics. In fact, Lazard's own report highlights the differences in historical growth. Furthermore, Lazard includes companies in the peer group that are not used in any valuations by any professionals who recently valued Madewell. Had Lazard excluded these companies in its CompCo, it would have concluded a significantly greater value for Madewell.

  ➢ In its calculation of enterprise value for the peer companies (i.e., market capitalization + net debt), Lazard incorrectly did not limit certain companies' net debt to zero. For example, if a peer company had cash greater than debt, Lazard concluded that the company's enterprise value was less than its equity value. This has the impact of lowering Lazard's multiple and, therefore, the value of Madewell.



29

(1)   As illustrated in Appendix A, Lululemon was identified as a peer company to Madewell more than any other company on the list.

# Lazard's CompCo Valuation of Madewell is Flawed

## Lazard's Selected Multiple Range is Unreasonable

- Lazard selected a FY2021 EV/EBITDA multiple range of 11.75x to 13.75x to value Madewell. This selected multiple range indicates that Madewell's growth is similar to the median of the peer group, which significantly undervalues Madewell. As shown in the table below, according to historical data presented on page 39 of the Lazard Report, Madewell's historical revenue growth and EBITDA growth were, in fact, significantly above the upper quartile and same store sales ("SSS") growth was the maximum.[1]

| Lazard Peers | FY2017 - FY2019 | | |
|---|---|---|---|
| | Same Store Sales | Revenue CAGR | EBITDA CAGR |
| Lululemon | 35.0% | 22.6% | 31.1% |
| Aritzia | 16.4% | 14.9% | 19.5% |
| Inditex | 10.5% | 5.7% | 5.7% |
| Carter's | 3.2% | 1.7% | (3.3%) |
| Fast Retailing | N/A | 9.1% | 5.7% |
| H&M | N/A | 8.3% | 2.5% |
| Canada Goose | N/A | 27.5% | 39.0% |
| Levi's | N/A | 7.7% | 8.1% |
| VF Corporation | N/A | (6.8%) | (4.7%) |
| | | | |
| Maximum | 35.0% | 27.5% | 39.0% |
| Upper Quartile | 21.1% | 14.9% | 19.5% |
| Average | 16.3% | 10.1% | 11.5% |
| Median | 13.5% | 8.3% | 5.7% |
| Lower Quartile | 8.7% | 5.7% | 2.5% |
| Minimum | 3.2% | (6.8%) | (4.7%) |
| | | | |
| Madewell | 35.0% | 25.3% | 24.4% |



(1) Lazard Report, p. 39.

30

# Lazard's CompCo Valuation of Madewell is Flawed

## Lazard's Selected Multiple Range is Unreasonable

- If Lazard was to use an upper quartile multiple to value Madewell in its CompCo valuation, the selected multiple would increase to 16.9x, as illustrated in the table to the right. This change by itself, would increase Lazard's CompCo valuation of Madewell, from $1,419 to $1,882 million.[1]

| ($ billions) Company Name | Market Value | Enterprise Value | EV/EBITDA FY2021 |
|---|---|---|---|
| Industria de Diseno Textil, S.A. | $    86.4 | $    79.4 | 13.0x |
| FAST RETAILING CO., LTD. | 56.8 | 52.9 | 22.4x |
| Lululemon Athletica Inc | 42.8 | 42.4 | 32.6x |
| H&M Hennes & Mauritz AB Class B | 26.2 | 27.6 | 9.2x |
| V.F. Corporation | 24.2 | 27.1 | 16.9x |
| Levi Strauss & Co. Class A | 5.2 | 5.4 | 8.2x |
| Carter's, Inc. | 3.7 | 3.9 | 8.5x |
| Canada Goose Holdings, Inc. | 2.5 | 2.7 | 12.9x |
| Aritzia, Inc. | 1.5 | 1.5 | 10.9x |

| | |
|---|---|
| Maximum | 32.6x |
| **Upper Quartile** | **16.9x** |
| Average | 15.0x |
| Median | 12.9x |
| Lower Quartile | 9.2x |
| Minimum | 8.2x |

| Concluded Enterprise Value for Madewell EV/EBITDA FY2021 | | |
|---|---|---|
| Operating Figure | $ | 111 |
| Trading Multiple - Upper Quartile | | 16.9x |
| **Enterprise Value** | **$** | **1,882** |



(1)  Lazard Report, p. 34. Note: Lazard excludes Lululemon from its calculation of multiple without any substantiation. We have included it in our analysis.

# Lazard's CompCo Valuation of Madewell is Flawed

## Lazard's Selected Multiple Range is Unreasonable

- Contrary to Lazard's use of a multiple range in line with the median of its peer group, in the MSG Expert Report we demonstrated that Madewell's historical revenue growth was similar to the upper quartile of the MSG peer group. As shown in the chart below, Madewell's historical revenue growth was similar to the upper quartile of the MSG peer group and significantly above the median of the Lazard peer group. Therefore, the use of an upper quartile to value Madewell is reasonable and most appropriate, and Lazard's use of a valuation multiple range similar to the median of its peer group should not be relied upon. Moreover, this is an indication that Lazard's peer group for Madewell is not comparable.[1]

### Lazard Peers vs. MSG Peers vs. Madewell: Historical Revenue Growth

| | FY'17 | FY'18 | FY'19 |
|---|---|---|---|
| MSG Upper Quartile | 33.5% | 28.8% | 20.6% |
| Lazard Median | 7.7% | 13.7% | 3.4% |
| Madewell | 27.3% | 33.0% | 17.3% |

Legend: --- MSG Upper Quartile    ⋯⋯ Lazard Median    —— Madewell

(Y-axis: Revenue Growth, -% to 35.0%)



32

(1)  Sourced from FactSet, Lazard Report, p. 39 and MSG Expert Report, p. 46.

# Lazard's CompCo Valuation of Madewell is Flawed

## Lazard's Selected Peer Group is Unreasonable

- In order to assess the reasonableness of the peer group used by Lazard, we compared the comparable companies selected by various financial professionals obtained through discovery. These financial professionals include Goldman Sachs, Alvarez and Marsal, Bank of America Merrill Lynch, TPG, J.P. Morgan, Lazard itself and the Debtors.[1] We performed a count of every company referred to in these 14 different sources, and the results are shown in the table to the right.

- Notably, two companies selected by Lazard were not mentioned even once in any of the 14 documents, namely, Carter's and H&M.

- It is also worth noting that Lululemon was referred to in every one of the 14 sources.

| Company Name | Lazard Report Peer Company | # of Times Identified in Other Reports |
|---|---|---|
| Aritzia, Inc. | X | 13 |
| boohoo group Plc | | 12 |
| Canada Goose Holdings, Inc. | X | 12 |
| Carter's | X | - |
| Duluth Holdings, Inc. | | 7 |
| FAST RETAILING CO., LTD. | X | 9 |
| Francesca's Holdings Co. | | 1 |
| H&M | X | - |
| Industria de Diseno Textil, S.A. | X | 9 |
| Kate Spade & Co. | | 2 |
| Levi Strauss & Co. | X | 7 |
| Lululemon Athletica Inc. | X | 14 |
| Michael Kors Ltd. / Capri | | 1 |
| NIKE, Inc. | | 8 |
| Restoration Hardware Inc. | | 1 |
| Revolve | | 6 |
| Stitch Fix | | 2 |
| Ulta Beauty Inc. | | 9 |
| Under Armour, Inc. | | 2 |
| Urban Outfitters, Inc. | | 7 |
| V.F. Co. | X | 11 |
| Vince Holding Co. | | 1 |
| Zalando SE | | 8 |



33

(1) See Appendix A for a summary of the peer companies listed in each document.

# Lazard's CompCo Valuation of Madewell is Flawed

## Lazard's Selected Peer Group is Unreasonable

- Furthermore, Lazard's peer group includes V.F. Corporation. As explained in the MSG Expert Report, and as illustrated on page 39 of the Lazard Report, V.F. Corporation's revenue declined from FY2017 to FY2019, the only Madewell peer company with declining sales. Over the same period, Madewell's revenue grew annually by over 25%. Clearly, V.F. Corporation does not fit the description of a high growth retailer, and therefore is not comparable to Madewell.

- By excluding the two companies from Lazard's list of multiples who do not appear in any list of companies comparable to Madewell (Carter's and H&M), and excluding V.F. Corporation which is not a high growth company, the upper quartile multiple of the remaining comparable companies increases from 16.9x to 20.1x, resulting in an increase in Madewell's enterprise value from $1,882 million to $2,233 million.[1]

| ($ billions) Company Name | Market Value | Enterprise Value | EV/EBITDA FY2021 |
|---|---|---|---|
| Industria de Diseno Textil, S.A. | 86.4x | $    79.4 | 13.0x |
| FAST RETAILING CO., LTD. | 56.8x | 52.9 | 22.4x |
| Lululemon Athletica Inc | 42.8x | 42.4 | 32.6x |
| Levi Strauss & Co. Class A | 5.2x | 5.4 | 8.2x |
| Canada Goose Holdings, Inc. | 2.5x | 2.7 | 12.9x |
| Aritzia, Inc. | 1.5x | 1.5 | 10.9x |

| | |
|---|---|
| Maximum | 32.6x |
| **Upper Quartile** | **20.1x** |
| Average | 16.7x |
| Median | 13.0x |
| Lower Quartile | 11.4x |
| Minimum | 8.2x |

| Concluded Enterprise Value for Madewell EV/EBITDA FY2021 | | |
|---|---|---|
| Operating Figure | $ | 111 |
| Trading Multiple - Upper Quartile | | 20.1x |
| **Enterprise Value** | **$** | **2,233** |



(1)  Sources: Lazard Report, p. 34.

34

# Lazard's CompCo Valuation of Madewell is Flawed

## Lazard's Calculation of its Peer Companies' Enterprise Value is Incorrect

- As described on page 26 of this report, Lazard makes an error in its calculation of its peer companies' enterprise values. Enterprise value is commonly calculated by adding net debt to a company's market value of equity. Net debt is calculated by subtracting cash from debt, under the assumption that cash on hand could be used to repay debt.

  Market value of equity + (debt – cash) = Enterprise value

- However, there are several peer group companies (identified by Lazard and us) where cash on hand is greater than debt. In these cases, Lazard has followed this formula but did not apply the appropriate constraints, which results in a negative number being added to market value of equity. For example, in the case of Inditex, Lazard calculated its enterprise value as follows ($ amounts in billions):[1]

  $86.4 + ($0.2 – $7.0) = $79.4 (minor rounding difference)

- This calculation results in an enterprise value ($79.4 billion) that is lower than the company's equity value ($86.4 billion), and consequently results in a lower multiple. While this may make sense in an M&A scenario (e.g., if you acquire the company for $86.4 billion, you will take control of $7.0 billion in cash, so your effective cost is lower), it does not make sense that, in a valuation context, that a company such as Inditex in this example, is less valuable because it has cash on its balance sheet. Yet it will appear less valuable as the multiple is skewed downwards. As a result of this downward bias, the multiple used to by Lazard to value Madewell is lower. Under this approach, Madewell would be considered less valuable because one of its competitors has cash on its balance sheet.

- In the MSG Expert Report, we correctly limited net debt at zero, so that enterprise value used to calculate the multiple is not lower than the company's equity value.

MSG

35

(1)  Sources: Lazard Report, p. 34.

# Lazard's CompCo Valuation of Madewell is Flawed

## Lazard's Calculation of its Peer Companies' Enterprise Value is Incorrect

- By correcting this error, Lazard's upper quartile multiple (after correcting for Carter's, H&M and V.F. Corporation) would increase from 20.1x to 21.6x, resulting in an increase in Madewell's enterprise value from $2,233 million to $2,402 million.[1]

| ($ billions) Company Name | Market Value | Enterprise Value | EV/EBITDA FY2021 |
|---|---|---|---|
| Industria de Diseno Textil, S.A. | $ 86.4 | $ 86.4 | 14.1x |
| FAST RETAILING CO., LTD. | 56.8 | 56.8 | 24.1x |
| Lululemon Athletica Inc | 42.8 | 42.8 | 32.9x |
| Levi Strauss & Co. Class A | 5.2 | 5.4 | 8.2x |
| Canada Goose Holdings, Inc. | 2.5 | 2.7 | 12.9x |
| Aritzia, Inc. | 1.5 | 1.5 | 10.9x |

| | |
|---|---|
| Maximum | 32.9x |
| **Upper Quartile** | **21.6x** |
| Average | 17.2x |
| Median | 13.5x |
| Lower Quartile | 11.4x |
| Minimum | 8.2x |

| Concluded Enterprise Value for Madewell EV/EBITDA FY2021 | | |
|---|---|---|
| Operating Figure | $ | 111 |
| Trading Multiple - Upper Quartile | | 21.6x |
| **Enterprise Value** | **$** | **2,402** |

(1)  Sources: Lazard Report, p. 34.

# Lazard's CompCo Valuation of Madewell is Flawed

## MSG Peer Group is Comparable to Madewell

- MSG's peer group for Madewell contained four companies that Lazard did not include in its peer group. Those four companies include: boohoo group Plc, Revolve Group, Inc., Ulta Beauty Inc., and Zalando SE. All four of these companies were often identified as Madewell comparable companies by various financial professionals (see Appendix B). As shown in the table below, all four of these companies had similar revenue growth rates to Madewell from FY2017 to FY2019.[1]  Therefore, it is our opinion that boohoo group Plc, Revolve Group, Inc., Ulta Beauty Inc., and Zalando SE are comparable to Madewell and should have been included in Lazard's CompCo valuation of Madewell.

**Boohoo group Plc, Revolve Group, Inc., Ulta Beauty Inc., and Zalando SE vs. Madewell: Historical Revenue Growth**

Revenue Growth

| | FY2017 | FY2018 | FY2019 |
|---|---|---|---|
| Upper Quartile | 44.9% | 31.3% | 25.3% |
| Median | 26.9% | 25.2% | 17.3% |
| Madewell | 27.3% | 33.0% | 17.3% |

Legend: Upper Quartile (dashed), Median (dotted), Madewell (solid)



37

(1)  Sourced from FactSet, Lazard Report p. 39, and MSG Expert Report, p. 46.

# Lazard's CompCo Valuation of Madewell Is Flawed

## Lazard's Peer Group Contains Peer Companies Not Comparable to Madewell

- Lazard's peer group for Madewell contained five companies that MSG did not include in its peer group. Those five companies include: Carter's, Fast Retailing, Inditex, H&M, and V.F. Corporation. Of these five companies, Carter's and H&M were not included in peer group analyses by various financial professionals (see Appendix B). All five of these companies had revenue growth rates from FY2017 to FY2019 significantly below Madewell's and are therefore not comparable.[1] This is clearly shown in the chart below.





(1)  Lazard Report, p. 39.

# III. Rebuttal to the Ocean Tomo Report



# Ocean Tomo's Valuation of the J. Crew IP is Flawed and Unreasonable

## Conclusion

- Ocean Tomo's valuation of the J. Crew IP is flawed, incorrect and unreasonable for the following reasons:

**Ocean Tomo's Assumed Royalty Rate is Unreasonable**

➤ In Exhibit 2.2 of its report, Ocean Tomo presents 20 "comparable license agreements" sourced from the ktMINE Royalty Database and its prior engagements. Of these 20 transactions that Ocean Tomo relied upon, 12 are private agreements that Ocean Tomo marked confidential. Ocean Tomo did not provide any documents relating to these agreements. Therefore, it was not possible for us to replicate or verify any of the information relating to those 12 agreements marked confidential by Ocean Tomo in Exhibit 2.2 of its report.

➤ Trademarks identified by Ocean Tomo in the Markables database are not comparable to the J. Crew IP as the brands/business underlying the trademarks were significantly more profitable than J. Crew.

➤ Ocean Tomo's assumed royalty rate of 3.0% implies a median profit split of 87.7% from FY2021 to FY2024. This is unreasonably high and is not supported by the profit split data presented in Ocean Tomo's Report.

**Ocean Tomo's Implied Profit Split of 87.7% is Unreasonable**

➤ Ocean Tomo's implied profit split for the J. Crew IP is significantly higher than the implied profit split for its valuation of the Madewell trademarks.

➤ Ocean Tomo's implied profit split is significantly higher than the lower quartile and the median of the trademarks it identified from the Markables database.

➤ A profit split of 87.7%, which implies that a trademark licensee would pay 87.7% of its profits to license the J. Crew IP, does not make economic sense.



40

# Ocean Tomo's Valuation of the J. Crew IP is Flawed and Unreasonable

## Conclusion (cont.)

**Ocean Tomo Unreasonably Assumed the Same Royalty Rate as it Did in its 2016 Report**

➢ Despite J. Crew's declining revenue from FY2016 to FY2020, Ocean Tomo used the same royalty rate in its 2020 Report as it did in its 2016 Report.

➢ Despite lower projected revenue in its 2020 Report than in its 2016 Report, Ocean Tomo used the same royalty rate in its 2020 Report as it did in its 2016 Report.

➢ Despite J. Crew's declining profitability from FY2016 to FY2020, Ocean Tomo used the same royalty rate in its 2020 Report as it did in its 2016 Report.

➢ Despite lower projected EBIT margin in its 2020 Report than in its 2016 Report, Ocean Tomo used the same royalty rate in its 2020 Report as it did in its 2016 Report.

**Ocean Tomo's Assumed PGR is Unreasonable**

➢ Ocean Tomo's assumed PGR of 2.0% in its valuation of the J. Crew IP is unreasonable and is inconsistent with Lazard's assumed PGR of 0.0% in its valuation of J. Crew.

➢ Moreover, Ocean Tomo's assumed PGR of 2.0% is inconsistent with the Disclosure Statement Projections, which project J. Crew's revenue to remain flat over the projections period.



41

# a) Ocean Tomo's Royalty Rate is Unreasonable



# Critique of Ocean Tomo's Selected Royalty Rate

## Rejection of Ocean Tomo's Comparable Licensing Agreements

- The Ocean Tomo Report gathered licensing agreements from the licensing databases ktMINE and RoyaltyStat in order to identify comparable royalty rates.[1, 2]

- Furthermore, Ocean Tomo supplemented the licensing agreements from these databases with confidential and proprietary licensing agreements related to previous Ocean Tomo engagements.[3]

- After reviewing the identified licensing agreements in finer detail, Ocean Tomo relied on the 20 comparable licensing agreements presented in Exhibit 2.2 of the Ocean Tomo Expert Report.[4]

- Upon review of Ocean Tomo's analysis, we reject the usage of the royalty rates from the 20 comparable licensing agreements that it relies on due to the following:

  ➢ Of these 20 transactions that Ocean Tomo relied upon, 12 are private agreements that Ocean Tomo marked confidential. Ocean Tomo did not provide any documents relating to these agreements. Therefore, it was not possible for us to replicate or verify any of the information relating to those 12 agreements marked confidential by Ocean Tomo in Exhibit 2.2 of its report.

  ➢ Five of the eight "non-confidential" transactions (with Private Brands, Yanuk Jeans, Bill Blass, Antik Denim, and American Rag as licensors) relied upon by Ocean Tomo are from prior to 2010. Obtaining old and outdated royalty rates as far back as 2005 is inconsistent with Ocean Tomo's own approach to its Markables screen.

  ➢ A group of only three transactions (with Tennman WR-T, Phat Fashions, and Elsa Peretti as licensors) remained, which is too limited to base a reasonable conclusion with regards to an appropriate royalty rate.

(1)  Ocean Tomo Report, pp. 28 – 29.
(2)  Ocean Tomo stated that RoyaltyStat was screened in a similar manner to ktMINE, but did not disclose what criteria it explicitly used with which to recreate its analysis. Regardless, none of the licensing agreements that Ocean Tomo references in Exhibit 2.2 of the Ocean Tomo Report cite RoyaltyStat as a source. Therefore, we assume that it did not actually rely on any licensing agreements specifically from RoyaltyStat.
(3)  Ocean Tomo Report, pp. 28 – 29.
(4)  Ocean Tomo Report, Exhibit 2.2.

MSG

43

# Critique of Ocean Tomo's Selected Royalty Rate

## Ocean Tomo's ktMINE Screening Criteria

- According to the Ocean Tomo Report, it conducted a screen of the licensing agreement database ktMINE using the following criteria:[1]

  - SIC Codes:

    - 5600 – Retail Apparel & Accessory Stores; 5621 – Retail Women's Clothing Stores; 5651 – Retail Family Clothing Stores; and 5661 – Retail Shoe Stores

    - 5940 – Retail Miscellaneous Shopping Goods Stores; and 5944 – Retail Jewelry Stores

    - 6794 – Patents Owners & Lessors

  - Agreement Types:

    - Include – "Asset Purchase"; "Manufacturing/Process Intangible"; and "Marketing Intangible"

    - Exclude – "Cross License"; and "Joint Development"

  - Effective Date: After December 31, 2004

  - Included Keywords: "Trademark(s); "Tradename(s)"; or "Copyright(s)"

- Utilizing the above criteria, we were not able to fully recreate Ocean Tomo's analysis presented in Exhibit 2.2. However, we were able to find five of the eight licensing agreements through our own searches.[2] The results are summarized on the following page.

(1)  Ocean Tomo Report, pp. 28 – 29.
(2)  Our recreation indicates that five of the identified licensing agreements are not categorized under the SIC Codes that Ocean Tomo used as screening criteria. Instead, it is categorized under either the SIC Code 2300 (Office of Manufacturing - APPAREL & OTHER FINISHD PRODS OF FABRICS & SIMILAR MATL) or the SIC Code 2330 (Office of Manufacturing - WOMEN'S, MISSES', AND JUNIORS OUTERWEAR).

# Critique of Ocean Tomo's Selected Royalty Rate

## Ocean Tomo's ktMINE Screening Results

- The table below summarizes the royalty rates and royalty bases of the licensing agreements identified in Ocean Tomo's ktMINE screen.

| # | Licensor | Licensee | SIC Code | Effective Date | Royalty Rate | Royalty Base |
|---|----------|----------|----------|----------------|--------------|--------------|
| 1. | Private Brands, Inc. as, licensee from American Rag, CIE, LLC | Macys Merchandising Group, LLC | 2330 | 3/7/2005 | 3% | Net Sales of all Licensed Products sourced by Sublicensee |
| | | | | | 5% | Net Sales of all Licensed Products sourced by person other than Sublicensee |
| 2. | Yanuk Jeans, LLC | Blue Holdings, Inc. | 2300 | 10/5/2005 | 3% | Net Sales of certain Licensed Products that are imperfect or second quality |
| | | | | | 5% | Net Sales of certain Licensed Products |
| 3. | Bill Blass International, LLC | The Fashion House Inc. | 5600 | 11/1/2005 | 3.5% | Net Sales |
| 4. | Antik Denim, LLC | North Star, LLC | 2300 | 10/1/2006 | 2.25% | Net Sales of certain Licensed Products during the First Term |
| | | | | | 4.5% | Net Sales of up to $4 million in Year One |
| | | | | | 5% | Net Sales of certain Licensed Products during the Extended or Renewal Term |
| | | | | | 10% | Net Sales above $4 million in Year One |
| | | | | | 10% | Net Sales in all Other Years |
| 5. | American Rag, CIE, LLC | Private Brands, Inc. | 2330 | 10/1/2008 | 0.791% | Net Sales of up to $2 billion when Licensed products are manufactured/sourced by Licensee |
| | | | | | 0.875% | Net Sales above $2 billion when Licensed products are manufactured/sourced by Licensee |
| | | | | | 1.13% | Net Sales of up to $2 billion |
| | | | | | 1.25% | Net Sales above $2 billion |
| 6. | Tennman WR-T, Inc. | William Rast Sourcing, LLC | 2300 | 10/1/2011 | 2.5% | Retail Net Sales |
| | | William Rast Licensing, LLC | | | 5% | Wholesale Net Sales |
| 7. | Phat Fashions LLC | Anthony L&S, LLC | 5600 | 7/1/2012 | 1% | The Greater of Minimum Net Sales or Actual Net Sales in the First Renewal Term |
| | | | | | 1% | The Greater of Minimum Net Sales or Actual Net Sales in the Second Renewal Term |
| | | | | | 3% | Net Sales for Advertising payment |
| | | | | | 3% | The Greater of Minimum Net Sales or Actual Net Sales in the Initial Term |
| | | | | | 5% | Net Sales during the First Renewal Term and Second Renewal Term |
| | | | | | 8% | Net Sales during the Initial Term |
| 8. | Elsa Peretti | Tiffany & Co. | 5944 | 12/27/2012 | 2% | Net Peretti Sales for Quality Control Services |
| | | | | | 2.6% | Net Peretti Sales for Minimum Promotional Expenses |
| | | | | | 5% | Net Peretti Sales |



# Critique of Ocean Tomo's Selected Royalty Rate

## Rejection of Ocean Tomo's Implied Industry Transaction Royalty Rates

- Ocean Tomo also gathered implied royalty rates from the trademark database Markables.[1] Ocean Tomo utilized similar screening criteria as we did in the MSG Expert Report, except for the following:

  - Ocean Tomo included an extra Product Classification Code for "Watches"

  - Ocean Tomo restricted its results to brands/businesses with more than $100 million in Revenue

  - Ocean Tomo did not exclude foreign countries

- After reviewing websites and public filings of the identified trademarks in finer detail, Ocean Tomo relied on the 19 trademarks ("Ocean Tomo Trademark Comparables") presented in Exhibit 2.4 of the Ocean Tomo Report.[2]

- Upon review of Ocean Tomo's analysis, we reject the usage of the royalty rates from the Ocean Tomo Trademark Comparables due to the following:

  - Ocean Tomo did not exclude foreign trademarks, which are not appropriate in determining a domestic royalty rate.

  - Ocean Tomo excluded certain trademarks from the Ocean Tomo Trademark Comparables that we deemed to be comparable in the MSG Expert Report.

- Despite rejecting Ocean Tomo's analysis, we show in the following pages that had it utilized the Marakables data in a similar manner to how we did in the MSG Expert Report, it should have determined a more appropriate royalty rate for valuing the J. Crew IP.

**MSG**

(1) Ocean Tomo Report, pp. 29 – 30.
(2) Ocean Tomo Report, Exhibit 2.4.

46

# Critique of Ocean Tomo's Selected Royalty Rate

## Ocean Tomo's Markables Screening Criteria

- The Ocean Tomo Report conducted a screen of the trademark database Markables using the following criteria:[1]

  - Product Classification Codes:

    - 2821 – Collections; 2822 – Specific products; 2823 – Specific lifestyle Groups, 2824 – Innerwear and intimatewear; 2825 – Functional wear and sportswear; 2826 – Leatherwear; 2827 – Legwear and hosiery; and 2828 – Accessories (except fashion accessories made of Leather)

    - 2920 – Luggage, handbags, and the like; saddlery and harness; other articles of leather; 2930 – Footwear, with outer soles and uppers of rubber or plastics, or with uppers of leather or textile materials, other than sports footwear, footwear incorporating a protective metal toe-cap and miscellaneous special footwear; and 2940 – Sports footwear, except skating boots

    - 4841 – Watches

  - Occurred on or after January 1, 2010

  - Had target company annual revenues in excess of $100 million as of the acquisition date

- According to our recreation of Ocean Tomo's analysis, the above screening criteria should have produced approximately 97 results for comparable trademarks.[2] Upon reviewing the identified trademarks, Ocean Tomo eliminated trademarks that it did not believe were comparable to the J. Crew IP, and as a result, was left with only 19 results. These 19 trademarks are summarized in the following page.

(1) Ocean Tomo Report, p. 30.
(2) This includes 30 transactions that had unknown target company annual revenues.

# Critique of Ocean Tomo's Selected Royalty Rate

## Ocean Tomo's Markables Screening Results

- The table below summarizes the royalty rate, profit split and implied profitability of the trademarks included in Ocean Tomo's Markable screen.

| ($ millions) # Brand Name/Business (1) | Business Activities | Year | Royalty Rate | Profit Split | Implied Profitability (2) |
|---|---|---|---|---|---|
| 1. American Apparel® | apparel, sportswear, imprintable shirts | 2017 | 4.8% | 52.2% | 9.1% |
| 2. ANN INC. | fashion vertical; specialty retailer of womens apparel, footwear and accessories | 2015 | 3.6% | 44.3% | 8.1% |
| 3. Bonita International GmbH & Co. KG | apparel; fashion vertical offering mens and womenswear for people over 40 | 2012 | 5.0% | 75.6% | 6.6% |
| 4. Boyner Büyük Mağazacılık A.Ş. | retail; fashion; vertically integrated fashion supplier | 2013 | 2.5% | 28.1% | 9.0% |
| 5. Dudalina S.A. | apparel; shirts and blouses | 2014 | 2.8% | 6.4% | 44.2% |
| 6. Hallhuber GmbH | retail; ladies fashion; vertically integrated fashion supplier | 2015 | 3.0% | 38.6% | 7.7% |
| 7. Hi-Tec International Holdings BV | footwear; sports and outdoor footwear; brand licensor | 2016 | 3.6% | 63.1% | 5.7% |
| 8. IVN – Serviços Partilhados, SA (Salsa) | apparel; jeanswear brand | 2016 | 4.0% | 41.5% | 9.6% |
| 9. J Brand Holdings, LLC | apparel; contemporary denim fashion | 2012 | 9.6% | 28.3% | 33.9% |
| 10. Janie and Jack | premium children's fashion; retail store chain; vertical supplier of kidswear | 2019 | 2.0% | 42.0% | 4.7% |
| 11. Jessica Simpson | lifestyle apparel, footwear, accessories, fragrance, home textiles; celebrity brand licensing business | 2015 | 4.6% | 97.9% | 4.7% |
| 12. Keen Reach Limited | apparel; vertical designer, manufacturer and retailer of ladies fashion | 2019 | 3.2% | 29.7% | 10.8% |
| 13. Lee Cooper® | fashion; jeanswear; denim; licensing | 2013 | 2.6% | 95.2% | 2.8% |
| 14. Poppy Holdco Limited (dba Phase Eight) | fashion; single branded vertical fashion retailer of evening and bridal wear | 2015 | 5.7% | 36.3% | 15.8% |
| 15. Rafaella Apparel Group, Inc. | fashion; apparel; women's sportswear | 2011 | 3.8% | 53.6% | 7.1% |
| 16. Skagen Designs, Ltd. | fashion watches; fashion jewelry | 2018 | 3.0% | N/A | N/A |
| 17. Tommy Hilfiger B.V. | fashion; apparel; sportswear; licensing | 2010 | 7.1% | 52.8% | 13.4% |
| 18. Vionic Group LLC | footwear; stylish, supportive, biomechanic footwear | 2018 | 7.3% | 31.6% | 23.2% |
| 19. Witchery Australia Holdings Proprietary Limited | fashion; vertical fashion brand for women, men and kids | 2012 | 1.9% | 33.0% | 5.6% |

| | | | | | |
|---|---|---|---|---|---|
| Minimum | | | 1.9% | 6.4% | 2.8% |
| Lower Quartile | | | 2.9% | 31.9% | 6.0% |
| Median | | | 3.6% | 41.7% | 8.5% |
| Average | | | 4.2% | 47.2% | 12.3% |
| Upper Quartile | | | 4.9% | 53.4% | 12.8% |
| Maximum | | | 9.6% | 97.9% | 44.2% |



(1)  Brands/businesses underlying the trademarks identified in the Markables screen.
(2)  To analyze the profitability of the brands/businesses underlying the trademarks identified, we divided the Royalty Rate by the Profit Split to calculate an implied profitability.

# Critique of Ocean Tomo's Selected Royalty Rate

## Ocean Tomo's Markables Screen is Not Comparable to the J. Crew IP

- Similar to our analysis in the MSG Expert Report, we compared the projected profitability of J. Crew to the implied profitability of the brands/businesses underlying the Ocean Tomo Trademark Comparables. As shown in the chart below, J. Crew's adjusted EBIT margin from FY2021 to FY2024 is projected to be below the median implied profitability of 8.5% of the Ocean Tomo Comparables, as shown on the previous page.[1]

**J. Crew's Projected EBIT Margin vs. Median Implied Profitability of the Ocean Tomo Trademark Comparables**

Margins (%)

| Year | Adjusted EBIT Margin | Median Ocean Tomo Implied Profitability |
|------|----------------------|------------------------------------------|
| 2021 | 3.5% | 8.5% |
| 2022 | 3.7% | 8.5% |
| 2023 | 3.1% | 8.5% |
| 2024 | 3.1% | 8.5% |

Legend: ■ Adjusted EBIT Margin   – – – Median Ocean Tomo Implied Profitability



49

(1)  Disclosure Statement dated June 24, 2020, Exhibit B, p. 8 (Docket #541).

# Critique of Ocean Tomo's Selected Royalty Rate

## Ocean Tomo's Markables Screen is Not Comparable to the J. Crew IP

- Furthermore, as shown in the chart below, J. Crew's adjusted EBITDA margin from FY2021 to FY2024 is projected to be below the median implied profitability of 8.5% of the Ocean Tomo Comparables.[1]

### J. Crew's Projected EBITDA Margin vs. Median Implied Profitability of the Ocean Tomo Trademark Comparables

Margins (%)

| Year | Adjusted EBITDA Margin | Median Ocean Tomo Implied Profitability |
|------|------------------------|------------------------------------------|
| 2021 | 6.4% | 8.5% |
| 2022 | 6.6% | 8.5% |
| 2023 | 5.9% | 8.5% |
| 2024 | 5.9% | 8.5% |

■ Adjusted EBITDA Margin   - - - Median Ocean Tomo Implied Profitability



(1) Disclosure Statement dated June 24, 2020, Exhibit B, p. 8 (Docket #541).

# Critique of Ocean Tomo's Selected Royalty Rate

## Ocean Tomo's Markables Screen is Not Comparable to the J. Crew IP

- As shown in the chart below, J. Crew's UFCF margin from FY2021 to FY2024 is projected to be below the median implied profitability of 8.5% of the Ocean Tomo Comparables.[1]

**J. Crew's Projected UFCF Margin vs. Median Implied Profitability of the Ocean Tomo Trademark Comparables**

| Year | UFCF Margin |
|------|-------------|
| 2021 | 6.8% |
| 2022 | 0.2% |
| 2023 | 3.8% |
| 2024 | 3.6% |

Median Ocean Tomo Implied Profitability: 8.5%

Legend: ■ UFCF Margin   - - - Median Ocean Tomo Implied Profitability



(1)  Disclosure Statement dated June 24, 2020, Exhibit B, p. 8 (Docket #541).

# Critique of Ocean Tomo's Selected Royalty Rate

## Ocean Tomo's Markables Screen is Not Comparable to the J. Crew IP

- Additionally, all of J. Crew's projected adjusted EBIT margins are projected to be below the lower quartile implied profitability of 6.0% for the Ocean Tomo Trademark Comparables between FY2021 and FY2024.

- In summary, J. Crew is projected to be significantly less profitable than all but one of the 19 Ocean Tomo Trademark Comparables (see page 47 of this Report) were at the time their royalty rates were negotiated. Therefore, it is our opinion that the royalty rates of the 19 trademarks identified by Ocean Tomo in its Markables screen are not comparable to the J. Crew IP and should not be used to determine a royalty rate for the J. Crew IP.  Moreover, J. Crew's projected profitability is below the median and the lower quartile implied profitability of the 19 Ocean Tomo Trademark Comparables and as a result would demand a significantly lower royalty rate.

**MSG**

52

(1)   Disclosure Statement dated June 24, 2020, Exhibit B, p. 8 (Docket #541).

# Critique of Ocean Tomo's Selected Royalty Rate

## Ocean Tomo Acknowledged the Relationship between Profitability and Royalty Rates

- The disparity in profitability between J. Crew and the brands/businesses underlying the Ocean Tomo Trademark Comparables is a strong indication that the market royalty rates identified by Ocean Tomo are not appropriate to value the J. Crew IP. In its report, Ocean Tomo acknowledged the importance of examining expected profitability when attempting to determine what the appropriate royalty rate for an asset should be. For example, as stated by Ocean Tomo:

  - "**Royalty rates are also often based on the amount of profits**, cost savings or other income associated with the asset being valued."[1]

  - "**A licensee's expected profitability is a key consideration when entering into a license agreement and agreeing to a reasonable royalty rate**."[2]

- Moreover, financial literature also discusses the relationship between profitability and royalty rates. Consider the following:

  - "**Profitability is another factor that directly affects the amount of royalty that a licensor would be willing to pay**. **Access to a high-profit environment is more valuable than access to a business environment offering only marginal profits**. The methodology presented allocates the total amount of debt-free net income from the enterprise that uses the property. **If higher levels of profit are expected, more would be attributed to the intellectual property and a higher royalty would result**, all else being equal."[3]

- Ocean Tomo's use of trademarks with a higher profitability than J. Crew to determine a royalty rate for J. Crew, a business that is expected to have low profitability, is inconsistent with Ocean Tomo's own statements discussing the relationship between profitability and royalty rates and financial literature discussing the topic.

**MSG**

(1)  Ocean Tomo Report, p. 25. (emphasis added)
(2)  Ocean Tomo Report, p. 31. (emphasis added)
(3)  Smith, Gordon V., and Russell L Parr, Valuation of Intellectual Property and Intangible Assets. 3rd Edition. 2000. John Wiley & Sons Inc. p. 362. (emphasis added)

53

## b) Ocean Tomo's Implied Profit Split is Unreasonable



# Critique of Ocean Tomo's Selected Royalty Rate

## Ocean Tomo's Implied Profit Split for the J. Crew IP is Unreasonable

- Ocean Tomo's selected royalty rate of 3.0% for the J. Crew IP implies a profit split that is unreasonable and does not make economic sense. As shown in the table below, from FY2021 to FY2024, Ocean Tomo's calculated royalty divided by J. Crew's Adjusted EBIT implies a profit split of 82.1% in FY2021 increasing to 93.4% in FY2024, with a median profit split of 87.7% over the period. In other words, if J. Crew were to license the J. Crew IP from a third-party, it would have to pay out 87.7% of the profits it generated to the licensor.

| ($ millions) | For the Fiscal Year | | | | FY2021 - FY2024 | |
|---|---|---|---|---|---|---|
| | **2021** | **2022** | **2023** | **2024** | **Average** | **Median** |
| Adjusted EBIT | $   52 | $   57 | $   46 | $   46 | | |
| Ocean Tomo's J. Crew Royalty | $   43 | $   43 | $   43 | $   43 | | |
| Implied Profit Split | 82.1% | 76.5% | 93.3% | 93.4% | 86.3% | 87.7% |

- As previously stated in the MSG Expert Report, economically, it is unreasonable for a hypothetical licensee to pay a hypothetical licensor a royalty rate in excess or virtually all of the profits the asset is expected to generate. The J. Crew IP's high implied profit splits further supports that Ocean Tomo's selected royalty rate of 3.0% is unreasonable.

**Economic Rationale**

Royalty Rate < EBIT Margin



55

# Critique of Ocean Tomo's Selected Royalty Rate

## Ocean Tomo's Implied Profit Split for the J. Crew IP is Unreasonable

- In addition to valuing the J. Crew IP, the Ocean Tomo Report also determined a value for the Madewell trademarks. Specifically, Ocean Tomo concluded a royalty rate of 5.0% was appropriate to value the Madewell trademarks. This 5.0% royalty rate implies a median profit split of 35.1% from FY2021 to FY2024 for the Madewell trademarks. As shown in the chart below, the implied profit split from Ocean Tomo's valuation of the Madewell trademarks is significantly below the implied profit split from its valuation of the J. Crew IP.



This vast discrepancy between Ocean Tomo's implied profit split for the J. Crew IP and the Madewell trademarks is a further indication that Ocean Tomo's selected royalty rate of 3.0% for the J. Crew IP is flawed, unreasonable and should not be relied upon.



56

# Critique of Ocean Tomo's Selected Royalty Rate

## Ocean Tomo's Implied Profit Split for the J. Crew IP is Unreasonable

- Additionally, Ocean Tomo's implied profit split for the J. Crew IP is significantly higher than the median and lower quartile implied profit split of the Ocean Tomo Trademark Comparables. The median implied profit split of the Ocean Tomo Trademark Comparables was 41.7% and the lower quartile implied profit split was 31.9%. Comparatively, Ocean Tomo's median implied profit split from FY2021 to FY2024 was 87.7%.



Ocean Tomo's implied profit split for the J. Crew IP is significantly greater than its implied profit split for the Madewell trademarks, as well as the median and lower quartile implied profit split of the Ocean Tomo Trademark Comparables.



57

## c) Ocean Tomo Assumed the Same Royalty Rate in its 2016 Report



# Critique of Ocean Tomo's Selected Royalty Rate

## Ocean Tomo's 2020 Valuation vs. 2016 Valuation

- In 2016, Ocean Tomo performed a valuation analysis of the J. Crew IP. Several of the key assumptions in the Ocean Tomo Report are identical to the assumptions it made in its 2016 Ocean Tomo Report. Specifically, as summarized below, Ocean Tomo's PGR, WACC, and royalty rate assumptions are all exactly the same in the Ocean Tomo Report as they were in the 2016 Ocean Tomo Report:[1, 2]

| Ocean Tomo's Assumption | 2016 | 2020 | Change? |
|---|---|---|---|
| Perpetuity Growth Rate | 2.0% | 2.0% | SAME |
| Weighted Average Cost of Capital | 13.0% | 13.0% | SAME |
| Royalty Rate | 3.0% | 3.0% | SAME |

- Ocean Tomo assumed the same royalty rate in its valuation of the J. Crew in 2020 as it did back in 2016.  Ocean Tomo's selection of the same royalty rate is inconsistent with J. Crew's deteriorating financial performance and lower projected revenue and profitability.  As summarized in the table below, J. Crew's financial performance in FY2020 was worse than its performance in FY2016 according to key metrics.

| J. Crew Operating Performance | 2020 vs. 2016? |
|---|---|
| Historical Revenue | DECLINED |
| New Domestic Revenue Projections | LOWER |
| Historical Adjusted EBITDA Margin | DECLINED |
| New Adjusted EBIT Margin Projections | LOWER |

- The following pages illustrate J. Crew's historical and projected performance for these four metrics. Ocean Tomo's assumption of a 3.0% royalty rate in its 2020 valuation, the same as in its 2016 valuation, is clearly wrong when considering the declining profitability and performance of J. Crew over that time period.

(1)  2016 Ocean Tomo Report, pp. 29 – 30. (CREW_UCC00006041 at -6069-6070)
(2)  Ocean Tomo Report, pp. 31 – 33.

MSG

59

# Critique of Ocean Tomo's Selected Royalty Rate

## J. Crew's Declining Revenue Supports a Royalty Rate Significantly Below 3.0%

- J. Crew's revenue decreased from $2,017 million in FY2016 to $1,734 million in FY2019, for a CAGR of negative 4.9%.[1]



**J. Crew's 14% decrease in revenue from FY2016 to FY2019 supports a royalty rate below the 3.0%, assumed by Ocean Tomo.**

(1)  FY2016-2019 revenue data sourced from Excel file "2016-2019 Historical Financials by Entity" (as provided by the Debtors).

# Critique of Ocean Tomo's Failure to Recognize J. Crew's Declining Position

## New Domestic Revenue Projections

- According to the 2016 Ocean Tomo Report, in 2016, J. Crew's projected revenue was expected to increase from $1,902 million in FY2016 to $2,014 million in FY2020.[1]  As of 2020, the Ocean Tomo Report was projecting J. Crew's domestic revenues to be flat and even decrease from $1,437 million in FY2021 to $1,429 in FY2024.[2]



**Despite a decrease of more than $500 million in projected revenue from 2016 to 2020, Ocean Tomo assumed the same royalty rate in both its 2016 Report and 2020 Report.**

(1)  2016 Ocean Tomo Report, Exhibit 2.1. (CREW_UCC00006041 at- 6081)
(2)  Ocean Tomo Report, Exhibit 1.3.

# Critique of Ocean Tomo's Failure to Recognize J. Crew's Declining Position

## Historical Adjusted EBITDA Margin

- As shown in the chart below, J. Crew's EBITDA margin decreased from 7.6% in FY2016 to 6.1% in FY2019.[1]

**J. Crew Historical Adjusted EBITDA Margin**

| FY | Adjusted EBITDA Margin (%) |
|----|---------------------------|
| FY'13 | 16.6% |
| FY'14 | 10.8% |
| FY'15 | 7.8% |
| FY'16 | 7.6% |
| FY'17 | 6.1% |
| FY'18 | (1.2%) |
| FY'19 | 6.1% |

**Despite J. Crew's declining profitability from FY2016 to FY2020, Ocean Tomo assumed the same royalty rate in its 2016 Report and its 2020 Report.**

(1)  J. Crew FY2010-2015 and FY2016-2019 revenue data obtained from "2010-2015 Detailed Historical Financials and 2016-2020 Projections" (CREW_UCC00024398 @ 24403); and Excel file "2016-2019 Historical Financials by Entity" (as provided by the Debtors). J. Crew FY2010-2015 adjusted EBITDA calculated from data sourced from "2010-2015 Detailed Historical Financials and 2016-2020 Projections" (CREW_UCC00048455), tabs "Stand Alone Summary," "J.Crew Brand," and "Factory Brand," "Madewell Brand;" J. Crew FY2016 adjusted EBITDA calculated based on expected percentage-wise allocation of corporate overhead sourced from "2010-2015 Detailed Historical Financials and 2016-2020 Projections" (CREW_UCC00048455), tabs "Madewell Brand," "Stand Alone Summary," "J.Crew Brand," and "Factory Brand;" Channel EBITDA obtained from Excel file "2016-2019 Historical Financials by Entity" (as provided by the Debtors), and actual adjusted EBITDA sourced from J. Crew, "Materials for Restricted Ad Hoc PIK Noteholders" dated March 13, 2017 (CREW_UCC00333788 @ 333802);    J. Crew FY2017-2019 adjusted EBITDA sourced from Excel file "2017-2019 Actual Adjusted EBITDA by Entity" (as provided by the Debtors).



62

# Critique of Ocean Tomo's Failure to Recognize J. Crew's Declining Position

## New Adjusted EBIT Margin Projections

- ███████████████████████████████████████████████████████████████ On the other hand, according to the Disclosure Statement Projections, J. Crew's performance is expected to deteriorate such that its projected Adjusted EBIT Margins are expected to further decrease from 3.5% in FY2021 to 3.1% in FY2024.[2]



**Despite J. Crew projecting its EBIT margin to be drastically lower in 2020 than it was in 2016, Ocean Tomo elected to use to same royalty rate in both valuations.**

**Logical Conclusion:**
**2020 Royalty Rate should be significantly less than 2016 Royalty Rate**



(1)  Duff & Phelps, "J. Crew Group Inc. ASC 350 Analysis as of October 15, 2016," March 21, 2017, Exhibit 8.0. (CREW_UCC00064418 at- 64475)
(2)  Disclosure Statement dated June 24, 2020, Exhibit D, p. 3 (Docket #541).

63

# Critique of Ocean Tomo's Selected Royalty Rate

## Impact of Selecting a More Reasonable Royalty Rate on Ocean Tomo's Valuation

- Ocean Tomo assumed a 3.0% royalty rate in its valuation of the J. Crew IP.[1] This assumed royalty rate is not supported by the expected profitability of the company according to the Disclosure Statement Projections.

- As we demostrated in the MSG Expert Report, using a midpoint of the median and lower quartile profit splits identified from our Markables screen of comparable trademarks, results in a more appropriate royalty rate for valuing the J. Crew IP.[2] Applying the profit splits implied by the Ocean Tomo Trademark Comparables to J. Crew's adjusted EBIT margins results in a similar royalty of 1.2%:[3]

| | For the Fiscal Year | | | | FY2021 - FY2024 | |
|---|---|---|---|---|---|---|
| | 2021 | 2022 | 2023 | 2024 | Average | Median |
| Adjusted EBIT Margin | 3.5% | 3.7% | 3.1% | 3.1% | | |
| Implied Pre-Tax Royalty Rates: | | | | | | |
| 31.9% Profit Split (1) | 1.1% | 1.2% | 1.0% | 1.0% | 1.1% | 1.0% |
| 36.8% Profit Split (2) | 1.3% | 1.4% | 1.1% | 1.1% | **1.2%** | **1.2%** |
| 41.7% Profit Split (3) | 1.5% | 1.6% | 1.3% | 1.3% | 1.4% | 1.4% |

- The table below summarizes the impact of only correcting for the royalty rate assumption:

| ($ millions) | J. Crew IP | |
|---|---|---|
| | Ocean Tomo | Corrected |
| Royalty Rate | 3.0% | 1.2% |
| | | |
| **Relief from Royalty  Valuation** | **$324** | **$130** |



(1)  Ocean Tomo Report, dated July 31, 2020, pp. 32.
(2)  MSG Expert Report, p. 76.
(3)  Disclosure Statement dated June 24, 2020, Exhibit B, p. 8 (Docket #541).

## d) Ocean Tomo's PGR is Unreasonable



# Ocean Tomo's Assumptions are Flawed and Incorrect

## Ocean Tomo's Concluded Royalty Rate is Incorrect

- Ocean Tomo assumed a 2.0% PGR in its valuation of the J. Crew IP.[1] This assumed PGR is in direct contradiction of the 0.0% used by Lazard and is not supported by any elements of the Disclosure Statement Projections, which provide for flat growth.[2]

- The table below summarizes the impact of only correcting for the PGR assumption:

| ($ millions) | J. Crew IP | |
|---|---|---|
| | Ocean Tomo | Corrected |
| Perpetuity Growth Rate | 2.0% | 0.0% |
| Relief from Royalty  Valuation | $324 | $289 |

MSG
(1)  Ocean Tomo Report, pp. 33.
(2)  Lazard Report, p. 20.

66

# IV. Limiting Factors and Other Assumptions



# Limiting Factors and Other Assumptions

This Report is furnished solely for the benefit of the Court, counsel and the parties in this matter. This Report may not be relied upon by any other person or entity without Back Bay Management Corp.'s and its division, The Michel-Shaked Group's ("BBM/MSG") expressed, prior written consent. Any disclosure of this Report, whether or not consented to, shall not create any obligation or liability on Israel Shaked, BBM/MSG, or any of its employees. This Report is delivered subject to the conditions, scope of engagement, limitations and understandings set forth in this Report.

In accordance with recognized professional ethics, our professional fees for this service are not contingent upon the opinion expressed herein, and we do not have a present or intended financial interest in the outcome of this matter.

Public information, statistical information and data are from sources we deem to be reliable. However, we make no representation as to the accuracy or completeness of all such public information, statistical information and data, and have at times accepted the information and data without further investigation.

Neither all nor any part of the contents of this Report should be conveyed to the public through advertising, public relations, news, sales, mail, direct transmittal, or other media, without BBM/MSG's prior written consent and approval.

As discovery is ongoing as of the date of this Report, we reserve the right to supplement or amend this Report.

Respectfully submitted,

_____    _____

Professor Israel Shaked    Brad Orelowitz, CPA
Managing Director    Senior Vice President
The Michel-Shaked Group    The Michel-Shaked Group



# V. Appendix



## a) Historical Peer Groups Identified for J. Crew and Madewell



# Historical Peer Groups Identified for J. Crew

| Company Name | MSG Report | Lazard Report | # of Times Identified in Other Reports | 7/13/2016 (1) Goldman Sachs | 11/1/2016 (2) Lazard Email | 11/9/2016 (3) Lazard | 12/2/2016 (4) Alvarez & Marsal | 2/1/2020 (5) BAML | 2/13/2020 (6) Duff & Phelps | 3/13/2020 (7) 2019 10-K Draft |
|---|---|---|---|---|---|---|---|---|---|---|
| Abercrombie & Fitch Co. | X | X | 7 | | | | | | | X |
| American Eagle Outfitters, Inc. | X | X | 6 | | | | | | | X |
| Ascena Retail Group, Inc. | | | 5 | | | | | | | X |
| Burlington Stores, Inc. | | | 1 | | | | | | | |
| Chico's FAS, Inc. | | X | 6 | | | | | | | X |
| Children's Place, Inc. | | X | - | | | | | | | |
| Express, Inc. | | | 4 | | | | | | | |
| Gap, Inc. | X | X | 7 | | | | | | | X |
| Guess?, Inc. | X | | 6 | | | | | | | X |
| H&M | | | 2 | | | | | | | |
| Inditex | | | 1 | | | | | | | |
| L Brands, Inc. | X | | 4 | | | | | | | X |
| Michael Kors Ltd. / Capri | | | 1 | | | | | | | X |
| Nordstrom, Inc. | X | | 2 | | | | | | | X |
| Oxford Industries, Inc. | | X | 1 | | | | | | | |
| PVH Co. | X | | 1 | | | | | | | |
| Ralph Lauren Co. | X | | 5 | | | | | | | X |
| Ross Stores, Inc. | | | 1 | | | | | | | |
| Stein Mart, Inc. | | | 1 | | | | | | | |
| Tapestry / Kate Spade / Coach Stores | | | 2 | | | | | | | X |
| TJX Companies Inc. | | | 1 | | | | | | | |
| Under Armour, Inc. | | | 1 | | | | | | | X |
| Urban Outfitters, Inc. | X | X | 7 | | | | | | | X |

(1) Goldman Sachs, "J. Crew: Discussion Materials" July 13, 2016, p. 20 (CREW_UCC00052758 @ 52778).

(2) Email Lazard & Jeremy Brooks (J. Crew CAO) October 24, 2016 - November 1, 2016 (CREW_UCC00064743 @ 064744).

(3) Lazard, "Comparable Company Analysis" November 9, 2016 (CREW_UCC00130598). Although this document was provided to us with other Lazard documents, metadata indicates that the source may be Ocean Tomo.

(4) Alvarez & Marsal Valuation Services, LLC, "Solvency Analysis" December 2, 2016, p. 24 (CREW_UCC00005890 @ 5913).

(5) BAML, "Monet: WholeCo IPO" February 2020, p. 7 (CREW_UCC00499022 @ 499030).

(6) Duff & Phelps, "J. Crew: Compensation Committee" February 13, 2020, p. 25 (CREW_UCC00547166 @ 547190). Duff & Phelps, "J. Crew Group, Inc. 409a Analysis as of January 31, 2020" February 10, 2020, Exhibit 26.0 (CREW_UCC00533941 @ 533972). Duff & Phelps, Preliminary Draft "ASC 350 Analysis" November 3, 2019, Exhibit 5.0. Duff & Phelps, "J. Crew Group, Inc.: ASC 350 Analysis as of October 29, 2018" March 19, 2019, Exhibit 5.0 (CREW_UCC00513079 @ 513132). J. Crew Group, Inc., Estimation of the Fair Value of the J. Crew Trade Name as of April 29, 2017, Duff & Phelps, May 22, 2017, Exhibit 5.0 (CREW_UCC00070119 @ 070162). Duff & Phelps, "J. Crew Group, Inc.: ASC 350 Analysis as of October 15, 2016" March 21, 2017, Exhibit 4.0 (CREW_UCC00064418 @ 064471). Duff & Phelps, "J. Crew Group, Inc.: Estimation of the Fair Value of the J. Crew Trade Name as of July 2, 2016" September 20, 2016, Exhibits 5.0 (CREW_UCC00034636 @ 034678). Duff & Phelps, "J. Crew Group, Inc.: Business Enterprise Value Analysis" July 2, 2016, Exhibit 4.0 (CREW_UCC00006028 @ 6033). Duff & Phelps, "J. Crew Group, Inc.: ASC 350 Analysis as of October 15, 2015" December 14, 2015, Exhibit 12.0 (CREW_UCC00005955 @ 006022).

(7) J. Crew, Draft of 2019 10-K Form, March 13, 2020, p. 52.



71

# Historical Peer Groups Identified for Madewell

| Company Name | MSG Report | Lazard Report | # of Times Identified in Other Reports |
|---|---|---|---|
| Aritzia, Inc. | X | | 13 |
| boohoo group Plc | X | | 12 |
| Canada Goose Holdings, Inc. | X | X | 12 |
| Carter's | | X | - |
| Duluth Holdings, Inc. | | | 7 |
| FAST RETAILING CO., LTD. | | X | 9 |
| Francesca's Holdings Co. | | | 1 |
| H&M | | X | - |
| Industria de Diseno Textil, S.A. | | X | 9 |
| Kate Spade & Co. | | | 2 |
| Levi Strauss & Co. | X | X | 7 |
| Lululemon Athletica Inc. | X | X | 14 |
| Michael Kors Ltd. / Capri | | | 1 |
| NIKE, Inc. | | | 8 |
| Restoration Hardware Inc. | | | 1 |
| Revolve | X | | 6 |
| Stitch Fix | | | 2 |
| Ulta Beauty Inc. | X | | 9 |
| Under Armour, Inc. | | | 2 |
| Urban Outfitters, Inc. | | | 7 |
| V.F. Co. | | X | 11 |
| Vince Holding Co. | | | 1 |
| Zalando SE | X | | 8 |

(Date columns: 7/13/2016 (1) Goldman Sachs, 12/2/2016 (2) Alvarez & Marsal, 4/9/2019 (3) BAML, 5/14/2019 (4) Lazard, 7/15/2019 (5) Lazard, Aug. 2019 (6), Sep. 2019 (7), Oct. 2019 (8) TPG, 10/7/2019 (9) J.P. Morgan, 10/17/2019 (10), 10/28/2019 (11) J.P. Morgan, 12/6/2019 (12) BAML, 1/23/2020 (13) BAML, Feb. 2020 (14) BAML)

(1)  Goldman Sachs, "J. Crew" July 13, 2016, p. 20 (CREW_UCC00052758 @ 52778).

(2)  Alvarez & Marsal, "Solvency Analysis" December 2, 2016, p. 20 (CREW_UCC00005890 @ 5909).

(3)  J. Crew, "Project Liberty - Final Readout" April 9, 2019, p. 75 (CREW_UCC00156228 @ 156245). Peers provided by BAML on April 4, 2019.

(4)  Lazard, "Special Committee of Chinos Intermediate Holdings A, Inc." May 14, 2019 (CREW_UCC00154167 @ 154212). Attachment to Lazard document that appears to be a Company presentation with its advisors: Lazard, BAML, and Weil, Gotshal & Manges LLP ("Weil").

(5)  Lazard, "Situation overview: Meeting of the Board of J. Crew Group, Inc." July 15, 2019 (CREW_UCC00156258 @ 156275). Valuation deck, attached to Lazard presentation, put together by BAML, Goldman Sachs, JP Morgan and Morgan Stanley. Note on page CREW_UCC00156275 lists the following Madewell peers: Lululemon, Canada Goose, Ulta Beauty, Duluth Trading, Aritzia, Inditex, Urban Outfitters, Fast Retailing, Nike, VF Corp, Boohoo, and Zalando.

(6)  Madewell, "Project Monet, Valuation Materials" August 2019, pp. 1 & 10 (CREW_UCC00523956 @523957 & 523966). Valuation deck put together by BAML, JP Morgan and Morgan Stanley. Lululemon and Canada Goose identified as "Core Comps."

(7)  BAML, JP Morgan, and Morgan Stanley, "Monet, Timing Options and PDIE Overview" September 2019, p. 1 (CREW_UCC00531625 @ 531627). Note on p. 1 lists the following Madewell peers: Lululemon, Canada Goose, Ulta Beauty, Duluth Trading, Aritzia, Inditex, Urban Outfitters, Fast Retailing, Nike, VF Corp, Boohoo, and Zalando.

(8)  TPG, "Project Monet: Investment Opportunity Overview" October 2019, p. 20 (CREW_UCC00535577 @ 535596).

(9)  "Board of Directors Call: J. Crew Group, Inc." as of October 7, 2019, pp. 65 & 71 (CREW_UCC00154671 @ 154735 & 154741). Valuation deck put together by BAML, JP Morgan and Morgan Stanley. Note on p. 65 lists the following Madewell peers: Lululemon, Canada Goose, Ulta Beauty, Duluth Trading, Aritzia, Inditex, Urban Outfitters, Fast Retailing, Nike, VF Corp, Boohoo, and Zalando.

(10) Chinos, "Board Minutes" October 17, 2019, (CREW_UCC00560554 @ 560564). Valuation deck put together by BAML, JP Morgan and Morgan Stanley. Note on CREW_UCC00560564 lists the following Madewell peers: Lululemon, Canada Goose, Ulta Beauty, Duluth Trading, Aritzia, Inditex, Urban Outfitters, Fast Retailing, Nike, VF Corp, Boohoo, and Zalando. Note: Three Lazard representatives at the meeting.

(11) J. Crew, "Madewell Board Materials" October 28, 2019, pp. 8 & 16 (CREW_UCC00156345 @ 156355 & 156364). Valuation deck put together by BAML, JP Morgan and Morgan Stanley. Note on p. 8 lists the following Madewell peers: Lululemon, Canada Goose, Ulta Beauty, Duluth Trading, Aritzia, Inditex, Urban Outfitters, Fast Retailing, Nike, VF Corp, Boohoo, and Zalando.

(12) BAML, "Madewell Board Materials" December 6, 2019, p. 56 (CREW_UCC00156448 @ 156451).

(13) BofA Securities, "Madewell, Board Materials" January 23, 2020, p. 2 (CREW_UCC00525316 @ 525320). Note on p. 2 lists the following Madewell peers: Lululemon, Canada Goose, Ulta Beauty, Duluth Trading, Aritzia, Inditex, Urban Outfitters, Fast Retailing, Nike, VF Corp, Boohoo, and Zalando.

(14) BAML, "Monet: WholeCo IPO" February 2020, p. 7 (CREW_UCC00499022 @ 499030). BAML was an investment banker involved in the potential Madewell IPO.

MSG

## b) Documents Relied Upon



**Financial Advisor Reports:**

- BAML, JP Morgan, and Morgan Stanley, "Monet, Timing Options and PDIE Overview" September 2019 (CREW_UCC00531625)
- Duff & Phelps, "J. Crew Group, Inc. 409a Analysis as of January 31, 2020" February 10, 2020 (CREW_UCC00533941)
- Duff & Phelps, "J. Crew Group, Inc.: Business Enterprise Value Analysis" July 2, 2016 (CREW_UCC00006028)
- Duff & Phelps, "J. Crew: Compensation Committee" February 13, 2020 (CREW_UCC00547166)
- Duff & Phelps, Preliminary Draft "ASC 350 Analysis" November 3, 2019 (as provided by the Debtor)
- Madewell, "Project Monet, Valuation Materials" August 2019 (CREW_UCC00523956)
- Ocean Tomo, "Valuation of J. Crew Group, Inc.'s Intellectual Property Portfolio" November 29, 2016 (CREW_ UCC00006041)

**Company Internal Documents:**

- Lazard, "Situation overview: Meeting of the Board of J. Crew Group, Inc." July 15, 2019 (CREW_UCC00156258)
- Chinos, "Board Minutes" October 17, 2019, (CREW_UCC00560554)
- BAML, "Madewell Board Materials" December 6, 2019 (CREW_UCC00156448)
- BofA Securities, "Madewell, Board Materials" January 23, 2020 (CREW_UCC00525316)
- J. Crew, Draft of 2019 10-K Form, March 13, 2020 (as provided by the Debtors)
- "Board of Directors Call: J. Crew Group, Inc." as of October 7, 2019 (CREW_UCC00154671)

**Academic Books & Articles:**

- Business Valuation Resource, "Supply-side ERP more reliable, says Delaware Chancery" June 15, 2010.
- Laurence B. Siegel, "The Equity Risk Premium: A Contextual Literature Review" CFA Institute Research Foundation, 2017
- Pratt, P. Shannon and Robert J. Grabowski, "Developing the Cost of Equity Capital: Risk-Free Rate and ERP During Periods of 'Flight to Quality'" excerpt from <u>Cost of Capital: Applications and Examples</u>. 4th ed. John Wiley & Sons, 2010
- Pratt, Shannon P., Roger J. Grabowski, <u>Cost of Capital: Applications and Examples</u>. 5th Ed. John Wiley & Sons, Inc. 2014
- Smith, Gordon V., and Russell L Parr, <u>Valuation of Intellectual Property and Intangible Assets</u>. 3rd Edition. 2000. John Wiley & Sons Inc.
- ValueWalk, "Equity Risk Premium – The Most Important Number in Finance" May 1, 2016.

**Case Documents:**

- Expert Valuation Report of Lazard Frères & Co. LLC dated July 31, 2020
- Expert Valuation Report of The Michel-Shaked Group dated July 31, 2020
- Brand Valuation Report of Ocean Tomo, LLC dated July 31, 2020

**Other:**

- Email Lazard & Jeremy Brooks (J. Crew CAO) October 24, 2016 - November 1, 2016 (CREW_UCC00064743)

The documents and other information that we considered in preparing this Report are listed above. Any other items cited in the Report not listed are incorporated herein by reference.